UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERNEST D. SMITH,

      PLAINTIFF,

    v.

EDWARD F. REILLY, et al.,

      DEFENDANT.

_____/

Civil Action No. 07-cv-1934(RMC)

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON EX POST FACTO CLAIMS.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h) and 56.1, Plaintiff moves this Court to enter summary judgment on Plaintiff's claims that the Defendants violated, and continue to violate, the Ex Post Facto Clause of the United States.

In support of this motion, Plaintiff submitts the accompanying Memorandum in Support of the Motion of Plaintiff for Partial Summary Judgment on his Ex Post Facto Claims, Plaintiff's Statement of Marterial Facts Not in Dispute, as well as all exhibits attached to each of these documents. As Plaintiff's memorandum of law in support of this motion and statements of material facts not in dispute demonstrate, Defendants have violated the Ex Post Facto Clause by applying their own parole practices, instead of those of the former District Columbia Board of Parole, and thereby creating a significant risk of prolonging Plaintiff's incarceration. The undisputed facts also demonstrate that Defendants' actual application of their parole practices instead of those of the D.C. Parole Board has lengthened the term of imprisonment that the Plaintiff would otherwise

RECEIVED

MAY 9 - 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

have served and, therefore, violates the Ex Post Facto Clause.

For the reasons stated herein, along with those in Plaintiff's memorandum of law in support of this motion and statement of material facts not in dispute, Plaintiff requests that the Court grant his motion for partial summary judgment with respect to his claims under the Ex Post Facto Clause of the United States Constitution.

Dated: *May 5, 2008*

Respectfully submitted,

*Ernest Smith*

Ernest D. Smith, pro-se
#11565-007
U.S.P.Lewisburg
P.O.Box#1000
Lewisburg,PA 17837

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERNEST D. SMITH

      PLAINTIFF,

      v.

Civil Action No.07-cv-1934(RMC)

EDWARD F. REILLY, et al.,

      DEFENDANT.

_____/

MEMORANDUM IN SUPPORT OF THE MOTION
OF PLAINTIFF FOR PARTIAL SUMMARY
JUDGMENT ON EX POST FACTO CLAIMS.

Plaintiff, Ernest D. Smith, pro-se, respectfully submits this memorandum in support of his motion for summary judgment on his claims that Defendants violated Ex Post Facto Clause of the United States Constitution. In futher support. Plaintiff is submitting a statement of undisputed material facts[1]. The undisputed facts prove that Defendant, by applying their own parole practices, instead of those of the District of Columbia Board of Parole (the "D.C. Parole Board" or the "Board"), have created a significatnt risk of prolonging Plaintiff's incarceration and, in fact, have increased that incarceration.

_____

[1] Plaintiff's Statment of Undisputed Material Facts is referred and cited to herein as "Plaintiff's Statement."

## INTRODUCTION

Since August 5, 1998, the United States Parole Commission and the Defendants as is members (collectively, the "USPC") conduct hearings and decide requests for parole of all persons convicted of violating D.C. Code ("D.C. Code offenders"), including Plaintiff. At issue in this case are substantial changes the USPC made to the criteria the USPC uses to determine Plaintiff's suitability for parole. Although the USPC made these changes after Plaintiff committed his crimes, the USPC has applied the changes on a retroactive basis.

The facts pertinent to Plaintiff's motion are undisputed. Plaintiff is a inmate serving prison sentences for violating the District of Columbia Code. He has been incarcerated on his current sentence for sixteen years and has served the "minimum sentence" imposed by the sentencing court for his offense (i.e., the period of incarceration an inmate must serve before becoming eligible for parole). Plaintiff first became eligible for parole after August 5, 1998.

Prior to August 5, 1998, the D.C. Parole Board conducted the parole hearings of D.C. Code offenders located in District of Columbia facilities and the USPC conducted the parole hearings of D.C. Code offenders located in federal facilities. Both the Board and the USPC, however, applied the Board's parole practices and regulations when conducting such hearings. See 28 D.C. Mun.Regs. ("DCMR") §§100-531.12; Cosgrove v. Thornburgh, 703 F. Supp. 995, 1003-04 (D.D.C. 1998)(holding that the USPC was obligated to apply the D.C. Parole Board's guidelines and could not apply the federal parole guidelines to D.C. Code offenders in federal institutions).

Under the parole statues, regulations, policies, and practices of the D.C. Parole Board (the "D.C. parole practices"), parole candidates

were deemed to have satisfied accountability for their crimes, i.e., the need for punishment and general deterrence, once they served their minimum sentence. Thus, the only remaining issues under the D.C. parole practices were whether to presume that the parole candidate was suitable for parole, and if so, whether his case involved "unusual circumstances" that warranted a departure from that presumption.

Under the D.C. parole practices, Plaintiff would have been presumed suitable for parole at his initial parole hearing, which the USPC conducted. To overcome the presumption, the USPC would have needed to identify "unusual circumstances" that warranted ignoring the presumption. Instead, because the USPC used its own parole regulations, policies, practices, and criteria (the "USPC parole practices") to determine Plaintiff suitability for parole, the USPC presumed that Plaintiff was unsuitable for parole when he became eligible for parole. Based on this reversed presumption, the USPC increased, by more than 5 years, the period of incarceration under D.C. parole practices that Plaintiff needed to serve to establish presumptive suitability for parole.

Contrary to D.C. parole practices, the USPC used factors premised on the severity of the Plaintiff's current offense to overcome the presumption. The USPC's obvious goal, which is inconsistent with the Board's policy, was, and is, to increase the punishment imposed by the sentencin judge.

## FACTUAL BACKGROUND

Thousands of District of Columbia Code offenders are currently serving their prison sentences in federal correctional facilities throughout the country. Plaintiff is a D.C. Code offender who committed his crime and was sentenced by the Superior Court of the District of Columbia prior to August 5, 1998, when the D.C. parole Board was responsible for determining the criteria to apply to D.C. Code offenders.

3

By the time Plaintiff first became eligible for parole, Congress had abolished the D.C. Parole Board by enacting the National Capital revitalization and Self-Government Improvement Act (the "Revitalization Act"), Pub.L.No.105-33, §11231, 111 Stat. 712 (1997). In addition to abolishing the D.C. Parole Board, the Revitalization Act directed the USPC to conduct parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations of the District of Columbia." Id. §11231(c).

Since August 5, 1998, the USPC has decided D.C. Code offenders parole request. For D.C. Code offenders who received an initial parole hearing prior to August 5, 1998, the USPC applies the parole guidelines that the D.C. Parole Board had promulgated in 1985 and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Regulations"). For D.C. Code offenders like Plaintiff, who became eligible for parole after August 5, 1998, the USPC promulgated its own parole regulations, which found in Title 28 of the Code of Federal Regulations and were imple- mented in 2000 (the "2000 Guidelines").

Although the 2000 Guidelines sought to maintain the basic structure of the 1987 Regulations, they made significant changes to the D.C. Parole Board's regulations and the manner in which the Board implemented them. These changes have created a significant risk that plaintiff will serve longer period of incarceration under the 2000 Guidelines than under the 1987 Regulations.

### I. UNDER D.C. PAROLE PRACTICES OFFENSE ACCOUNTABILITY WAS THE PURVIEW OF THE SENTENCING COURT AND NOT A FACTOR RELEVANT TO THE GRANT OR DENIAL OF PAROLE.

When the D.C. Parole Board adopted the 1987 Regulations, the Board "sought to structure the exercise of [its] discretion" under the D.C. parole statues. Report on the Development of Paroling Policy Guidelines

4

for the District of Columbia Board of Parole at 1, Exhibit A to Defendants'
Response to Plaintiff's First Request for Production of Documents Propounded
to Defendants James Palmer, Walter Ridley, and James Freeman, Cosgrove
v. Thornburgh C.A. No. 80-0516(attached as Exhibit 6 to Plaintiff's Statement)
(the "D.C. Guideline Report"). As its guide for determining whether to
grant or deny parole, the Board used the criteria set forth in the 1987
guidelines. See id. at 2 ("[T]he use of guidelines should be seen as
an effort to make <u>explicit</u> those factors that will be considered in each
individual case").

The Board believed that the guidelines were "a significant step
toward a more coherent parole decision-making process that w[ould] lead
both to increased consistency in parole release decisions." Id. (emphasis
added). The D.C. Parole Board hoped that, the guidelines would "[p]romot[e]
consistent parole decision-making," "[m]ake more explicit the paroling
policies of the Board of Parole," "[i]ncorporat[e] a concern for fairness
by ensuring that the time served...[wa]s proportionate to the sentence
imposed by the court and the risk posed by the offender," and "[a]chiev[e]
the sentencing purposes of incapacitation and specific deterrence, while
promoting, to the fullest extent possible, the offender's efforts at
principles in drafting the 1987 Regulations. See id. at 2-4.

First, the Board believed that "the touchstone of the parole decision-
making process should be based on offender characteristics that have
a statistically determined bearing on the offender's risk of future involve-
ment in criminal behavior". Id. at 2. second, the Board did not include
among its goals in determining a parole candidate's suitability any consider-
ation of the adequacy of the candidate's sentence for purpose of retribution
or general deterrence. See id. at 2. ("The second principle behind the
guidelines is that the court addresses the purposes of retribution and
general deterrence through the sentence it imposed in adult cases.").

The Board left such considerations to the sentencing court. Thus, "[a]s a matter of policy, the [Board] d[id] not and w[ould] not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." Id. at 3-4.

Although it had adopted the federal Salient factor Score system, the D.C. Parole Board explicitly rejected patterning the 1987 Regulations "after the federal grid which includes an offense severity scale." Id. at 17. Instead, it sought to model its decisionmaking process on jurisdictions with a "guidelines structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant". Id.

The Board's third guiding principle in enacting the 1987 Regulations was that the D.C. parole practices should evidence "a rehabilitative focus". Fletcher,433 F.3d at 871; see D.C. Guidelines Report at 4. It, therefore, considered "[g]uidelines oriented to the assessment of risk and institutional perforamnce, therefore touching on the need for progress towards rehabilitation" as consistent with the Board's adoption of the 1987 Regulations. Id.; see Cosgrove,703 F.Supp. at 1003 (explaining that while the federal guidelines were "primarily concerned with punishment and the public safety," the D.C. guidelines "emphasize[d] early release of an offender who respond[ed] favorably to rehabilitative efforts").

## II.                    THE D.C. PAROLE BOARD'S 1987 REGULATIONS

The 1987 Regulations "employed an analytic framework that relied on both 'pre and post-incarceration factors." Fletcher,433 F.3d at 871 (quoting 28 DCMR §204.1). Under this framework, the D.C. Parole Board used four factors to determine suitability for parole: two preincarceration factors, (i) the degree of risk and (ii) the type of risk: and two post-incarceration factors, (iii) institutional adjustment and (iv) program

participation. See D.C. Guidelines Report at 5; Cosgrove,703 F.Supp. at 1003.

The D.C. Parole Board intentionally did not employ an offense severity factor in its guidelines. See Memorandum from M.Stover, General Counsel, and R.Chickinell, Deputy General Counsel, U.S. Parole Commission, to J.R. Clay,Jr., Acting Chairman, U.S. Parole Commission at 2 (Aug. 21, 1992) ("[T]he D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served.") (attached as Exhibit 8 to Plaintiff's Statement) [hereinafter "1992 Stover Memorandum" or "1992 Stover Mem"]. Instead, the Board's policy was to let the "court-imposed sentence serve as its offense severity indicant." D.C. Guidelines Report at 17; see also 1992 Stover Mem. at 2-3 ("[T]he D.C. guidelines use the minimum term of the sentence...to determine whether or not the prisoner is suitable for parole upon the completion of the minimum term."). Thus, the Board did not look to the seriousness of the offense for which a D.C. Code offender was imprisoned. See D.C. Guidelines Report at 4 ("[T]he Board of Parole does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge.").[2]

## A.  Degree of Risk

The primary factor affecting a parole candidate's suitability for parole under the D.C. parole practices was the degree of risk of recidivism posed by the candidate. See D.C. Guideline Report at 5. The factor was based on a Salient Factor Score ("SFS") that relie[d]

[2]See also Memorandum from Micheal A. Stover, General Counsel, USPC, to Micheal J. Gaines, Chairman, USPC, at 3 (June 26,1998)("the guidelines of the D.C.Board of Parole clearly focus exclusively on the issue of risk") (attached as Exhibit 9 to Plaintiff's Staement)[hereinafter,the "1998 Stover Memorandum" or "1998 Stover Mem"];Deposition of Gladys W. Mack("Mack Dep.") at 42-43, Cosgrove v. Meese, No.08-0516 (Mar. 18,1988)(Chairperson of the D.C.Parole Board in 1988 testifying that the 1987 Regulations are premised on the principle that the court addresses the purposes of retribution and general deterrence identified in the D.C.Guideline Report at 3-4)

exclusively on information known at the time of incarceration." Id.; see
28 DCMR §204.3 (attached as Exhibit 7 to the Plaintiff's Statement).

In calculating a prisoner's SFS, the D.C. Parole Board considered
a parole candidate's prior convictions and adjudications, prior commitments,
age at the commission of the current offense, commitment-free period, status
at the time of the current offense, such as whether the candidate was on
parole or probation, and history of drug dependence. See Fletcher, 433 F.3d
at 871(citing 28 DCMR §§204.4-204.16). A parole candidate's SFS placed
the candidate into one of four risk categories from which the D.C. Parole
Board would determine a baseline number of points. See D.C. Guidelines
Report at 5; 28 DCMR §204.17 & App. 2-1. The higher a candidate's SFS,
the lower the risk the parole candidate would become a recidivist and the
lower the baseline number with which the candidate began for purposes of
the Board's futher calculations. See 28 DCMR §204.17 & App. 2-1(App. 2-1
attached as Exhibit 11 to Plaintiff's Statement). The Board then would
adjust a candidate's baseline number using the type of risk factor, and
the candidate's institutional adjustment and program participation and
arrive at a total point score. See D.C. Guideline Report at 5-6; 28 DCMR
§204.17.

### B. The Type of Risk

The secon factor that the D.C. Parole Board considered is what type of
crime the candidate could be expected to commit while released on parole.
See D.C. Guidelines Report at 5. The type of risk factor was an "aggravating
factor" that applied to those cases where "the current offense, or the offen-
_____
(attached as Exhibit 10 to Plaintiff's Statement); 63 Fed.Reg.39172, 39174(July
21, 1998)(recognizing that the "parole function for D.C. Code offenders rest
on a premise somewhat different from that of the federal guidelines" and
under which "the minimum term of imprisonment imposed by the court [is treated]
as the usual measure of basic accountability for the offense of conviction").

der's pattern of past offenses, involved violence, weapons, or drug traffic-king." Id. Under the type of risk factor, the board looked at three types of offense behaviors as parole indicants: (1) violence, (2) use of weapon, and (3) drug trafficking. See id. at 21-22; 28 DCMR §204.18 & App. 2-1. If the Board determined that a parole candidate's "current offense, or two prior felony convictions involve[d] any or all of the listed behaviors," which were violence, the use of a weapon, and drug trafficking it would increase the baseline number from the candidate's SFS by one point. D.C. Guidelines Report at 21-22 (emphasis added); see 28 DCMR §204.18 & App. 2-1. Thus, the Board considered a parole candidate with any on of these risk indicants to present the same level of risk as a candidate with two or all of these indicants. See 28 DCMR §204.18 & App. 2-1.

####    C.    Institutional Adjustment

The D.C. Parole Board considered the candidate's institutional adjust-ment-whether the candidate had committed serious disciplinary infractions while imprisoned for the current offense. Under the 1987 Regulations, the candidate's institutional adjustment was "an aggravating factor applicable [where] the Board has made findings that disciplinary infractions...are either serious or repetitious enough to impact negatively on the parole decision." D.C. Guidelines Report at 5. Serious disciplinary infractions, it would increase a candidate's baseline number by one point. 28 DCMR § 204.18(h).

####    D.    Program Achievement

The final factor that the Board used considered was the candidate's program achievement. See 28 DCMR §204.18(i). Under the 1987 Regulations, a parole candidate's program participation was a "mitigating factor" that the Board applied when it found that the candidate's program or work accompl-ishments were substantial enough to impact favorably on the parole decision. D.C. Guidelines Report at 5. For sustained program achievement, the Board

would deduct one point from the candidate's point score. See 28 DCMR at App. 2-1.

E.    The Parole Decision

After the D.C. Parole Board calculated its "baseline" point score and adjusted it based on the type of risk, institutional adjustment, and program achievement factors under the 1987 Regulations, the D.C. Parole Board "integrated [these factors] into a calculus to produce a point score which constrained the Board's discretion in making final parole determinations." Fletcher,433 F.3d at 871 (citing 28 DCMR §204.19 & App. 2-1) (emphasis added). This total point score "determine[d] whether or not parole is granted, and if so, the level of supervision to be imposed." D.C. Guidelines Report at 6.

A total point score of two or less at his or her initial parole hearing the 1987 Regulations directed the Board to grant parole. See 28 DCMR §204.18 & App. 2-1. At a parole rehearing, the 1987 Regulations directed the Board to grant parole if the candidate had a total score of three or less. See id. & App. 2-2

Regardless of a parole candidate's total point score, the 1987 Regulations permitted the D.C. Parole Board to grant or deny parole in "unusual circumstances." Id. §204.22. As the Board recognized when it promulgated the 1987 Regulations, "there occasionally will be unique circumstances that are not taken into account by either the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on the release decision." D.C. Guidelines Report at 22 (emphasis added). The Board, however, had to explain the existence of such "unusual circumstances" by reference to the specific aggravating or mitigating factors listed in Appendices 2-1 and 2-2. 28 DCMR §204.22.[3] In Appendix 2-1, the D.C. Parole Board listed those pre-and post-incarceration circumstances that might warrant a departure. See 28 DCMR at App. 2-1; Mack Dep. at 11-13,22-25.

10

In contrast to Appendix 2-1, Appendix 2-2, which applied at parole rehearing, did not include any pre-incarceration aggravating factors on which the Board could rely to depart from the regulations and deny parole. See Mack Dep. at 26-27. Because its primary focus was rehabilitation, the D.C. Parole Board did not consider a parole Candidate's current offense at a parole rehearing, see Mack Dep. at 28. Appendix 2-2 instead, focused on the candidate's rehabilitation, community resources, and health since the previous hearing, see id. at 26-27.

F.    **The D.C. Parole Board's 1991 Policy Guideline**

To ensure consistent and equitable application of the 1987 Regulations the Board adopted a Policy Guideline that defined the terms used in the Appendices to the 1987 Regulations (the "1991 Policy Guideline")(attached as Exhibit 12 to Plaintiff's Statement). See 1991 Policy Guideline at 1. The USPC's General Counsel, following this Court's decision in the Cosgrove case, instructed the USPC personnel to apply the 1991 Policy Guidelines when conducting parole hearings for D.C. Code offenders in federal correctional facilities. See Deposition of Rockne Chickinell at 78:15-18 ("Chickinell Dep.")(attached as Exhibit 13 to Plaintiff's Statement); 1992 Stover Mem. at 2. The Board adopted the 1991 Policy Guideline to avoid disparate decisions for similary-situated offender under the 1987 Regulations resulting from the subjective views and judgment of hearing examiners and commissioners. See 1991 Policy Guideline at 1.

Section VI.A.1 of the 1991 Policy Guideline, established criteria defining "negative institutional behavior" by listing the types of

---

3 See mack Dep. at 12-13(testifying that the six aggravating factors in Appendix 2-1 of the 1987 Regulations indicating that a parole candidate was a worse risk than the candidate's total point score indicated were the only pre-incarceration factors the Board could use to depart from the guidelines and deny parole);D.C. Guidelines Report at 6("Decisions outside the guideline may be rendered for good cause when accompanied by written reasons that include a summary of the information upon which the determination is based").

institutional behavior" by listing the type of institutional disciplinary infractions that the D.C. Parole Board considered to be "negative institutional behavior" under Appendices 2-1 and 2-2. For purposes of a parole candidate's initial hearing, the 1991 Policy Guideline limited the Board's consideration of disciplinary infraction to only those that the candidate committed in the three years before the hearing, except in the case of offenses involving murder, manslaughter, kidnapping, armed robbery, or first degree burglary. See id.

G.    The D.C. Parole Board's Definition of Unusual Circumstances

The 1991 Policu Guideline also clarified the scope of the Board's authority to deny parole for "unusual circumstances." To promote consistency in the Board's decisionmaking regarding departures from the action indicated by a parole candidate's total point score, the 1991 Policy Guideline described the objective criteria and parameters for each of the factors listed in Appendix 2-1 of the 1987 Regulations that the D.C. Parole Board recognized as constituting "unusual circumstances." 1991 Policy Guideline at 6-9.

III.    THE USPC'S PAROLE REGULATIONS AND PRACTICES

In 1998, after the USPC assumed the D.C. Parole Board's responsibilities with respect to parole determinations for D.C. Code offenders, the USPC immediately drafted interim parole regulations that were significantly different from D.C. parole practices. See Fletcher, 433 F.3d at 870. In 2000, the USPC published the 2000 Guidelines in final form and announced that it would apply those guidelines to any D.C. Code offender, including Plaintiff, who had not received an initial parole hearing as of August 5, 1998. See id.

The USPC justified the 2000 Guidelines' changes to the 1987 Regulations on the ground that its research and analysis allegedly demonstrated that the board's point score system had "resulted in a high rate of upward departures from the guideline based upon factors that should be included in the

guideline." 63 Fed. Reg. 17771, 17772(Apr. 10, 1998). The USPC also undertook an analysis "to identify factors related to current offense and criminal history that [could] be empirically correlated with repeat violent crime." Id. For this study, sample of D.C. Code offenders released in 1992 was evaluated to determine whether those offenders had an arrest for a violent offense within five years after their release. Id. Despite data and process deficiencies, the USPC determined that this research confirmed that violence and weapons were good predictors of future violence See id. at 39173. Based on these two studies, the USPC replaced the D.C. parole practices with the 2000 Guideline for D.C. Code offenders receiving an initial parole hearing after August 5, 1998. Id.

### A.    Offense Accountability Under the 2000 Gudelines

The 2000 Guidelines apply a classic federal parole guideline principle, i.e., offense accountability, and allow the USPC to ignore this assumption in "exceptional cases" based on the gravity of a parole candidate's offense. See 28 C.F.R. §2.73(b). Effectively, the 2000 Guideline change the 1987 Regulations' "assumption' into a "presumption" that the USPC can ignore in "exceptional cases" based on "the gravity of the offense." Id.

Nowhere in the 1987 Regulations did the Board leave room to consider offense accountability when determining an inmate's parole suitability. See Mack Dep. at 46:22-47:2, 52:11-14, 53:7-10. Instead, the Board looked solely at the degree and type of risk of recidivism posed by a parole candidate and the candidate's institutional conduct (both positive and negative) to determine the candidate's suitability for parole. See D.C. Guidelines Report at 4; 1998 Stover Mem. at 3; 1992 Stover Mem. at 2-3.

### B.    The Presumption of Suitability Under the 2000 Guidelines

Like the 1987 Regulations, the 2000 Guidelines initially use a point score system to determine whether a candidate is presumed suitable for parole.

13

This system, like the 1987 Regulations, begins with the calculation of a Salient Factor Score aimed at assessing the dgree of risk that a parole candidate will become a recidivist. See 28 C.F.R. §§2.80(c) and 2.20. It then purports to look to the "type of risk" that the candidate poses, and finally factors in the candidate's institutional behavior. See 28 C.F.R. §§2.80(f), (j), and (k).

Unlike the 1987 Regulations, which rely on a parole candidate's total point score to determine whether a parole candidate is presumed suitable for parole, the 2000 Guidelines Range developed a "Base point Score" that the USPC uses to identify a "Base Guideline Range," the number of months to add to the candidate's parole eligibility period to account for the SFS and type of risk factors. 28 C.F.R. §2.80(f); see 65 Fed. Reg. at 70663; 28 C.F.R. §2.80(1).[4] This system makes it impossible, absent an awrd of superior program achievement, for any person with a Base Point Score over three to establish a presumption of suitability for parole when he or she becomes eligible for parole, as the 1987 Regulations permitted.

After adding the Base Guideline Range to the parole eligibility period, the USPC then adds or subtracts periods of months to reflect negative institutional behavior and/or superior program achievement. See 28 C.F.R. §2.80(1). The 2000 Guidelines refer to the final range of months as the Total Guideline Range and treat it as "the amount of time [an offender] may expect to serve with cintinued good conduct and ordinary program achievement." 65 Fed. Reg. at 70664. Until a parole candidate has served a period of time equal to the bottom of his or her Total Guideline Range, the candidate is presumed to be unsuitable for parole. See Chickinell dep. at 117:18, 172:8-10, howard Dep. at 49:18-9; Husk Dep. at 187:19-187:3.

Under the 1987 Regulations, a parole candidate often would have been presumed suitable for parole at the end of his or her minimum sentence. Under the 2000 Guidelines, the same candidate is now presumed unsuitable

for parole until he or she has served his or her minimum sentence and an additional term indicated by the Base Guideline Range and/or for negative institutional behavior. See 28 C.F.R. §2.80(h), (i), and (1).

C.    **The USPC's Changes in the 2000 Guidelines to the 1987 Regulations' SFS and type of Risk Assessment Increased the Period of Incarceration that Plaintiff had to serve to Establish a Presumption that They Were Suitable for Parole.**

In addition to cahnging the 1987 Regulations' point score system into a range of months, the 2000 Guidelines changed the factors considered under the SFS and type of risk assessments. The USPC made these changes under the guise of improving the predictive value of the 1987 Regulations and to reflect what the USPC preceived as the "unstructured discretionary departures" by the D.C. Parole Board. 63 Fed. Reg. at 39173.

The 2000 Guidelines, like the 1987 regulations, provide for a "type of risk" analysis by looking at the candidate's history of violence, the use of a weapon, and/or the death of the victim as a result of the candidate's crime. See 28 C.F.R. §2.80(f). Unlike the 1987 Regulations, under which the most points a parole candidate could obtain for the "type of risk" factor was a single point, the 2000 Guideline treated the candidate's history of violence, use of a weapon, and/or death of a victim as distinct factors, each of which the USPC uses to contribute points to a parole candidate's Base Point Score. In total, the 2000 Guidelines enabled the USPC to give a parole candidate as many as 7 points based on the "type of risk" factor. Compare 28 DCMR Appendix 2-1 with 28 C.F.R §2.80(f). Each point in excess of three increases the period to be presumed suitable for parole. See 28 C.F.R. §2.80 (h).

---

4 The Base Guideline Range represents "[t]he time [in excess of the candidate's parole eligibility period, i.e., minimum sentence] expected for the inmate to qualify for parole (assuming no disciplinary infractions and no ordinary program achievement". 65 Fed. Reg. at 70663.

The 2000 Guidelines divided the 1987 Guidelines "type of risk" analysis into two categories. See 28 C.F.R. §2.80(f). The USPC used Category II of the "type of risk" analysis to adjust a parole candidate's Base Point Score by adding points based on the candidate's history of violence, or use of a firearm in the current offense. See 28 C.F.R. §2.80(f). For the Category III adjustments, the USPC did not offer any empirical findings supporting its decission to increase a parole candidate's Base Point Score, as it had for Category II. Instead, the USPC, without any factual or legal support in the D.C. Parole Board's regulations, policies, or practices, "decided that [extremely violent crimes such as murder and rape] present implied risk levels that would either justify [1] repeated departures, or [2] the inclusion of the relevant factors in the guideline system itself", which is what the USPC asserted it had chosen to do. 63 Fed. Reg. at 39173.

For any parole candidate serving a sentence for a crime of violence that resulted in the death of the victim, such as Plaintiff, the 2000 Guidelines automatically increase the Base Point Score by at least five points. See 28 C.F.R. §2.80(f). This translates into at least 18-24 months added onto the period that the candidate had to serve to be presumed suitable for parole under the 1987 Regulations. See 28 C.F.R. §2.80(h). If a candidate has any prior convictions for violent offenses, the Base Point Score increases even more as does the additional period the candidate has to serve to be presumed suitable for parole. See 28 C.F.R. §2.80(f) and (h).

D.    **The 2000 Guideline Use a Parole Candidate's Negative Institutional Behavior to Increase the Period of Incarceration the Candidate Has to Serve to Establish Presumptive Parole Suitability.**

The 2000 Guidelines, like the 1987 Regulations, take a parole candidate's institutional behavior into account for purposes of parole determinations. Unlike the 1987 Regulations, the 2000 Guidelines determine a range of

months under the provisions of 28 C.F.R. §2.36 for any disciplinary infractions since the begining of confinement on the current offense in the case of an initial hearing, and "since the last hearing in case of a rehearing." 28 C.F.R. §2.80(j). The USPC then adds the range of months it calculates under 28 C.F.R. §2.36 to the parole candidate's Base Guideline Range and minimum setnce, to determine the period of incarceration that the candidate must serve to be presumed suitable for parole. Id. Unlike the 1987 Regulations, the 2000 Guidelines consider all disciplinary infractions received prior to initial parole hearing, not just those within the three years prior to the parole hearing. Thus, the 2000 Guidelines allow the USPC to increase the periods of incarceration that a parole candidate "may expect to serve" before being considered suitable for parole based on disciplinary infractions that the D.C. parole practices would not have considered at all. Compare 28 C.F.R. §2.36 with 1991 Policy Guideline at 2.

      E.    **The 2000 Guideline, Unlike the 1987 Regulations, Do Not Reward a Parole Candidate's Ordinary Program Achievement By Improving the Candidate's Prospects of Parole.**

Pursuant to section 2.80(e)(1) of the 2000 Guidelines, the USPC assesses whether a parole candidate "has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense." 28 C.F.R. 2.80(e)(1). The 2000 Guidelines give the USPC the sole discretion of determining whether the parole applicant's work and program achievement are to be considered "superior" or "ordinary". Howard Dep. at 66:5-68:4. Per the USPC's guidelines, "if superior achievement is found, the award for superior achievement shall be one-third of the number of months during which the prisoner demonstrated superior program achievement". 28 C.F.R. §2.80(e). If the USPC finds only "ordinary" program achievement, the parole candidate's Total Guideline Range is completely unaffected. Under the 1987 Regulations and

the D.C. parole practices, the D.C. Parole Board used an objective standard, set forth in the 1991 Policy Guideline, to reward "Sustained Program Achievement or Work Assignment Achievement". 1991 Policy Guideline at 3. Once the Board determined that a parole candidate demonstrated sustained program achievement, the Board awarded the candidate a credit of one point, which the candidate could use to offset points in his or her total point score.

**F.    The 2000 Guidelines Significantly Changed the Bases on which the USPC Could Depart from the Presumption that a D.C. Code Offender was Suitable for Parole.**

Like the 1987 Regulations, the 2000 Guidelines permit the USPC, in "unusual circumstances", to deny parole when a parole candidate has served sufficient incarceration to establish a presumption of parole suitability. The 2000 Guidelines define "unusual circumstances" as those "case-specific factors that are not fully taken into account in the guidelines, and that are relevant to the grant or denial of parole." 28 C.F.R. §2.80(n).

Although the 2000 Guidelines provide examples of "unusual circumstances" similar to those utilized by the D.C. Parole Board, they do not define the criteria necessary to establish the applicability of those "unusual circumstances" as the D.C. parole practices did 28 C.F.R. §2.80(n)(2). The 2000 Guidelines also did not place any limit on the type of circumstances the USPC can deem "unusual", except to the extent that the circumstances cannot have been "fully taken into account in the guidelines." 28 C.F.R. §2.80(n); see Husk Dep. at 132:18-12, 141:9-13. Thus, the 2000 Guidelines left it to the subjective whims of the USPC hearing examiners and/or Commissioners to identify a factor for which the USPC did not add a point to the Base Point Score and deem it an "unusual circumstance." See id. at 91:10-92:3. In contrast, the 1987 Regulations provided clear criteria, in the 1991 Policy Guideline, that the D.C. Parole Board applied to determine whether "unusual circumstances" existed. See 1991 Policy Guideline at 6-9.

Moreover, the 1987 Regulations did not consider offense severity or accountability factors as " unusual circumstances." Those factors already had been accounted for by the sentencing judge. Under the 2000 Guidelines, the USPC has identified offense severity and accountability factors as "unusual circumstances" warranting the denial of parole.

As discussed in greater detail below, the undisputed facts demonstrate that the USPC violated the Ex Post Fcato Clause in deciding Plaintiff's request for parole by applying its 2000 Guideline retroactively and ignoring the D.C. parole policies. The USPC's actions not only increased the risk that Plaintiff will serve longer than he would have under the D.C. parole practices, based on offense severity factors that the D.C. Parole Board did not use. As a result, the Court should grant Plaintiff's motion for summary judgment with respect to his claims based on the Ex Post Facto Clause.

## ARGUMENT

### I.    THE STANDARD FOR SUMMARY JUDGMENT.

A party is entitled to summary judgment "if the plaedings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judment as a matter of law," Fed.R.Civ.Proc.56(c). The facts regarding the issue addredded in this motion are set forth in the accompanying Plaintiff's Statement of Material Facts Not in Dispute and in the plaintiff's statement of undisputed facts filed contemporaneously with this memorandum. The undisputed facts establish that the USPC has applied its parole regulations, guidelines, policies, and practices retroactively to Plaintiff and others D.C. Code offenders instead of the parole regulations, guidelines, policies, and practices of the D.C. Parole Board that governed parole decisions for D.C. Code offenders prior to August 5, 1998. As a result, the USPC has

19

created a significant risk that Plaintiff will serve longer period of incarceration as punishment for his crimes.

II.    THE EX POST FACTO CLAUSE PROHIBITS RETROACTIVE CHANGES TO PAROLE POLICIES THAT CREATE A SGINIFICANT RISK OF PROLONGING A PRISONER'S INCARCERATION.

The Ex Post Fcato Clause of the United States Constitution prohibits a retroactive increase in the punishment for a crime after its commission. See U.S. Const. art. I, §9, cl.3;Fletcher v. Reilly,433 F.3d 867,877 (D.C. Cir. 2006). Under the Supreme Court's decision in Garner v. Jones,529 U.S. 244,251 (2000), a retroactive change in a parole regulation, guideline, or policy violates the Ex Post Facto Clause if it "creates a significant risk of prolonging [an inmate's] incarceration." See Fletcher,433 F.3d at 876-77. A party can demonstrate that the retroactive application of a change in parole policy creates a "significant risk" in two ways: (1) it can establish that "there are facial distinctions between the old and new parole/reparole regimes"; or (2) it can introduce "evidence drawn from the rule's practical implementation by the agency" showing that "retroactive application [of the policy] will result in a longer period of incarceration than under the earlier rule". Id. at 877 (quoting Garner, 529 U.S. at 255).

To determine whether the retroactive application of a new parole regime violates the Ex Post Facto Clause, the D.C, Circuit requires "a sentencing comparison" of the two parole regimes. Fletcher,433 F.3d at 879. The Court must then use the information gleaned from this comparison to determine whether the USPC's application of its own regulations, guidelines, policies, and/or practices instead of the D.C. Parole practices "created a significant risk that [Plaintiff would] be subjected to a lengthier incarceration than [they] would have been if the Commission had adhered to the rules and practices of the D.C. Board". Id. at 879; see also id.

at 877 (the "controlling inquiry is one of practical effect").

As demonstrated in the Plaintiff's statement of undisputed facts and in supporting documents attached thereto, a searching comparison of the USPC parole practices to the D.C. parole proves that:

a. Under the D.C.parole practices,parole candidates convicted of committing a crime of violence resulting in the death of the victim, such as Plaintiff could establish a presumption that they were suitable for parole after serving the minimum sentence imposed by the sentencing court,i.e.,at parole eligibility. Under the USPC's parole practices,which use a parole candidate's "Base Point Score" to add a range of months to the candidate's parole eligibility period, these same candidates are presumed unsuitable for parole until they serve at least 18 to 24 months longer than their parole eligibility dates.

b. Under the D.C.parole practices,a parole candidate's negative institutional conduct,if any,was considered at his or her initial parole hearing only if the conduct was (i) significant,i.e.,a Class I offense or two Class II offenses,and occured in the three years prior to the hearing or (ii) involved murder,manslaughter,kidnapping,armed robbery,or first degree burglary. The USPC's parole hearing regardless of significance or age and add a range of months for such conduct to a candidate's parole eligibility period,during which the candidate is presumed unsuitable for parole.

c. Under D.C.parole practices,Plaintiff sustained program achievements improved his prospects for parole by reducing his total point score. Under the USPC parole practices,these same achievements essentially are ignored and do not affect Plaintiff's prospects for parole.

d. Under D.C. parole practices,it was assumed that Plaintiff satisfied offense accountability and the needs for punishment,general deterrence,and retribution when they served the minimum sentence imposed by the sentencing court and became eligible for parole and the D.C.Parole Board did not usurp the function of the sentencing judge by departing from this assumption to deny parole on the basis of offense severity characteristics. Under the USPC's parole practices,Plaintiff is only presumed to have satisfied offense accountability after serving his minimum sentence,and the Defendants may ignore this presumption in "exceptional cases"based on the "gravity of the offense,"which the USPC has deemed to include every crime of violence in which a victim dies.

e. Under D.C.parole practices,the D.C.Parole Board applied the clearly defined parameters and criteria in the 1991 Policy Guideline and refused to look to offense severity characteristics to determine whether pre-incarceration "unusual circumstances" existed warranting a parole denial notwithstanding a parole candidate's presumptive suitability for parole. The USPC,however,ignores the parameters and criteria in the 1991 Policy Guideline and,infact,has not even provided the policy guideline to some USPC hearing examiners. Futhermore,the USPC regularly denies parole on the basis of offense severity factors.

f. The practical effect of each of these differences is that the period that Plaintiff must serve under the D.C.parole practices to establish presumptive suitability for parole has been increased by the 2000 Guidelines. Plaintiff continues to languish in prison,well after his parole eligibility date,because the defendants are unlawfully applying federal parole accountability standards when D.C.parole standards should apply.

Accordingly, Plaintiff has demonstrated as a matter of law that the USPC violated, and continues to violate, their rights under the Ex Post Facto Clause by failing to "adhere[] to the rules and practices of the D.C. Board" in Plaintiff's case. Fletcher,433 F.3d at 879.

III.    THE 2000 GUIDELINES, ON THEIR FACE, CREATE A
        SIGNIFICANT RISK THAT PLAINTIFF WILL SERVE LONGER
        PERIODS OF INCARCERATION THAN THEY WOULD HAVE
        UNDER THE D.C.PAROLE PRACTICES.

As the Supreme Court recognized in Garner, a party can establish an Ex Post Facto Clause violation in the parole context by establishing that there are facial distinctions between old and new parole regimes that create a significant risk of prolonging an inmate's incarceration. See 529 U.S. at 255. In this case, the USPC cannot dispute that there are significant differences between the 1987 Regulations and D.C. parole practices and the USPC's 2000 Guidelines and parole practices. The USPC recognized these distinctions and, in fact, was concerned that its changes to the D.C. parole practices might increase the length of incarceration served by D.C. Code offenders. See Chickinell Dep. at 185:19-186:10(attached as Exhibit 13 to Plaintiff's Statement). Despite this concern, the USPC has never evaluated whether its application of its parole practices instead of the D.C. parole practices has increased the length of D.C. Code offenders' incarceration. See id. at 190:19-191:5.

On their face, the Uspc parole practices increase the period of incarceration, or create a significant risk of increasing the period of incarceration, for D.C. Code offenders. First, the 2000 Guideline change the factors and methodology used by the D.C. Parole Board to evaluate the degree and type of risk of recidivism and a parole candidate's institutional

22

behavior . Second, the USPC parole practices change the D.C. Parole Board's
assumption that a parole candidate's court-imposed minimum sentence is
the offense severity indicant and satisfies the candidate's accountability
for the offense into a presumption that the USPC can overcome in "excep-
tional cases" based on the "gravity of the offense". Finally, the USPC's
parole practices change the D.C. Parole Board's interpretation of the
"unusual circumstances" that permit a denial of parole where a parole
candidate has demonstrated presumptive suitability for parole.

<blockquote>
A.     The 2000 Guidelines Increased the Period of
       Incarceration that Plaintiff Had to Serve to
       Be Presumed Suitable for Parole.
</blockquote>

Under the 1987 Regulations, a parole candidate became eligible for
parole after serving his or her minimum sentence. The parole issue then
turned from one of eligibility to one of suitability. To determine a parole
candidate's "presumptive suitability for parole", 1992 Stover Mem at 3,
the D.C. Parole Board calculated a point score by looking at the candidate's
degree and type of risk of recidivism and negative and positive institutional
behavior. See 28 DCMR at App. 2-1. To assess a candidate's degree of risk,
the D.C. Parole Board used a Salient Factor Score to determine a baseline
point score which it then adjusted upward to assess the type of risk based
on whether the candidate's current or past offenses involved violence,
weapons, and/or drug trafficking. See id. The Board then adjusted the point
score upward by one point to reflect the parole candidate's negative inst-
itutional behavior and/or downward by one point tp reflect positive instit-
utional behavior. See id.

If a parole candidate had a final point score of two or less at his
or her initial hearing, the D.C. Parole Board presumed that the candidate
was suitable for parole. See 28 DCMR. §204.18. The D.C. Parole Board, however,
could overcome that presumption in "unusual circumstances." Id. §204.22.

The 2000 Guidelines significantly altered this process and the criterior used by the Board used to assess a candidate's suitability for parole. They did so by changing the impact of the degree and type of risk of recidivism assessments and of a parole candidates institutional behavior.

    1.   The 2000 Guidelines Increase the Period of Incarceration that D.C. Code Offenders with Current Offenses Involving Violence and the Death of the Victim, or Who Have Prior Convictions, Must Serve to Be Presumed Suitable for Parole.

The 2000 Guidelines replaced the degree and type of risk of recidivism assessments under the 1987 Regulations, see 28 DCMR §§ 204.17, 204.18 and App.2-1, with a "Base Point Score" that the USPC tied to a range of months, the "Base Guideline Range", see 28 CFR § 2.80(f). The Base Guideline Range corresponds with an additional period of incarceration that the USPC requires a parole candidate to serve beyond his or her parole eligibility date to be presumed suitable for parole and to account for the factors reflected in the Base Point Score, (i.e., the SFS, the parole candidate's history of violence and the death of the victim). **Chickinell Dep. at 170:  18-172: 10; Husk Dep. at 112:1-113:6 (attached as exhibit 14 to Plaintiff's Statement).**

In addition to changing the methodology to assess the degree and type of recidivism and establish a parole candidate's presumptive parole suitability, the USPC changed the factors considered in those assessments. Significantly, the 2000 Guidelines increase the number of points a parole candidate can receive under the 1987 Regulation's total point score for the type of risk assessment (i.e., whether the

Thus, under the D.C. parole practices, none of the disciplinary in-
fractions used against Plaintiff would have been considered.  See id.

3.    The 2000 Guidelines Eliminate the Impact Under The 1987
      Regulations of a D.C. Code Offender's Ordinary Rehabili-
      tative Efforts and Drastically Change the Weight Such
      Efforts are Accorded.

      Under the D.C. Parole Board's 1987 Regulations, D.C. Code
offenders could positively affect their presumptive suitability for
parole by demonstrating "sustained achievement in the area of prison
programs, industries or work assignments" during their incarceration.
**28 DCMR at App. 2-1.**  By demonstrating such achievement, a D.C. Code
offender could reduce his or her total point score by one point, thus,
off-setting a one point **increase** in the point score resulting from
the type of risk assessment or from negative institutional behavior.
Under the 1987 Regulations, the D.C. Parole Board accorded a parole
candidate's program and work achievement weight equal to the weight
it accorded the type of risk and negative institutional behavior ass-
essments.  [underscore added]

      Under the 2000 Guidelines, however, a parole candidate sus-
tained program or work achievement simply maintains his or her enti-
tlement to a presumption of parole suitability once he or she serves
the minimum of the Total Guideline Range.  See **28 CFR § 2.80(e).**
To positively affect the minimum period that a parole candidate must
serve to establish presumptive suitability for parole, the candidate
must demonstrate "superior program achievement", which the 2000
Guidelines define as, "program achievement that is beyond the level
that the prisoner might ordinarily be expected to accomplish".  **Id.**

25

candidate's current offense or prior offenses involved violence,
weapons and/or drug trafficking) from one point to seven points, with
each point under the 2000 Guidelines corresponding with an increase in
the period of incarceration the parole candidate has to serve to be
presumed suitable for parole. Compare 28 CFR §2.80(f) with 28 DCMR
at App.2-1. The USPC accomplished this increase by replacing the
1987 Regulations' one point assessment for an offender whose current
offense or two prior offenses involved violence, weapons and/or drug
trafficking with two separate categories of point assessments:  (1)
A one to Four point assessment for violence or a firearm in the cur-
rent offense or violence in the current and/or prior offenses and (2)
a one to three point assessment for the death of the victim, a crime
where the most probable result was the death of the victim (includ-
ing attempted murder, conspiracy to commit murder and solicitation
to murder), or a crime involving "high level violence".  28 CFR §
2.80(f)

        Because of this change to the criteria for the type of risk
assessment, every D.C. Code offender convicted of a crime of violence
that resulted in the death of the victim, including Plaintiff, has a
minimum Base Point Score under the 2000 Guidelines of five (a mini-
mum of two points for violence in the current offense and three points
for the death of the victim), which adds at least 18 to 24 months to
the offender's parole eligibility period that the offender must serve
to be presumed suitable for parole. See Howard Dep. at 62:1-5; Chick-
nell Dep. 209:18-210:5; Husk Dep.122:4-123:16. If a D.C.Code offen-
der has prior convictions for crimes of violence or is a poorer risk
based on his or her SFS, the Base Point Score and period of post par-

ole eligibility incarceration increase, as they did for Plaintiff as a result of his lower SFS.

Thus, under the 2000 Guidelines, it is impossible for a D.C. Code offender convicted of a crime of violence that resulted in the death of the victim to be presumed suitable for parole when they become eligible for parole, as they could have done under the D.C. Code practices. In the ordinary case, i.e., absent "unusual circumstances", a D.C. Code offender who was presumed suitable for parole under the 1987 Regulations would be paroled. See **Chicknell Dep. at 218:13-219: 21.** On the other hand, under the 2000 Guidelines, the USPC presumes that each such D.C. Code offender is **unsuitable** for parole until he or she has served at least 18 months beyond his or her eligibility date, and in the ordinary case, the USPC will deny parole until the offender has served such additional time. See **Chickinell Dep. at 216: 17-217:21.**

By reversing the presumption of parole suitability to which Plaintiff was entitled under D.C. parole practices, the changes made by the 2000 Guidelines to the D.C. parole practices violate the Ex Post Facto Clause because they clearly disfavor offenders convicted of a crime of violence and create a significant risk of prolonging Plaintiff's incarceration. See **Fletcher, 433 F.3rd at 877; see also Garner, 529 U.S. at 253 ("The dangers that legislatures might disfavor certain persons after the fact is present even in the parole context, and...the Ex Post Facto Clause guards against such abuse.")** As a result of these changes, Plaintiff must serve at least 18 months beyond his parole eligibility date to be presumed suitable for parole; under the D.C. parole practices, Plaintiff would have been presumed suitable for parole at eligibility.

27

2.   The 2000 Guidelines Increase the Period of Incarceration
     that D.C. Code offenders with Disciplinary Infractions
     Must Serve to Be Presumed Suitable for Parole.

Like the 1987 Regulations, the 2000 Guidelines evaluate a
D.C. Code offender's negative institutional behavior and use that be-
havior to adjust the USPC's consideration of whether the candidate is
presumed suitable for parole.  The 2000 Guidelines make this adjustment
by adding a range of months to a candidate's parole eligibility per-
iod that the candidate must serve in addition to the Base Guideline
Range, to be presumed suitable for parole.  Unlike the D.C. parole
practices, the 2000 Guidelines place no limit on the nature or age of
the disciplinary infractions that the USPC considers.

Instead, the 2000 Guidelines direct the USPC, at an initial
parole hearing, to look to the federal rescission guidelines at 28 CFR
§ 2.36 for each incident of negative institutional behavior **"since the
beginning** of confinement on the current offense."  **28 CFR §2.80(j)**
[emphasis added]  In Plaintiff's case, the USPC added 0-10 months for
disciplinary infractions- while not affecting eligibility period it
increased the top of Plaintiff's guideline for which the hearing ex-
aminer "believes that a decision at the top of the guidelines for
this offense is appropriate."  See Hearing Summary, **Plaintiff's Exhibit
#3.**

Under the 1987 Regulations, the D.C. Parole Board did not
consider institutional infractions that occurred more than three years
before a parole candidate's initial parole hearing as negative instit-
utional behavior, unless the infractions involved murder, manslaughter,
kidnapping, armed robbery or first degree burglary.  See **1991 Policy
Guideline at 2.**

As the USPC's witness have testified, whether program achievement is "superior" is purely subjective, discretionary decision by USPC hearing examiners and Commissioners.

At Plaintiff's initial hearing, the USPC considered that Plaintiff had demonstrated "superior program achievement" which would have if determined reduce Plaintiff's Total Guideline Range by one-third of the period for which it determined he had demonstrated such achievement. See 28 C.F.R. §2.80(K). The USPC determined that Plaintiff demonstrated "superior program achievement" for 58 months yet only reduced his Total Guideline Range by 12 months and not by one-third percent. See Initial Prehearing Assessment at 3 Plaintiff's Exhibit #5.

Because of the 2000 Guideline changes to the D.C. Parole Board's treatment of sustained program achievement, the USPC has created a significant risk that D.C. Code offenders, such as Plaintiff will remain in prison longer than he would have under D.C. parole practices. The USPC's changes not only deprived Plaintiff of the benefit of a positive adjustment to the score that determines this presumptive suitability for parole which would have entitled him to a mitigating factor under the 1987 Regulations that was sufficient to overcome an aggravating factor that he received for the type of risk assessment, but they have significantly reduced the weight accorded by the D.C. Parole Board and ascribed to a parole candidate's sustained program and work assignment achievement.

8 The 2000 Guidelines indicate that a parole candidate's complete failure to participate in programming warrants a decision in the upper half of his or her Total Guideline Range. See 28 C.F.R. §2.80(e2). Thus, a parole candidate must demonstrate ordinary program achievement or the USPC will presume the candidate to be unsuitable for parole until he or she has served in excess of the midway point between his or her minimum and maximum Total Guideline range. See id. §§2.80(e) & (l).

B.    The 2000 Guidelines Eliminate the Assumption
Under the 1987 Regulations that the Minimum Sentence
Imposed by the Sentencing Court Address Plaintiff's
Offense Severity and Accountability.

The 1987 Regulations did not contain an offense severity factor. Instead, the D.C. Parole Board assumed that the court-imposed, minimum sentence satisfied all offense severity and accountability:

> The second principle behind the guideline is that the court address the purposes of retribution and general deterrence through the sentence it imposes in adult cases. As a matter of policy, the Board of Parole does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge......

D.C. Guidelines Report at 3 (emphasis added). In describing the rationale for the 1987 Regulations, the D.C. Parole Board futher explained that, although it was adopting the federal parole guideline SFS structure, it: "did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale. It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant." Id. at 17 (emphasis added); Mack Dep. at 43:8-22.

Thus, under the 1987 Regulations, once a D.C. Code offender serves his or her minimum sentence, the Board focused exclusively on the risk of recidivism and institutional conduct/rehabilitation of the offender. D.C. Guideline Report at 4. It did not look at the severity of the candidate's offense to determine whether the judge's sentence was sufficient punishment for the candidate's offense because doing so would usurp the sentencing judge's function. See id. At 3-4. The Board's sole focus was on the candidate's rehabilitation and the risk to the community if the candidate was paroled. See id. At 17-24.

Although the 2000 Guidelines recognize the D.C. Parole Board's policy that the minimum term imposed by the court satisfies the need for

punishment for the crime, the 2000 Guidelines expressly alter the 1987 Regulations' assumption that a parole candidate's service of the court-imposed minimum sentence satisfies offense accountability and changes that assumption into a presumption that the USPC can overcome in "exceptional cases" based on the "gravity of the offense." 28 C.F.R. §2.73;63 Fed.Reg at 39174; see also 1998 Mem. at 3(recommending adoption of an exception to the D.C. Parole Board's assumption despite the sparseness of case law supporting the exception and the fact that the 1987 Regulations focus exclusively on the issue of risk).[10] By creating an exception to the 1987 Regulations' policy based on the"gravity of the offense", the 2000 Guidelines allow the USPC to usurp the functions of the sentencing judge. Using this "exceptional circumstances", the USPC has denied the parole request of Plaintiff based solely on the alleged seriousness of his offense and accountability grounds. Thus, the 2000 Guidelines, on their face, not only create a significant risk that Plaintiff will serve a longer period of incarceration," but they have resulted in Plaintiff continued incarceration on grounds that violate the policies of the D.C. Parole Board. The very purpose of the Ex Post Facto Clause is to prevent such increased retroactive punishment.

        C.        **The 2000 Guidelines, Unlike the 1987 Regulations and D.C. Parole Board's Policies, Do Not Contain Formal Criteria for the "Unusual Circumstances" Identified in 28 C.F.R. §2.80(n)(2) and Therefore, on Their Face, Create a Significant Risk of Prolonging a D.C. Code Offender's Incarceration.**

---

10 In the case of a D.C. offender convicted of a crime of violence that resulted in the death of the victim, the exception apparently always applies because under the 2000 Guidelines, such an offender can never be presumed suitable for parole after his or her minimum sentence, unless he or she receives a significant award for superior program achievement.

Under the 1987 Regulations, once a parole candidate's total point score established his or her presumptive suitability for release, the D.C. Parole Board's discretion was limited to departing form that presumption only in "unusual circumstances". 28 DCMR §204.22. In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board identified circumstances it considered to be"unusual" that would support a departure from the action indicated by a parole candidate's total point score under 28 DCMR §204.18. To ensure equitable treatment of similarly-situated parole candidates and consistency in applying the factors in Appendix 2-1 and to avoid disparate interpretations and applications of those factors, the D.C. Parole Board adopted the 1991 Policy Guideline, which set forth specific, definitive "criteria and parameters for determining the applicability" of the facors listed in Appendix 2-1. See 1991 Policy Guideline at 1; Stover Mem. at 4(instructing USPC hearing examiners to "always consult the Policy Guidelines""[w]hen considering reasons for departure from the point score rehearing guidelines" (emphasis in original)).

Although the 2000 Guidelines include descriptions of "unusual circumstances" similar to those used in D.C. parole practices, the 2000 Guidelines do not contain any "formal criteria" for determining whether those "unusual circumstances" exist as the D.C. parole practices did. See 28 C.F.R. §2.80(n)(2). As a result of the 2000 Guidelines' elimination of any "formal criteria" for determining the applicability of the "unusual circumstances" listed in Appendix 2-1 to the 1987 Regulations, the USPC has created a significant risk that Plaintiff will serve a longer period of incarceration.

For example, the 2000 Guideline identify an "Unusually extensive prior record (suuicient to make the offender a poorer risk than the 'poor' prognosis category)" as a factor that "may warrant a decision above the guideline." 28 C.F.R. §2.80(n)(2)(i)(C). The USPC premised this "unusual circumstance" on the 1987 Regulations' listing of an "Unusually Extensive

32

or Serious Prior Record" as a factor countervailing a grant of parole. 28 DCMR at App. 2-1. The 1987 Regulations and the 1991 Policy Guidelines clearly limit the applicability of this factor to circumstances where a parole candidate has "at least five felony convictions." Id.; see 1991 Policy Guideline at 6. The 2000 Guideline, on the other hand, leave it to the unfettered discretion of the USPC, without providing any "formal criteria", determine whether the unusual circumstances applies. As the USPC's General Counsel implicitly recognized in 1992 after this Court ordered the USPC to apply the 1987 Regulations to D.C. Code offenders in federal custody, the USPC must apply the criteria for the factors listed in Appendix 2-1 of the 1987 Regulations that the D.C. Parole Board applied to avoid the risk of increasing a D.C. Code offender's period of incarceration. See Stover Mem. at 4.

IV.    THE USPC'S PRACTICAL IMPLEMENTATION OF THE 2000 GUIDELINE HAS RESULTED IN PLAINTIFFS SERVING LONGER PERIOD OF INCARCERATION.

In Garner, the Supreme Court also recognized that a party can establish an EX Post Facto Clause violation by showing that a retroactive change in policy will result in a longer period of incarceration than under the earlier rule. See 529 U.S. at 255. The USPC's implementation of the 2000 Guideline demonstrates such an Ex Post Facto Clause violation by showing that Plaintiff will serve, a longer period of incarceration than he would have under the D.C. Parole Board's parole regime. As the facts demonstrate, under the 2000 Guidelines, the USPC presumed that Plaintiff was unsuitable for parole at his initial parole hearing. Had the USPC applied the 1987 Regulations, Plaintiff would have been presumed suitable for parole at his initial hearing.

Once some of the Plaintiffs had established presumptive parole suita-bility under the 2000 Guidelines, the USPC, under the guise of "unusual

33

circumstances," denied these Plaintiffs' parole request on offense severity
and accountability bases that should only apply to United States Code offenders.
By doing so, the USPC changed the parole inquiry from the 1987 Regulations'
focus on rehabilitation and risk to an inquiry in which the USPC asks whether,
"upon consideration of the nature and circumstances of the offense and
the history and characteristics of the prisoner," a D.C. Code offender's
release would "depreciate the seriousness of his offense or promote disrespect
for the law"? 28 C.F.R. §2.18. The result of the USPC's application of
the federal parole criteria to Plaintiff has been repeated parole denials
based on offense severity and accountability characteristics that the D.C.
Parole Board deemed to be the function of the court-imposed minimum sentence.
Presently, plaintiff remains incarcerated despite the lack of any actual
"unusual circumstances" in his case recognized under the 1987 Regulations.

The 1987 Regualtions' focus at parole rehearings is solely on post-
incarceration factors to determine whether "unusual circumstances" exist.
The USPC's repeated use of the same pre-incarceration factors on which
it relied to deny parole at earlier hearing is inconsistent with the D.C.
Parole Board's policies and practices under the 1987 Regulations, and has
increased the period of incarceration that Plaintiff has had to serve.

      **A.**      **The USPC Increased Plaintiff's Period of Incarceration**
                **by Applying the 2000 Guidelines at his Initial Parole**
                **Hearing.**

At Plaintiff's initial parole hearing, Plaintiff would have had the
following total point score under the D.C. Parole Board's 1987 Regulations:

    Plaintiff: 2 (+2 for being a fair risk with an SFS of 4 or 3,+1 for
                  type of risk with current offense involving violence and
                  a firearm, and -1 for sustained program achievement.)

If a parole candidate had a total point score of two or less at his initial
parole hearing, i.e., when he or she became eligible for parole, as Plaintiff
did , the 1987 Regulations presumed that the candidate was suitable for

34

parole See 28 DCMR §220.18; Stover Mem. at 3.

Under the 2000 Guidelines, the USPC ysed its Base Point Score, Base Guideline Range, and the guideline range for disciplinary infractions to determine Total Guideline Ranges-the total period of incarceration Plaintiff must serve to be presumed suitable for parole under the 2000 Guideline-to increase the Plaintiffs minimum sentence by as much as 66 months. Until Plaintiff serves the minimum of his Total Guideline Range, the USPC presumed that Plaintiff is unsuitable for parole. See Howard Dep. at 49:18-50:9; Chicknell Dep. at 170:18-172:10; Husk Dep. at 112:1-113:6. The USPC's implementation of the 2000 Guidelines, thus, reversed the presumption of parole suitability to which Plaintiff was entitled under the 1987 Regulations once he served his minimum sentence and increased Plaintiff's incarceration by the period of the setoff that the USPC imposed before Plaintiff's next parole hearing.

The USPC has not cited any reason for the denial of Plaintiff's parole request other than not reaching the Total Guideline Range. However, the hearing examiner Pacholski recommended"a decision at the top of the guideline range is appropriate". See Hearing Summary at 3-4. This Base Point Score Guideline Range as applied in the USPC's 2000 Guideline has changed Plaintiff's presumptive suitability at his eligibility date to being unsuitable. See Howard Dep. at 49:18-50:9. The 1987 guidelines did not prescribe a range of months to be added to a parole candidates total point score.

Under the 1987 Regulations, once a parole candidate's total point score established his or her presumptive suitability for release, the D.C. Parole Board's discretion was limited to departing from that presumption only in "unusual circumstances". 28 DCMR §204.22; see Mack Dep. at 12:21-13:2. The D.C. Parole Board recognized the need for the discretion to depart in "unusual circumstances" given the limitations of the "Salient Factor Score" and "type of risk assessment" in the 1987 Regulations. As the Board explained

35

when it promulgated the 1987 Regulations: "The board of Parole recognizes that, when applying guidelines to individual cases, there occasionally will be <u>unique circumstances</u> that are not taken into account by either the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on the parole decision." D.C. Guidelines Report at 22 (emphasis added). Given that the "Salient factor Score" and "type of the risk assessment" adopted by the D.C. Parole Board did not contain offense severity or accountability factors (because the Board assumed that such factors were addressed by the sentencing judge in the court-imposed minimum sentence), the Parole Board did not consider such factors as valid "unique circumstances" for purposes of excercising its discretion to depart from the guidelines- after all, exercising discretion based on such factors would usurp the function of the sentencing judge. See id. at 3, 17,22.

As a result, in Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board identified exclusive factors addressing the degree and type of risk posed by a parole candidate that it considered to be "unusual" that would support a departure from the action indicated by a parole candidate's total point score under 28 DCMR §204.18. To futher ensure equitable treatment of similarly-situated parole candidates and consitency in applying the factors in Appendix 2-1 and to avoid disparate interpretations and applications of those factors, the D.C. Parole Board adopted the 1991 Policy Guideline, which set forth specfic, definitive "criteria and parameters for determining the applicability" of the factors listed inAppendix 2-1. See 1991 Policy Guideline at 1; Stover Mem. at 4 (instructing USPC hearing examiners to "always consult the Policy Guidelines" "[w]hen considering reasons for dep- arture from the point score or rehearing guidelines" (emphasis in original). Recognizing the rehabilitative premise of its 1987 Regulations, the D.C. Parole Board also included among the "unusual circumstances" on which it

36

could depart a parole candidate's "Serious Negative Institutional Behavior," failure or "Little Effort to Engage in Productive Programing or Work," and a need for "Programing to Remain Crime-Free in the Community." See 1991 Policy Guideline at 6-9.

The D.C. Parole Board, however, held true to its written and stated policy of deeming the court-imposed minimum term sufficient accountability for the crime. Thus, nowhere in the 1987 Regulations or in the D.C. Parole Board's regulations, guidelines, or policy statement is there any evidence that the Board considered offense severity and accountability factors in determining whether a parole candidate had satisfied his or her offense accountability or whether "unusual circumstances" existed sufficient to warrant denying a D.C. Code offender's parole request where the 1987 Regulations' total point score indicated that the offender was presumptively suitable for release.[12] The stated principle of the 1987 Regulations and policy of the D.C. Parole Board was that the Board "does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." D.C. Guidelines Report at 4. In fact, the D.C. Parole Board expressly rejected adopting the federal parole guideline model for this very reason:

> The Board,however,did not wish to pattern entirely the structure of its guidelines after the federal grid which includes anoffense severity scale. It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant. Id. at 17.

_____

12 Although the 1987 Regulations permitted the D.C. Parole Board to depart from the guidelines in circumstances where a parole candidate's offense involved unusual cruelty to victims or preying on especially vunerable victims, the Board did not do so on offense severity grounds. Rather,the D.C. Parole Board's focus was on the risk posed to the public if it paroled an offender who inflicted"[p]hysical,mental or emotional abuse beyond the degree needed to sustain a conviction" or preyed on "[e]epecially vunerable victims,e.g., children or elderly persons" through assaultive or fraudulent behavior." 1991 policy Guideline at 7.

The 2000 Guidelines, like the 1987 Regulations, limit the USPC's discretion to depart from a parole candidate's Total Guideline Range to "unusual circumstances," the USPC cannot deny a D.C. Code offender's request for parole where the 2000 Guideline indicate that the offender has served his Total Guideline Range. See Husk Dep. 133:1-7; 28 C.F.R. §2.80(n). Also like the 1987 Regulations, the 2000 Guideline prohibit the USPC from considering offense accountability and severity factors in making its parole decisions, except that the 2000 Guidelines permit the USPC to ignore this prohibition in "exceptional cases" based on the "gravity of the offendse". 28 C.F.R. §2.73(b).

Unlike the 1987 Regulations, the USPC's 2000 Guidelines, allow the uspc to consider as an "unusual circumstance" an almost limitless number of factors that are neither unusual, case-specific, nor unique and have no relation to either the degree or type of risk that a parole candidate poses to society, which was the sole focus of the D.C. Parole Board's 1987 Regulations. See Husk Dep. 91:10-92:3. The only limit as to what constitutes an "unusual circumstance" under the 2000 Guideline is that the factor must be case-specific, cannot have been used to increase a parole candidate's Base Point Score (e.g., a prior crime of violence, which would increase the Category II score by one point, or the death of the victim, which increases the Category III score to three points), and must be relevant to the grant or denial of parole. See 28 C.F.R. §2.80(n); Husk Dep. 132:18-12, 141:9-13. In practice, however, the USPC ignores the relevancy requirement because the USPC interprets it with respect to federal parole practices and not D.C. parole practices. See C.F.R. §2.18.

The D.C. Parole Board did not consider offense severity and accountability factors in deciding parole. Instead, the 1987 Regulations deemed offense severity and accountability factors irrelevent to suitability for parole, because they assumed that the offender's minimum sentence fully addressed those factors. The USPC, on the hand, appears to always consider offense severity and accountability factors and increases a D.C. Code offender's period of incarceration when it applies such factors to determine hia or her suitability. Thus, it is no surprise that the USPC can identify a myriad of offense severity factors and assert that they are not accounted for in the Base Point Score, i.e., the SFS and type of risk assessment. As the Defendants former General Counsel recognized, the D.C. Parole Board never intended for the 1987 Regulations to include such sentencing court factors in the parole consideration. See Stover Mem. at 2-3

As demonstrated above, the USPC's refusal, in implementing the 2000 Guidelines, to recognized this limitation on its discretion to deny parole for Plaintiff has led to departures where suitability for parole should have been presumed. These departures are based on nothing more than the USPC"S belief that Plaintiff needs more punishment

<u>CONCLUSION</u>

For the reasons stated herein, Plaintiff motion for partial summary judgment should be granted.

May 5, 2008

Respectfully, Submitted,

Ernest B. Smith
#11565-007
U.S.P. Lewisburg
P.O. BOX 1000
Lewisburg PA 17837

# CERTIFICATE OF SERVICE

I,   ERNEST D. SMITH                , hereby certify that I have served a true
and correct copy of the foregoing: 1. Plaintiff's Motion For Partial Summary
Judgment on Ex Post Facto ; 2. Memorandum in Support of The Motion
of Plaintiff For Partial Summary Judgment On EX Post Facto ;3. Plaintiff's
Statement of Undisputed Material Facts ; 4. Index of Exhibits to
Plaintiffs Statement of Undisputed Material Facts to Mr. Kenneth Adebonojo
U.S. Attorney.

Which is deemed filed at the time it was delivered to prison authorities for forwarding to
the court, Houston vs. Lack, 101 L.Ed.2d 245 (1988), upon the court and parties to
litigation and/or his/her attorney(s) of record, by placing same in a sealed, postage
prepaid envelope addressed to:

and deposited same in the United States Postal Mail at the United States Penitentiary,

Signed on this ___5___ day of May, 2008 ,

Respectfully Submitted,

*Ernest Smith*

REG. NO. 11565-007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBA

ERNEST D. SMITH
PLAINTIFF,

V.                                    Civil Action No. 07-cv-1934 (RMC)

EDWARD F. REILLY, JR., et al.,

DEFENDANTS.

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Plaintiff Ernest D. Smith hereby submits this Statement of Material Facts Not in Dispute in support of his claims that the United States Parole Commission (the Commission) and the Defendants (as the Chair and Commissioners of the Commission) (collectively the "USPC") violated Plaintiffs rights under the Ex Post Facto Clause of the United States Constitution when they replaced the parole regulations, guidelines, policies, and practices of the District of Columbia Board of Parole (the " D.C. Parole Board") with their own regulations, guidelines, policies, and practices, which they applied retroactively to Plaintiff thereby creating a significant  risk of increasing Plaintiffs punihment. This statement of undisputed facts addresses those facts.
As the undisputed facts below and Plaintiffs memmorandum in support of his motion for summary judgment demonstrate, the USPC, by applying its own parole regulations, guidelines,policies, and practices, instead of those of the D.C. Parole Board, created asignificant risk of prolonging Plaintiffs incarceration and, thereby, violated the Ex Post Facto Clause.

1. On December 3,1993, the Honorable Cheryl Long, then of the D.C. Superior Court, sentenced Plaintiff Ernest D. Smith to imprisoment for a combined, term of fifteen to forty five years for carrying a pistol without a license, possession of a firearm during a cime of violence, and voluntary manslaughter/while armed. Plaintiff is also serving a consecutive sentence of four to twelve years imposed by the Honorable Collen Kollar Kotelly for posssion with the intent to distribute cocaine. see D.C. Sup. Ct. Judgement and Commitment Order of Ernest D. Smith (Dec. 3,1993) (attacched as Exhibit #1)

2. Under District of Columbia law , Plaintiff became eligible for parole in January 2008. see Sentence Monitoring Computation Data(May 7,2007) (attached as Exhibit #2)

3. On August 5, 1998, the United States Parole Commission and the Defenant's and/or their predecessors (collectively the "USPC") assumed the responsibility for making parole relese decions for all eligible D.C. Code offenders, including Plaintiff Ernest D. Smith. see National Capital Revitalization and Self-Goverment Act, Pub . Law . No. 105-133§ 11231 (c) Stat. 712 (1997). The USPC promulgated guidelines (the 2000 guidelines) to be used in parole determinations for D.C. code offenders including Plaintiff, who had their first hearing after August 5, 1998. 28 C.F.R. § 2.80(a)(5)

4. On July 23, 2007, the USPC conducted Plaintiff's Initial parole hearing under the 2000 Guidelines.  see Hearing Summary July 23,2007 (attached as Exhibit #3)

2

5. The USPC calculated Plaintiff's Salient Factor Score ("SFS") as a 5, placing him in the Fair Risk category with a base point score of 2. Bsaed upon the USPC automatically adding 6 points to his base point score because he committed a crime of violence that resulted in the death of the victim under the 2000 guidelines. The USPC converted his Base Point Score of to a Base Guidelines Range of 72-96 months, which it added to his parole eligibility period of 189 months.

6. The USPC then added 0-10 months because of disciplinary infractions Plaintiff received in 2002 more than four years before his initial parole hearing.

7. The USPC subtracted 12 months from plaintiff's range for Superior Programing.[1] This produced a Total Guideline Range of 249-283 months for Plaintiff. see (HearingSummary at 1-4) and Notice of Action 1-3 attached as Exhibit #4

8. The USPC denied Plaintiff's request for parole on August 10, 2007, deeming plaintiff not yet suitable for parole- a decsion inside the 2000 Guidelines. see Notice of Action at 1. Plaintiff had served 183 months by that date and was 66 months away from the bottom of his Total Guideline Range of 249-283 months.

9. The USPC gave Plaintiff a five year set-off, setting a rehearing date for July 2012.

10. None of the infractions that the USPC considered in adding 0-10 months to plaintiff's Base Guideline Range [2] involved murder, manslaughter, kidnapping, armed robbery, or first degree burglary and all infractions occured more than three years beffore Plaintiff's initial parole hearing on july 23, 2007. see Hearing Summary at 1-2 listing dates of infractions.

---

[1] The USPC did not credit Plaintiff 1/3 of the 58 months for which he was determined to have exhibited Superior Programing . Which wold have been 19 months subtracted from his Total Range. see Initial Prehearing Assessment at 3 Exhibit #5

[2] Although adding 0-10 months to Plaintiff's Bsae Guideline Range did not not increase the minimum of his Base Guideline Range, the recomdation of Hearing Examiner Pacholski that "a decision at the top of the guidelines for the offense is appropiate" affects Plaintiff adversely. see Hearing Summary at 1 and 4

3

11. Under the 1987 Regulations, Plaintiff would have received a (SFS) Salient Factor Score of 5, placing him in the Moderate Risk Category with a Base Point Score of 2. see 28 D.C. Mun. Regs. App 2-1 ("DCMR Appendix2-") attached as Exhibit #11

12. Under the D.C. Parole practices, the disciplinary infractions of Plaintiff received more than 4 years before his initial parole hearing would not have been considered, because the 1987 Regulations limited consideration of disciplinary infractions (other than those for murder, manslaughter, kidnapping, armed robbery, and first degree burglary) to a period of 3 years before a parole canidates initial hearing. see 1991 Policy Guidelines at 2 attached as Exhibit#12

13. With a total Point Score 2, Plaintiff would have been presumed suitable for Parole at his initial hearing under the 1987 Regulations. see 28 D.C. Mun. Regs. § 204.18

14. By adding 72-96 months under the 2000 Guidelines for Plaintiff's Base Guideline Range and 0-10 months for Plaintiff's more than four year old disciplinary infractions to Plaintiff's minimum sentence, the USPC increased the period that Pliaintiff had to serve to establish that he is presumed suitable for parole by at least 66 months - five years and six months - after his parole eligibility date. see Notice of Action

15. Under the D.C. Parole practices, plaintiff would have been presumed suitable for parole after he served his minimum sentence, i.e., at his initial hearing. DCMR Appendix 2-1

16. Plaintiff is inmate serving prison sentences for violating the District of Columbia Code. He has been incarcerated on his current sentence for 16 years.

4

17. For almost ten years, since August 5,1998 the USPC has conducted the hearings, and decided the requests for parole, of all persons convicted of violating the D.C. Code("D.C. Code offenders"), including Plaintiff.

18. Before August 5, 1998 the D.C. Parole Board conducted the parole hearings of D.C. Code offenders located in District of Columbia correctional facilities.

19. Before August 5, 1998 the USPC conducted the parole hearings of D.C. Code offenders located in federal correctional facilities.

20. On August 5, 1998, the USPC took over the D.C. Parole Board's responsibilities for D.C. Code offenders. Approximately 10 years before that the USPC was obligated to apply the parole guidelines of the D.C. Parole Board, and not the federal parole guidelines, at the hearings of D.C. Code offenders that the USPC conducted. (Cosgrove v. Thornburgh, 703 F. Supp. 995, 1003-04 (D.D.C. 1998).

21. Plaintiff has served the minimum sentence imposed by the sentencing court for his offenses (i.e., the period of incarceration an inmate must serve before becoming eligible for parole).

22. Under the parole statutes, regulations, policies, and practices of the D.C. Parole Board (the "D.C. parole practices"), after Plaintiff served his minimum sentences, he was assumed (not just presumed) to have satisfied accountability for his crimes, i.e., the need for punishment and general deterance. The only remaning questions under the D.C. parole were whether Plaintiff was presumed suitable for parole, and if so,whether his cases involved unusal circumstances that warranted a departure from that presmption.

5

23. Under the D.C. parole practices, Plaintiff would have been presumed suitable for parole at his first hearing before the USPC. To overcome that presumption of suitability, the USPC would have needed to identify "unusual circumstances" that warranted ignoring the presumption.

24. Because the USPC used its own parole regulations, policies, practices, and criteria (the "USPC parole practices") to determine Plaintiff's suitability for parole and ignored the D.C. parole practices Plaintiff has languished in federal prison past the time when he would have been presumed suitable for parole under the D.C. parole practices.

25. In the case of Plaintiff (and those of hundreds of other D.C. Code offenders who had an intial parole hearing after August 5, 1998), the USPC has applied its parole practices to determine parole suitabilty.

26. Under the USPC parole practices, instead of presuming that Plaintiff was suitable for parole after completion of his minimum sentence the presumption that would have applied if the D.C. parole practices were applied to Plaintiff case - Defendants presumed that Plaintiff was unsuitable for parole at that time. Based on this reversed presumption, the Defendants increased by more than five years, the minimum period of incarceration that Plaintiff needed to serve to establish that he was presumed sitable for parole under the D.C. parole practices.

6

## Transfer of Parole Authority from the D.C. Board of Parole to the USPC

27. On August 5, 1997, Congress enacted the National Capital Revitalization and Self-Goverment Improvement Act (the "Revitalization Act"),Pub. L. No. 105-33, §11231, and 111 Stat. 712 (1997); see Flectcher v. Reilly, 433 F.3d 867, 870 (D.C. Cir. 2006). The Revitalization Act abolished the D.C. Parole Board, see Pub. L. No. 105-33 § 11231(b), and directed the USPC to conduct parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations of the District of Columbia," id § 11231(c).

28. On August 5, 1998, the USPC assumed the responsibility for making parole release decisions for all eligible D.C. Code offenders. Between 1998 and 2000, despite the requirements of the Revitalization Act that the Defendants apply D.C. parole practices, the USPC published new parole regulations and guidelines that it deemed applicable to any D.C. Code offender receiving an initial parole hearing after August 5, 1998 (the "2000 Guidelines"). See 28 C.F.R § 2.80(a)(5); Flectcher,433 F.3d at 870.

29. Fo  inmates who had an initial parole hearing date before August 5, 1998, the USPC chose to apply the D.C. Parole Board's guidelines. See 28 C.F.R. § 2.80(a)(4). For all other inmates, including Plaintiff the USPC applies some variation of the 2000 Guidelines. See id. § 2.80(a)(1) & (5).

30. At the time Plaintiff committed the crimes for which he is currently imprisoned and at the time that Plaintiff was sentenced, the D.C. Parole administered parole proceedings for D.C. Code offenders in the custody of the District of Columbia. Before August 5, 1998, the USPC conducted the parole hearings for D.C. Code offenders who were in the custody of the United States Goverment, in such circumstances, the USPC was required to apply the D.C. parole practices, which were found by this Court to have the force and effect of law. See Cosgrove v. Thornburgh, 703 F. Supp. 995, 1003-04 (D.D.C. 1988).

7

31. Before the USPC took over in 1998, the D.C. Parole Board applied mandatory guidelines and practices when it conducted parole hearings and made parole determinations. Many of the guidelines and practices were codified as municipal regulations, which carefully prescribed the method and criteria that the D.C. Parole Board used to render decisions on parole requests.

### D.C. Parole Board Guidelines and Legislative Intent of D.C. Parole

32. The D.C. Parole Board ( and for certain D.c. Code offenders in federal prison facilities, the USPC) made parole decisions for D.C. Code offenders using guidelines that it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Regulations"). See D.C. Mun. Regs. §§ 100-531.12.

33. By adopting formal regulations, the D.C. Parole Board "sought to structure the exercise of the paroling authority's discretion." Report on the Development of Paroling Policy Guidelines for the District of Columbia Board of Parole (the "D.C. Guidelines Report") at 1 (filed as Exhibit A to Defendants' Response to Plaintiffs' First Request for Production of Documents Propounded to Defendants James Palmer, Walter Ridley, and James Freeman in Cosgrove v. Thornburgh, C.A. No. 80-0516) (attached as Exhibit #6).

34. The D.C. Parole Board believed the the guidelines were "a significant step toward a more coherent parole decision-making process that w[ould] lead both to increased consistency in parole release decisions and enhanced accountability of the Board." Id. (emphasis added).

35.As its guide for determining whether an incarcerated individual would be paroled or reparoled, the D.C. Parole Board used the criteria set forth in the guidelines. See id at 2 ("[T]he use of guidelines should be seen as an effort to make explicit those that will be considered in each individual case.") (emphasis in original).

8

36. Although the D.C. Parole Board noted that the guidelines were not neccessarily "a finished or static product" and made minimal revision to the 1987 Regulations through changes to the regulations and through the issurance of formal policy statements, the D.C. Parole Board retained the basic structure of regulations until it was abolished in 1998. Id.

37. When it drafted the 1987 Regulations, the D.C. Parole Board hoped that, among other things, the guidelines would:

      a. "[p]romot[e] consistent parole decision-making";

      b. "[m]ake more explicit the paroling policies of the Board of Parole";

      c. "[i]ncorporat[e] a concern for fairness by ensuring that the time... served [wa]s proportionate to the sentence imposed by the court and the risk posed by the offender"; and

      d. "[a[chiev[e] the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilatation." Id

38. In furtherance of these objectives, the D.C. Parole Board employed three guiding principles in drafting the 1987 Regulations. See id. at 2-4.

39. The first guiding priciple was that "the touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involve ment in criminal behavior." Id. at 2. The D.C. Parole Board felt that this focus of the guidelines best enabled it to meet its duty to protect the public. Id

40. The second guiding principle, and of great importance in this case, was that retribution or general deterrence was not included among the goals that the D.C. Parole practices wre to effectuate. See id at 2. ("The second priciple behind the guidelines is that the court addresses the purposes of retribution and general deterrence through the sentence it imposes in adult cases.") Such concerns, the D.C. Parole Board  felt, were left to the sentencing court, and "[a]s a matter of policy, the [D.C. Parole Board] d[id] not and w[ould] not function in amanner that might be viewed as a usurpation of the sentencing judge." Id at 3-4.

41. The D.C. Parole Board explicitly rejected patterning its guidelines "after the federal grid which includes an offense severity scale." Id. at 17 (explaining that, in adopting guidelines, the D.C. Parole Board specifically looked to jurisdictions with a "guideline structure that would be more compatible with the Board's philosophy of letting the court imposed sentence serve as its offense severity indicant").

42. The third guiding principle was that the D.C. parole practices should plainly evidence "a rehabilitative focus". Flecther, 433 F.3d at 871; see D.C. Guidelines Report at 4 ("Guidelines oriented to the assessment of risk and institutional performance therefore touching on the need for progress towards rehabilitation, will be consistent with the intent of this Act.")

43. In Cosgrove, this Court factually distinguished the 1987 Regulations from the federal guidelines enacted in 1976, explaining that while the federal guidelines were "primarily concerned with punishment and the public safety," the D.C. guidelines "emphasize[d] early release of an offender who respond[ed] favorrably to rehabilitative efforts." Cosgrove, 703 F. Supp. at 1003.

## The D.C. Parole Board's 1987 Regulatons Focused On Risk Factors

44. Under its practices and the 1987 Regulations, the D.C. Parole Board "employed an analytic framework that relied in both 'pre and post-incarceration factors." Flecther, 433 F. 3d at 871 ( quoting 28 D.C. Mun. Regs. § 204.1(Weil) (28 D.C. Mun. Regs. §204.1-204.18 are attached as Exhibit #7)

45. The D.C. Parole Board used four factors to determine suitability for parole: two pre-incarceration factors, (i) the degree of risk and (ii) the type of risk; and two post-incarceration factors, (iii) institutional adjustment and (iv) program part-icipation. See D.C. Guidelines Report at 5; Cosgrove, 703 F. Supp. at 1003

10

46. The D.C. Parole Board intentionally did not employ an offense severity factor in its guidelines. See Memorandum from M. Stover, General Counsel, and R. Chickinell, Deputy General Counsel, U.S. Parole Commission to J.R. Clay Jr., Acting Chairman, U.S. Parole Commission ("1992 Stover Memorandum" or "1992 Stover Mem.") at 2 (Aug.21, 1992) ("[T]he D.C. guidelines do not contain an offense severity dimension, nor do they prescribed ranges of months to be served. ") (attached as Exhibit #8)

47. The D.C. Parole Board's philosophy was to let the "court-imposed sentence serve as its offense severity indicant." D.C. Guidelines Report at 17; see also 1992 Stover Mem. at 2-3 ("[T]he D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of accountability for the offense, and apply a point score syestem...to determine whether or not the prisoner is suitable for parole upon the completion of the minimum term.")

48. The D.C. Parole Board did not look to the seriousness of the off- ense for which a D.C. Code offender was imprisoned, and it assumed that society's punishent and deterrence interests in an inmate's sentence,i.e. the offense accountability characteristics of the sentence, were addressed by the sentencing court. See D.C. Guidelines Report at 4 ("[T]he Board of Parole does not and will not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge."); Memorandum from Michael A. Stover, General Counsel, USPC, to Michael J. Gaines, Chairman, USPC (the "1998 Stover Memorandum" or "1998 Stover Mem.") at 3 (June 26,1998) ("the guidelines of the D.C. Board of Parole clearly focus exclusively on the issue of risk") (attached as Exhibit #9); Deposition of Gladys W. Mack (" Mack Dep.") at 42-43, Cosgrove v. Meese, No.80-0516 (Mar. 18, 1988) (Chairperson of the D.C. Parole Board in 1988

testifying that the 1987 Regulations are premised on the principle that the court addressed the purposes of retribution and general deterrence identified in the D.C. Guidelines Report at 3-4) (excerpts attached as Exhibit # 10); 63 Fed. Reg. 39172, 39174 (July 21, 1998) (recognizing that the "parole function for D.C. Code offenders rests on a premise somewhat different from that of the federal parole guidelines" and under which "the minimum term of imprisonment imposed by the court [is treated as the usual measure of basic accountability for the offense of conviction").[3]

---

[3] The USPC recognized this basic premise of the D.C. Parole Board's guidelines in part in the 2000 Guidelines, but it has failed to abide by this principle in its parole decisions with respect to Plaintiff and other D.C. Code offenders. See 28 C.F.R. §2.73 ("It is the policy of the Commission with respect to District of Columbia Code offenders that the minimum term imposed by the sentencing court presumptively satisfies the need for punishment for the crime of which the prisoner has been convicted, and that the responsibility of the Commission is to account for the degree and the seriousness of the risk that the release of the prisoner would entail."). Instead, as demonstrated below, the USPC parole practices presume that all cases involving the death of the victim are "exceptional cases" to which the presumption in 28 C.F.R. § 2.73 does not apply.

## Degree of Risk: The First Factor Considered by the D.C. Parole Board

49. The first factor that the D.C. Parole Board considered was the degree of risk posed by a D.C. Code offender, that is, the likelihood that the offender would commit another crime if released on parole. See D.C. Guidelines Report at 5.

50. The "Degree of Risk" was "the primary factor of the guidelines, applicable in all cases," and was based on the Salient Factor Score ("SFS"), which was an "actuarial risk assessment device that relie[d] exclusively on information known at the time of incarceration." Id.; see 28 D.C. Mun. Regs. § 204.3.

51. In calculating a prisoner's SFS, the D.C. Parole Board considered six pre-incarceration factors: (1) prior convictions and adjudications, (2) prior commitments of more than 30 days, (3) age at the commission of current offense, (4) recent commitment-free period, (5) statute of priosner at time of current offerse, and (6) history of heroin or opiate dependence. See Fletcher, 433 F.3d at 871 (citing 28 D.C. Mun. Regs. § 204.4-204.16).

52. The D.C. Parole Board weighed these factors "by a formula to determine the candidate's risk category, called a 'salient factor score.'" Id. (citing 28 D.C. Mun. Regs. § 204.17, app.2-1).

53. A parole candidate's SFS placed the candidate into one of four risk categories (10-9 = low risk, 8-6 = fair risk, 5-4 = moderate risk, or 3-0 = high risk) from which the D.C. Parole Board would determine a baseline number of points ("baseline point score") - 0 for low risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk. D.C. Guidelines Report at 5; see 28 D.C. Mun. Regs. § 204.17, app. 2-1.

54. The higher a candidate's SFS, the lower the risk that parole candidate would become a recidivist and the lower the baseline point score with which the candidate began for

purposes of the D.C. Parole Board's further calculations.  See 28 D.C. Mun. Regs. § 204.17 & App. 2-1.

55. The D.C. Parole Board then would take a candidate's baseline point score and adjust it using the remaining pre-incarceration factor, i.e., the type of risk, and two post-incarceration factor -- institutional adjustment and program participation -- and arrive at a Point Assignment Grid score ("total point score"). D.C. Guidelines Report at 5-6.

## The Type of Risk: The Second Factor Considered by the D.C. Parole Board

56. The second factor that the D.C. parole Board considered was the type of risk posed by a D.C. Code offender, that is, what type of crime an offender would commit if he/she were to commit another crime while released on parole.  See D.C. Guidelines Report at 5.

57. The "Type of Risk" factor under the 1987 Regulations was "an aggravating factor applicable to these cases in which the Board ha[d] made findings that the current offense, or the offender's pattern of past offenses, involved violence, weapons, or drug trafficking."  Id.  This factor recognized that "if an offender has already indicated through past behavior that he or she is capable of committing a type of crime that is considered particularly serious..., we should be willing to tolerate a lesser degree of risk."  Id. at 21 (emphasis in original).

58. To account for the type of risk posed by a parole candidate based on his on his current or past offenses, the D.C. Parole Board chose three types of offense behaviors that it would count as parole indicants: (1) violence, (2) use of a weapon, and (3) drug trafficking.  Id. at 21-22; see 28 D.C. Mun. Regs. § 204.18 & App. 2-1.

59. Under the 1987 Regulations, the D.C. Parole Board increased the baseline point score that it derived from the candidate's SFS by a maximum of one point if it determined that the parole candidate's "current offense, or two prior felony conviction involve[d] **any or all of**

14

the [following] listed behaviors": violence, the use of a weapon, and drug trafficking.  D.C. Guidelines Report at 21-22 (emphasis added); see 28 D.C. Mun. Regs. § 204.18 & App. 2-1.

60. Under the D.C. parole practices, the highest point score a parole candidate could have based on the candidate's SFS and Type of Risk assessment, and before adjusting for institutional adjustment and program achievement, was a 4 (3, the highest possible baseline point score, plus 1, the only, and maximum, number that can be added for type of risk).  See 28 D.C. Mun. Regs. § 204.18 & App. 2-1.

## Institutional Adjustment: The Third Factor Considered by the D.C. Parole Board

61. The third factor that the D.C. Parole Board considered was institutional adjustment -- whetehr the D.C. Code offender had received any serious disciplinary infractions since the offender had been imprisoned for the current offense. See D.C. Guidelines Report at 5.

62. After calculating a parole candidate's SFS and the corresponding risk category and baseline point score and adjusting that score to account for the type of risk the D.C. Parole Board was required, under its 1987 Regulations, to determine whether the candidate had "committed serious disciplinary infraction." 28 D.C. Mun. Regs. § 204.18(h).

63. Under the 1987 Regulations, the candidate's institutional adjustment was "an aggravating factor applicable [where] the [D.C. Parole] Board has made findings that disciplnary infractions...are either serious or repetitious enough to impact negatively on the parole decision."  D.C. Guidelines Report at 5.

64. The manner in which the D.C. Parole Board used the parole candidate's institutional adjustment to adjust the his/her baseline point score at an initial parole hearing was the subject of precise guidelines adopted by the D.C. Parole Board.  Specifically, the D.C. Parole Board used the "point grid" in Appendices 2-1 and 2-2 to the 1987 Regulations to reflect adjustments to a parole candidate's baseline point score.  See 28 D.C. Mun. Regs. apps. 2-1, 2-2.

Pursuant to Appendices 2-1 and 2-2, the D.C. Parole Board could add one point to a candidate's baseline point score for "negative institutional behavior." See Id. The 1987 Regulations, however, did not provide guideline as to how the D.C. Parole Board was to determine whether to adjust a parole candidate's point score for institutional adjustment, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to, and later did, avoid. See infra ¶¶ 65-66.

## Program Achievement: The Fourth Factor Considered by the D.C. Parole Board

65. The fourth factor that the D.C. Parole Board considered was program achievement -- whether the candidate had achieved sustained program achievement since he/she had been imprisoned for the current offense.

66. After calculating a parole candidate's SFS, the corresponding baseline point score, and adjusting for "type of risk" and institutional infactions, the D.C. Parole Board, under its 1987 Regulations, was required to determine whether a candidate had "demonstrated sustained achievement in the area of priosn programs, industries, or work assignments while under confinement for the current offense." 28 D.C. Mun. Regs. § 204.18(i).

67. Under the 1987 Regulations, a parole candidate's program participation was a "mitigating factor" applied when the D.C. Parole Board found that the candidate's program or work accomplishments were substantial enough to impact favorably on the parole decision. D.C. Guidelines Report at 5.

68. The manner in which the D.C. Parole Board used the parole candidate's program achievement to adjust the baseline point score at an initial parole hearing was the subject of precise guidelines adopted by the D.C. Parole Board. Specifically, the D.C. Parole Board used the "point grid" in Appendices 2-1 and 2-2 to the 1987 Regulations to reflect adjustments to a parole candidate's adjusted baseline point score. 28 D.C. Mun. Regs. apps. 2-1, 2-2. Pursuant to

16

Appendices 2-1 and 2-2, the D.C. Parole Board could subtract one point from a candidate's baseline point score for sustained program or work assignment achievement.  See id.  The 1987 Regulations, however, did not provide guideline as to how the D.C. Parole Board was to determine whether to adjust a parole candidate's adjusted baseline point score for program achievement, which led to sometimes inconsistent and inequitable interpretations and applications of the regulations, which the Board sought to, and later did, avoid.  See infra ¶¶ 65-66.

### The Parole Decision

69.  Once the D.C. Parole Board calculated its baseline point score and adjusted it based on the "Type of Risk," "institutional Adjustment," and "Program Achievement" factors under Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board "integrated [these factors] into a calculus to produce a point score which constrained the Board's discretion in making final parole determinations."  Fletcher, 433 F.3d at 871 (citing 28 D.C. Mun. Regs. § 204.19 & App. 21 (emphasis added)(Appendix 2-1 is attached as Exhibit #11).  This total point score "determine[d] whetehr or not parole is granted, and if so, the level of supervision to be imposed."  D.C. Guidelines Report at 6.

70.  In the case of an initial parole hearing, the 1987 Regulations, as amended by the D.C. Parole Board in 1994, directed the D.C. Parole Board to grant parole to an adult at an initial parole rehearing if the final adjusted score was zero, one, or two:

> After determining an adult parole candidate's SFS score and after applying the pre and post incarceration factors to arrive at a total point score pursuant to §204 and Appendix 2-1, the Board shall take one (1) of the following actions:
>
> (a) IF POINTS = 0: Parole may be granted at initial hearing with low level of supervision required;
>
> (b) IF POINTS = 1: Parole may be granted at initial hearing with high level of supervision required;

(c) IF POINTS = 2: Parole may be granted at initial hearing with highest level of supervision required; or

(d) IF POINTS = 3-5:Parole may be denied at initial hearing and rehearing scheduled.

28 D.C. Mun. Regs. app. 2-1.

71. In the case of a parole rehearing, the 1987 Regulations, as amended by the D.C. Parole Board in 1994, directed the D.C. Parole Board to grant parole to an adult at an initial parole rehearing if the total point score was zero, one, two, or three:

In determining whether to release on parole an adult or a youth offender appearing before the Board at a parole rehearing, the Board shall take the total point score from the initial hearing and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2. The Board shall then take one of the following actions:

(a) IF POINTS = 0-3:Parole may be granted at this rehearing with highest level o[f] supervision required; or

(b) IF POINTS = 4-5:Parole may be denied and a rehearing date scheduled.

28 D.C. Mun. Regs. app. 2-2.

72. When it promulgated the 1987 Regulations, the D.C. Parole Board recognized that "there occasionally will be unique circumstances that are not taken into account by either the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on the release decision." D.C. Guidelines Report at 22 (emphasis added). To address these unique circumstances, the 1987 Regulations permitted the D.C. Parole Board to deport from the action indicated by a parole candidate's total point score only when mitigating and/or countervailing factors applied that demonstrated "unusual circumstances," which the Board had to explain by

reference to the specific aggravating or mitigating factors listed in Appendices 2-1 and 2-2.  28 D.C. Mun. Regs. § 204.22.[2]

73.  In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board listed those pre- and post-incarceration circumstances that it determined might be deemed unusual and therefore warrant a departure from the 1987 Regulations where a parole candidate's total point score indicated that the candidate should be paroled.  See 28 D.C. Mun. Regs. app. 2-1; Mack Dep. at 11-13, 22-25.

74. The D.C. Parole Board believed that six pre-incarceration circumstances or factors ordinarily demonstrated that the candidate was a worse risk for parole at the candidate's initial parole hearing than indicated by his/her total point score:

    a. the candidate repeatedly failed under parole supervision -- "Repeated failure under parole supervision";

    b. the "Current offense involve[d] on-going criminal behavior";

    c. the candidate had a "Lengthy history of criminally related alcohol abuse";

    d. the candidate had a "History of repetitive sophisticated criminal behavior";

    e. the candidate had an "Unusually extensive and serious prior record (at least five felony convictions)"; and

    f. the candidate's crime involved "Unusual cruelty to victims."

28 D.C. Mun. Regs. app. 2-1.

75. The D.C. Parole Board recognized that the six pre-incarceration circumstances were "unique" or "unusual" circumstances because they did not apply to the majority of parole

---

[2] See Mack Dep. at 12-13 (testifying that the six aggravating factors in Appendix 2-1 of the 1987 Regulations indicating that a parole candidate was a worse risk than the candidate's total point score indicated were the only factors the Board could use to depart from the guidelines and deny parole); D.C. Guidelines Report at 6 ("Decisions outside the guidelines may be rendered for good cause when accompanied by written reasons that include a summary of the information upon which the determination is based.").

candidates, i.e., the usual parole candidate. See D.C. Guidelines Report at 22. The D.C. parole Board did not consider them to be "unique" or "unusual" simply because they were factors not taken into account by the SFS or type of risk assessment. See id.

76. The 1987 Regulations did not identify the criteria that the D.C. Parole Board was to apply to determine whether one or more of these six pre-incarceration factors applied in a specific case, which sometimes led to inconsistent and inequitable interpretations and applications of the regulations by D.C. Parole Board officials.

77. Appendix 2-2 of the 1987 Regulations, which applied at parole rehearings, did not include any pre-incarceration aggravating factors on which the D.C. Parole Board could rely to depart from the regulations and deny parole. See Mack Dep. at 26-27.

78. It was the D.C. Parole Board's policy and practice not to consider a parole candidate's current offense at a parole rehearing in deciding whetehr to depart from the guidelines, see Mack Dep. at 28 (testifying that there is no place in Appendix 2-2 for the D.C. Parole Board to consider the current offense behavior as a reason for departing from to depart from the action indicated by a parole candidate's total point score), and instead, to focus on the candidate's rehabilitation, community resources, and health since the candidate's previous hearing, see id. at 26-27.

### The 1991 Policy Guideline: The D.C. Parole Board's Effort to Remove Ensure Equitable Application of the 1987 Regulations

79. In 1991, to ensure consistent and equitable application of the 1987 Regulations, the D.C. Parole Board adopted a Policy Guideline that defined the terms used in the Appendices to the 1987 Regulations (the "1991 Policy Guideline")(attached as Exhibit 12).

80. The 1991 Policy Guideline applied to all requests for parole heard by the D.C. Parole Board. See 1991 Policy Guideline at 1.

81. Following this Court's decision in the Cosgrove case in 1988, the USPC instructed its personal to apply the 1991 Policy Guideline when conducting parole hearings for D.C. Code offenders in federal correctional facilities. See Deposition of Rockne Chickinell ("Chickinell Dep.") at 78 (excerpts attached as Exhibit #13; 1992 Stover Mem. at 2.

82. The purpose of the 1991 Policy Guideline was "[t]o define criteria and parameters for determining the applicability of descriptive terminology used in the [1987 Regulations] for release decisionmaking, and to facilitate consistency in Guideline application." 1991 Policy Guideline at 1.

83. The D.C. Parole Board expressly adopted the 1991 Policy Guideline to avoid disparate decisions for similarly-situated offenders under the 1987 Regulations resulting from the subjective views and judgments of the various individuals at the Board applying those regulations to D.C. Code offenders:

> Many of the descriptive terms used in the Parole Guidelines criteria
> are judgmental or subjective. As such, they lend themselves to
> disparate interpretations and applications by Guideline users.
> To ensure equitable treatment of similarly-situated offenders,
> these terms require definitions that facilitate equitable application
> across affected cases, while preserving sufficient discretion
> to accommodate individual circumstances.

1991 Policy Guideline at 1.

84. To promote consistency in its exercise of discretion under the 1987 Regulations and D.C. parole practices, the D.C. Parole Board sought to limit that discretion in the 1991 Policy Guideline by identifying the criteria and parameters that it used to determine whether certain discretionary factors applied. See id.

## The D.C. Parole Board Narrowly Defined Negative Institutional Behavior

85. As part of its effort to ensure consistency in its application of the "institutional adjustment" factor in its 1987 Regulations, the D.C. Parole Board promulgated section VI.A.1 of the 1991 Policy Guideline, which defined the types of institutional disciplinary actions that the D.C. Parole Board ordinarily considered to be "negative institutional behavior" under

21

Appendices 2-1 and 2-2 of the 1987 Regulations. In section VI.A. 1 of the
1991 Policy Guideline, the D.C. Parole Board defined "Negative Institution
Behavior" as:

> serious or repeated major disciplinary infractions as described below
> that are sanctioned under Department of Corrections due process procedures.
>
> a.    In INITIAL PAROLE CONSIDERATION cases, the following
> disciplinary infractions shall ordinarily be considered as negative
> institutional behavior:
>
>> (1)    One Class I Offense for murder, manslaughter,
>> kidnapping, armed robbery or first degree burglary at any
>> time during the minimum sentence (see DCMR 28-502.3, May
>> 1987); OR
>>
>> (2)    One Class I Offense...during the 12 months
>> preceding the hearing OR during the last half of the
>> minimum sentence up to a period of three years, whichever
>> is longer; OR
>>
>> (3)    Two Class II Ofense...during the 12 months
>> preceding the hearing OR during the last half of the minimum
>> sentence up to a period of three years, whichever is longer.
>
> b.    In PAROLE RECONSIDERATION cases, the following disciplinary
> infractions occurring since the preceding release consideration
> on the sentence shall ordinarily be considered as negative
> institutional behavior:
>
>> (1)    One Class I Offense (see DCMR 28-502.3 through
>> 502.17, May 1987); OR
>>
>> (2)    Two Class II Offenses (see DCMR 28-503.2 through
>> 503.12, May 1987).

1991 Policy Guideline at 2 (emphasis added).

        86. For purposes of determining at a parole candidate initial hearing
whether the candidate had engaged in negative institutional behavior, the
1991 Policy Guideline provided that the D.C. Parole Board's written policy
was to consider only those institutional offenses committed by a candidate
in the twelve months preceding the hearing or in the last half of the minimum
sentence up to a period of three years, except in the case of the offenses
of murder, manslaughter, kidnapping, armed robbery, or first degree burglary.  See id.

87. The 1991 Policy Guideline provided that at a parole rehearing, the D.C. Parole Board only would consider certain types of offenses committed since the initial parole hearing as "negative institutional behavior," i.e., a Class I offense or two Class II offenses.  See id.

## The D.C. Parole Board Broadly Defined Sustained Program or Work Assignment Achievement

88. To achieve greater consistency in its application of the "program achievement" factor of the 1987 Regulations, in section VI(A)(2)(a) of the 1991 Policy Guideline, the D.C. Parole Board defined "sustained program or work assignment achievement" for purposes of Appendix 2-1 as:

> In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:
>
> (1) successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area.

1991 Policy Guideline at 3.

89. For purposes of parole rehearing under Appendix 2-2 of the 1987 Regulations, section VI(A)(2)(b) of the 1991 Policy Guideline defined "sustained program or work assignment achievement" as:

> In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy [i.e., those that apply in initial parole hearings] shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence.

Id.

## The D.C. Parole Board Limited the Scope of Unusual Circumstances

90. In the 1991 Policy Guideline, the D.C. Parole Board clarified the scope of its authority to deny parole for "unusual circumstances" when a parole candidate's total point score indicates that parole should be granted.

91. Section VI(C) of the 1991 Policy Guideline, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," defined each of the factors listed in Appendix 2-1 of the 1987 Regulations that the D.C. Parole Board recognized as constituting "unusual circumstances" and described the objective criteria and parameters that the D.C. Parole Board required to establish the existence of those circumstances. 1991 Policy Guideline at 6-9.

92. The "unusual circumstances" of "Repeated Failure Under Parole Supervision" listed in Appendix 2-1 of the 1987 Regulations was defined by the 1991 Policy Guideline as requiring "two (2) or more revocations of parole on the current sentence, OR three (3) or more revocations of parole on any sentence within the preceding five years." Id. at 6.

93. The "unusual circumstances" of "Unusually Extensive or Serious Prior Record" was defined by the 1991 Policy Guideline as consisting of "at least five (5) felony convictions" for the commission of certain crimes of violence. Id. at 6-7.

94. The "unusual circumstances" of "Instant Offense Involved Unusual Cruelty to Victims" was defined by the 1991 Policy Guideline as requiring a finding that the offense involved "a. [p]hysical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense; OR b. [e]specially vulnerable victims, e.g., children or elderly persons were the victims of assaultive or fraudulent behavior." Id. at 7.

24

## The USPC Changed the D.C. Parole Board's Regulations and Practices and Reinstituted Board Discretion

95. Effective august 5, 1998, the Revitalization Act abolished the D.C. Parole Board.  Pub. L. No. 105-33 § 11231(b).  Thereafter, the USPC assumed responsibility for parole hearings for D.C. Code offenders.  Id.

96. Congress mandated in the Revitalization Act that the USPC conduct parole hearings for D.C. Code offenders according to the parole statutes and regulations of the District of Columbia.  Id. at § 11231(c).

97. Instead, the USPC immediately drafted interim parole regulations effective in 1998 that were significantly different from and replaced the D.C. parole practices.  28 C.F.R. § 2.80(a)(5); Fletcher, 433 F.3d at 870. The USPC explained that it would apply its new regulations retroactively. See id.

98. After promulgating several revisions to those interim rules, the USPC published the 2000 Guidelines in final form and announced that it would apply those guidelines to any D.C. Code offender that had not received an initial parole hearing as of August 5, 1998, 28 C.F.R. § 2.80(a)(5); Fletcher, 433 F.3d at 870, including Plaintiff.

99. For D.C. Code offenders who had received an initial parole hearing before August 5, 1998, the USPC decided that it would apply the 1987 Regulations but ignore the D.C. Parole Board's other parole policies and guidelines, including the 1991 Policy Guideline.  Chickinell Dep. at 38-39; Deposition of Stephen Husk ("Husk Dep.") at 60-61 (excerpt attached as Exhibit #14).

100. The USPC justified its use of the new 1998 regulations and the 2000 Guidelines on the ground that its research and analysis allegedly demonstrated that "[t]he point score system used by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from the guidelines based upon factors that should be included in the guidelines."  63 Fed. Reg. 17771, 17772 (Apr. 10, 1998).

101. As the USPC explained when it published its interim rule on July 21, 1998, "in a random sample of 100 cases decided by the D.C. Parole Board in 1997, the [USPC] found departures in more than half of the cases." See 63 Fed. Reg. 39172, 39172 (July 21, 1998). The USPC found that the "[f]actors cited by the [D.C. Parole] Board to justify departures most often appear to involve aspects of the prisoner's current offense or criminal history that indicate a risk of violent recidivism." Id. The USPC's new regulations purported to "incorporate factors that would otherwise be expected to result in decisions outside the guidelines." Id.

102. The USPC also undertook an analysis "to identify factors related to current offense and criminal history that [could] be empirically correlated with repeat violent crime." Id. For this study, a USPC contractor drew a statistical sample of 1,000 D.C. Code offenders released in 1992 and evaluated whether those offenders had an arrest for a violent offense within five years after their release. Id. Despite various data and process deficiencies noted by the USPC's contractor, the USPC determined that this research confirmed that (a) "a violent current offense predicts for future violence"; (b) a record of prior violent crime is "predictive even if the offense did not involve violence;" and (c) that firearm possession also predicts future violent crime even if the current offense did not involve violence. Id. at 39173.

103. Based on these two studies, the USPC replaced the D.C. parole practices with the 2000 Guidelines for D.C. Code offenders receiving an initial parole hearing after August 5, 1998. Id. It did so despite the fact that it was concerned that its new guidelines might increase the period of incarceration that D.C. Code offenders would have to serve. Chickinell Dep. at 184-186, 188-189. The USPC has not analyzed whether the 2000 Guidelines in fact have increased the period of incarceration served by D.C. Code offenders above what they likely would have served under the D.C. parole practices. Id. at 190:19-191:3.

26

104. The practices the USPC has followed when applying the 1987 Regulations since 1998 have increase the period of incarceration that offenders convicted of certain crimes, including Plaintiff, must serve to establish that are presumed suitable for parole.

105. Under the D.C. parole practices, an offenders who committed a crime of violence that resulted in the victim's death, even if that crime was murder, has satisfied offense accountability once the offender has served his/her "minimum sentence." D.C. Guidelines Report at 2-4.

106. Under the practices the USPC has followed when applying the 1987 Regulations since 1998, an offender who committed **any** crime of violence that resulted in the victim's death, whether it be involuntary manslaughter or murder, has not satisfied offense accountability once the offender has served his/her "minimum sentence."

107. On their face, the 2000 Guidelines are significantly different from the D.C. parole practices that applied to D.C. Code offenders before 1998. These new guidelines have increased the period of incarceration that offenders convicted of certain crimes, including Plaintiffs, must serve to establish that they are presumed suitable for parole.

108. Under the 2000 Guidelines, an offender who committed **any** crime of violence that resulted in the victim's death, whether it be involuntary manslaughter or murder, has not satisfied offense accountability once the offender has served his/her "minimum sentence." See 28 C.F.R. § 2.80(f).

27

109. Under the 2000 Guidelines, as explained in greater detail below, 18-24 months is automatically added (more if an offender has prior convictions and/or commitments, is under age 19, and/or was on parole or probation when the crime was committed) to the minimum sentence of an offender who committed **any** crime of violence that resulted in the victim's death, whether it was involuntary manslaughter or murder. 28 C.F.R. § 2.80(f), (h).

110. The USPC repeatedly has denied D.C. Code offenders' requests for parole, including those of Plaintiff, on offense severity bases or on the ground that it believes that the parole candidates have not served enough time for their offenses, i.e., that the inmates have not been incarcerated long enough to satisfy the accountability for their offenses.

111. In the 2000 Guidelines, the USPC has re-defined the term "unusual circumstances" that the D.C. Parole Board applied when it determined that it was appropirate to depart from the presumptive parole suitability indicated by its guidelines. Compare 1991 Policy Guideline at 6-9 with 28 C.F.R. § 2.80(n)(2).

112. The D.C. Parole Board adopted and applied specific criteria in the 1991 Policy Guideline to determine the existence of "unusual circumstances." 1991 Policy Guideline at 6-9. The USPC ignored that policy guideline and the D.C. Parole Board's definition of "unusual circumstances." See 28 C.F.R. § 2.80(n)(2).

113. The USPC has defined an "unusual circumstance" as any factor that a USPC hearing examiner or commissioner can think of that is not accounted for already in the calculation of a parole candidate's total point score under the 1987 regulations or Total Guideline range under the 2000 Guidelines. Husk Dep. at 133; see 28 C.F.R. § 2.80(n)(1).

28

## The USPC Consider Offense Accountability in Applying the 2000 Guidelines

114. Under the 1987 Regulations and D.C. parole practices, the D.C. Parole Board assumed that a parole candidate had satisfied the accountability for his or her offense (the need for punishment, retribution, and general deterrence) once that candidate became eligible for parole, i.e., after serving the minimum sentence imposed by the court. See D.C. Guidelines Report at 2-4; 1992 Stover Mem. at 2-3; 63 Fed. Reg. at 39174.

115. The D.C. Parole Board did not address offense accountability when determining whether an inmate was suitable for parole. Mack Dep. at 46-47, 52, 53.

116. The D.C. parole Board looked solely at the degree and type of risk of recidivism posed by a parole candidate and the candidate's institutional conduct (both postive and negative) to determine the candidate's suitability for parole. See 1998 Stover Mem. at 3; 1992 Stover Mem. at 2-3.

117. In the 2000 Guidelines, the USPC recognized that the 1987 Regulations were premised on the assumption that the "minimum term of imprisonment imposed by the court" was the "measure of basis accountability for the offense of conviction." 63 Fed. Reg. at 39174. The USPC determined that it could ignore this assumption under the 2000 Guidelines in "exceptional cases" and apply a classic federal parole guideline principle of considering based on the severity of a parole candidate's offense. 28 C.F.R. § 2.73(b). The USPC changed the "assumption" in the 1987 Regulations and D.C. Parole Board's practices into a "presumption" that the USPC determined it could ignore in "exceptional cases" based on "the gravity of the offense." Id.

118. The USPC has made a similar change in its practices when applying the 1987 Regulations to D.C. Code offenders who received their initial parole hearing before August 5, 1998. The D.C. Parole Board assumed that all D.C. Code offenders had satisfied offense accountability when they became eligible for parole. See D.C. Guidelines Report at 2-4; 1992 Stover Mem. at 2-3; 63

Fed. Reg. at 39174. The USPC purportedly presumes this fact, but ignores
the presumption whenever it decides that the court's sentence was inadequate
to satisfy the goals of punishment, retribution, and general deterrence.
See id.

119. The USPC has presented no evidence that the D.C. Parole Board
ever denied a parole candidate's request for parole simply because the D.C.
Parole Board believed that the candidate had not been punished enough or needed
to serve longer to satisfy accountability for the offense.

### The Presumption of Suitability Under the 2000 Guidelines

120. Like the 1987 Regulations, the 2000 Guidelines initially use
a point score system to determine whether a presumption applies that an inmate
is suitable for parole.

121. This point score system, like the 1987 Regulations, begins with
the calculation of a Silient Factor Score for each parole applicant and is
aimed at assessing the degree of risk that a parole candidate will become
a recidivist. See 28 C.F.R. §§ 2.80(c) and 2.20.

122. This point score system then purports to look to the "type of
risk" that the candidate poses should he or she become a recidivist, and finally
factors in the candidate's institutional behavior. See 28 C.F.R. §§ 2.80(f),(i),
and (k).

123. Unlike the 1987 Regulations, which use the SFS, type of risk,
and institutional behavior factors to come up with a total point score that
determines whether a parole candidate is presumed suitable for parole, the
2000 Guidelines use the SFS and type of risk factors to develop a "Base Point
Score," which the USPC uses to determine a "Base Guideline Range," a number
of months the USPC adds to a parole candidate's parole eligibility period.
28 C.F.R. § 2.80(f); see 65 Fed. Reg. at 70663; 28 C.F.R. § 2.80(1). This
makes it impossible for any person with a Base Point Score over three to establish
a presumption of suitability for parole when he or she becomes eligible for
parole, i.e., after completion of his or her minimum sentence, as the 1987

30

Regulations permitted.  The Base Guideline Range represents "[t]he time [in excess of the candidate's parole eligibility period, i.e., minimum sentence] expected for the inmate to qualify for parole (assuming no disciplinary infractions and no ordinary program achievement)."  65 Fed. Reg. at 70663.

124.  The USPC adjusts the range resulting from adding the Base Guideline range to the aprole eligibility period by adding or substracting periods of months to reflect negative institutional behavior and/or superior program achievement.  See 28 C.F.R. § 2.80(1).  The 2000 Guidelines refer to the final range of months as the Total Guideline Range and treat it as "the amount of time [an offender] may expect to serve with continued good conduct and ordinary program achievement."  65 Fed. Reg. at 70664.  Until a parole candidate has served a period of time equal to the bottom of his or her Total Guideline range, the candidate is presumed to be unsuitable for parole.  See Chickinell Dep. at 117, 172; Husk Dep. at 187.

125.  Under the 1987 regulations, depending largely on his or her SFS and institutional behavior, an offender often would have been entitled to a presumption that he or she was suitable for parole at the end of his or her minimum sentence.  Under the 2000 Guidelines, the same offender is now presumed unsuitable for parole until he or she has served his or her minimum sentence as well as any additional period of incarceration indicated by the Base Guideline Range or by adjustments for negative institutional behavior. See 28 C.F.R. § 2.80(h), (i) and (1).

### The USPC's Charges in the 2000 Guidelines to the 1987 Regulations' SFS and Type of Risk Assessments Increased the Period of Incarceration that Plaintiff Had to Serve to Establish a Presumption that he was Suitable for Parole

126.  The USPC accomplished the increase in the period a D.C. Code offender must serve to establish a presumption of suitability for parole through changes it made, under the guise of improving the predictive value of the 1987 Regulations and to reflect what the USPC

perceived as the "unstructured discretionary departures" that the D.C. Parole
Board "frequently ordered...to compensate for an inadequate violence prediction
('type of risk' scale)," 63 Fed. Reg. at 39173, to the factors used in calculating
D.C. Code offenders' SFS and type of risk score.

127. For the SFS calculation in the 2000 Guidelines, which, like the
1987 Regulations, classify a parole candidate by risk of recidivism according
to a point score (the higher the SFS, the lower the risk that the candidate
would become a recidivist), the USPC, among other things, removed the one
point increase that a D.C. Code offender could earn under the 1987 Regulations
if the offender did not have a history of heroin or opiate addiction and replaced
it with a one point increase that only offenders who were 41 years of age
or older at the time of their offenses could earn. Compare 28 C.F.R. § 2.20
salient factor scoring manual with 28 D.C. Mun. Regs. app. 2-1. These changes
to the SFS negatively impacted some D.C. Code offenders, i.e., those under
the age of 41 with no history or heroin or opiate addiction, by depriving
them of an SFS point they otherwise would have had under the 1987 Regulations.
See 28 C.F.R. § 2.20 salient factor scoring manual.

## The USPC's Changes to the "Type of Risk" Evaluation Were far More Drastic than its Changes to the SFS Calculation.

128. Like the 1987 Regulations, the 2000 Guideline provide for a "type
of risk" analysis by taking the number of points identifying the degree of
risk a parole candidate posed (as shown by the candidate's SFS score: an SFS
between 10-8 resulted in no points, between 7 and 6 in 1 point, between 5
and 4 in 2 points, and three or below in 3 points) and adjusting these points
based on the parole candidate's history of violence, the use of a weapon,
and/or the death of a victim as a result of the candidate's crime. See 28
C.F.R. § 2.80(f).

129. Unlike the 1987 Regulations, under which the most points a parole
candidate could obtain for the "type of risk" factor was a single point, the
2000 Guidelines treated the candidate's history of violence, use of a weapon,
and/or the death of a victim as distinct factors,

each of which the USPC could use to contribute points to a parole candidate's Base Point score. In total, the 2000 Guidelines enabled the USPC to give a parole candidate as many as 7 points based on the "type of risk" factor, compared to the 1 point the 1987 Regulations permitted. Compare 28 D.C. Mun. Regs. Appendix 2-1 with 28 C.F.R. § 2.80(f).

130. Each point of the Base Point Score in excess of three points increased the period of incarceration that a parole candidate had to serve in excess of his or her minimum sentence to be entitled to a presumption that he or she was suitable for parole. See 28 C.F.R. § 2.80(h).

131. The 2000 Guidelines divided the 1987 Guidelines "type of risk" analysis into two categories. See 28 C.F.R. § 2.80(f). Allegedly as a result of findings made in the recidivism study that the USPC commissioned, see 63 Fed. Reg. at 39172, the USPC used Category II of the "type of risk" analysis to adjust a parole candidate's Base Point Score by adding points based on whether the candidate had a history of violence, either in the current and/or in prior offenses, or used a firearm in the current offense. See 28 C.F.R. § 2.80(f).

132. If a parole candidate had two or more prior felony offenses involving violence and the current offense involved violence, the USPC added four points to the Base Point Score in Category II. 28 C.F.R. § 2.80(f).

133. If a parole candidate had one prior felony offense involving violence and the current offense involved violence, the USPC added three points to the Base Point score in Category II. Id.

134. If a parole candidate's current offense involved violence or a firearm, but the candidate had no prior felony offenses involving violence, the USPC added two points to the candidate's Base Point Score in Category II. Id,

135. If the candidate's current offense did not involve violence or the possession of a firearm, but the candidate had a prior offense involving violence, the USPC added one point to the Base Point Score. Id.

136. In Category III of the Base Point Score calculation, the USPC added three points to the Base Point Score if a parole candidate's current offense involved violence that resulted in the death of the victim. Id.

137. If the candidate's offense involved attempted murder, conspiracy to murder, solicitation of murder, or any willful violence where death of the victim was the most probable result of the crime, the USPC added two points to the Base Point Score. Id.

138. If a parole candidate's current offense involved "high level violence," such as arson, forcible rape, kinapping, and carjacking, where death of the victim was not the most problem result of the crime, the USPC added one point to the candidate's Base Point Score. Id.

139. For the Category III adjustments, the USPC did not offer any empirical findings supporting its decision to increase a parole candidate's Base Point Score, as it had for Category II. Instead, the USPC, without any factual or legal support in the D.C. Parole Board's regulations, policies, "decided that [extremely violent crimes such as murder and rape] present implied risk levels that would either justify [1] repeated departures, or [2] the inclusion of the relevant factors in the guideline system itself," which is what the USPC asserted it had chosen to do. 63 Fed. Reg. at 39173.

140. For any parole candidate who was serving a sentence for a crime of violence that had resulted in the death of the victim, such a Plaintiff, the 2000 Guidelines automatically increased the Base Point Score by **at least** five points. See 28 C.F.R. § 2.80(f). This translated into **at least** 18-24 months added onto the period that the candidate would have to serve to establish a

34

presumption of suitability for parole under the 1987 Regulations.  See 28
C.F.R. § 2.80(h).  If such a candidate had any prior convictions for violent
offenses, the Base Point Score would increase even more than 5 points, as
would the additional period the candidate had to serve to establish presumptive
suitability for parole.  See 28 C.F.R. § 2.80(f) and (h).

141. The USPC's use of the Base Point Score necessarily increases
the period of incarceration that any D.C. Code offender with a Base Point
Score in excess of three has to serve to establish that he or she is presumptively
suitable for parole.  See id.

142. On their face, the 2000 Guidelines, potentially could increase
an offender's presumptive suitability for parole by 110 - 140 months.

143. Under the 1987 Regulations, a 21 year old offender, who committed
two prior residential burglaries of empty homes, committed involuntary manslaughter
in the current offense, and has no disciplinary infractions and no sustained
program achievement, would be presumptively suitable for parole after serving
his minimum sentence.  This hypothetical offender will be discussed in Paragraph
130 - 135 below, and will be referred to as the "Offender."

144. Under the 2000 Guidelines, the Offender would have to serve
an additional 110 - 140 months to become presumptively suitable for parole.

145. Under the 1987 Regulations, the Offender's SFS would be 6 points,
comprised of:

> a. 1 point for having two or three prior adult or juvenile
convictions;
> b. 1 point for having one or two prior commitments for more
than thirty days;
> c. 1 point for being 20-25 years of age at the time of the
current offense;
> d. 1 point for having a recent commitment free period of three
years;
> e. 1 point for not being on probation, confinement, or escape
status during the commission of the current offense; and
> f. 1 point for having no history of heroin/opiate dependence.

28 D.C. Mun. Regs. app. 2-1.

146. Under the 1987 Regulations, the SFS of 6 points, would translate into a fair risk category and a baseline point score of 1. Id. the Offender would receive one additional point for the "type of risk" for the involuntary manslaughter and residential burglary under the 1987 Regulations. With a final point score of 2, the offender, under the 1987 Regulations, would be presumed suitable for parole at his/her initial hearing, that is, after serving his minimum sentence. 28 D.C. Mun. Regs. app. 2-1. He would be presumptively suitable for parole. See id.

147. Under the 2000 Guidelines, the Offender would not be presumed suitable for parole after serving his minimum sentence; instead, he would need to serve an additional 110 - 140 months above his minimum sentence to be presumed suitable for parole. See 28 C.F.R. § 2.80(f) and (h).

148. Under the 2000 Guidelines, the Offender's SFS would be 5 points, comprised of:

      a. 1 point for having two or three prior adult or juvenile convictions;

      b. 1 point for having one or two prior commitments for more than thirty days.

      c. 1 point for being 20-25 years of age at the time of the current offense;

      d. 1 point for having a recent commitment free period of three yaers; and

      e. 1 point for not being on probation, confinement, or escape status during the commission of the current offense; and

      f. 0 point for being under 41 years of age at the commencement of the current offense. 28 C.F.R. § 2.20. He would not receive 1 point as he would have under the 1987 Regulations for having history of heroin/opiate dependence.

149. Under the 2000 Guidelines, the SFS of 5 points also would translate into a fair risk category, but a baseline point score of 2 (not 1 as he had under the 1987 Regulations). Under the 2000 Guidelines, involuntary manslaughter and residential burglary are crimes of

36

violence. See 28 C.F.R. § 2.80(g)(4)(ii), (vi). Under Category II, the Offender would receive 4 additional points for "[v]iolence in the current offense and...felony violence in two...prior offense." 28 C.F.R. § 2.80(f). Under category III, the Offender would receive 3 additional points because the "[c]urrent offense involved violence (high level violence or other violence) with death of [the] victim resulting." Id. The Offender would receive 7 points in addition to his SFS Category Point Score of 2, for a total Base Point Score of 9 points. Id. The Base Point Score of 9 would be converted into a Base Guideline Range of 100 - 140 months, 28 C.F.R. 2.80(h), meaning that under the 2000 Guidelines, the Offender would be required to serve 110 - 140 months in addition to his minimum sentence to be presumed suitable for parole. Under the 1987 Regulations, this same Offender would have been presumed suitable for parole after serving his minimum sentence. That is a longer guaranteed sentence of 9 years and 2 months to 11 years and 8 months under the 2000 Guidelines.

150. The USPC asserted that its use of the Category III enhancement to the Base Point Score was justified because the D.C. parole Board departed "frequent[ly] for cases of 'unusual cruelty to victims'" (which the USPC believed correlated with "high level violence") because the D.C. Parole Board's "point score table assign[ed] a one point enhancement for violence, regardless of the nature and seriousness of the crime." 63 Fed. Reg. at 39172. the USPC cited absolutely no factual support for this assertion. See id.; 1998 Memorandum at 3, 7 (noting that the D.C. Parole Board's guidelines focus exclusively on risk and that "the research results did not justify the conclusion that current homicides statistically predict for future homicides," but nevertheless justifying the two point enhancement in Category III on the ground that including the factor would "structure discretion that would

otherwise be used in decisions outside the guidelines based on the fact
that a victim was done to death").

### In the 2000 Guidelines, The USPC Uses a Parole Candidate's Negative Institutional Behavior to Increase the Period of Incarceration the Candidate Has to serve to Establish Presumptive Parole Suitability

151. The 2000 Guidelines, like the 1987 Regulations, take a parole candidate's institutional behavior into account for purposes of parole determinations.

152. Unlike the 1987 Regulations, the 2000 Guidelines determine a range of months under the provisions of 28 C.F.R. § 2.36 "for any significant disciplinary infractions ince the beginning of confinement on the current offense in the case of an initial hearing, and since the last hearing in the case of a rehearing." 28 C.F.R. § 2.80(j).[3]

153. The USPC then adds the range of months it calculates under 28 C.F.R. § 2.36 to the parole candidate's Base Guideline range and minimum sentence, i.e. parole eligibility period, to determine the period of incarceration that the candidate must serve to establish his/her presumptive suitability for parole. Id.

154. Unlike the 1987 Regulations, 28 C.F.R. §§ 2.80(j) and 2.36 do not limit consideration at initial parole hearings to the parole candidate's institutional behavior within the three years before the parole hearing for all but the most serious infractions. Compare 28 C.F.R. §§ 2.80(j) and 2.36 with 1991 Policy Guideline at 2.

155. The USPC's use of the 2000 Guidelines instead of the 1987 Regulations have allowed the Defendants to increase the periods of incarceration that a parole candidate "may expect to serve" before considered suitable for parole based on disciplinary infractions that

---

[3] Although the USPC regulations state that the USPC only considers "significant" disciplinary infractions, the Defendants' practice is to add months to a D.C. Code offender's minimum sentence and Base Guideline range for every disciplinary infraction the offender receives, regardless of how insignificant or old the disciplinary infractions is. Husk Dep. at 47;

the D.C. parole practices would not have considered at all. [4] Compare 28
C.F.R. § 2.36 with 1991 Policy Guideline at 2.

## The 2000 Guidelines, Unlike the 1987 Regulations, Do Not Reward a Parole Candidate's Ordinary Program Achievement By Improving the Candidate's Prospects of Parole

156. Pursuant to section 2.80(e)(1) of the 2000 Guidelines, the USPC
assesses whether a parole candidate "has demonstrated ordinary or superior
achievement in the area of prison programs, industries, or work assignments
while under confinement for the current offense." 28 C.F.R. 2.80(e)(1).

157. The 2000 Guidelines give the USPC the sole discretion of determining
whether the parole applicant's work and program achievements are to be considered
"superior" or "ordinary." See Howard Dep. at 66-68.

158. Per the USPC's guidelines, "if superior achievement is found,
the award for superior program achievement shall be one-third of the number
of months during which the prisoner demonstrated superior program achievement."
28 C.F.R. § 2.80(e).

159. Under the 1987 Regulations and the D.C. parole practices, the
D.C. Parole Board used an objective standard, set forth in the 1991 Policy
Guideline, to reward "Sustained Program Achievement or Work Assignment Achievement."
1991 Policy Guideline at 3.

---

[4] Even where a parole candidate's institutional misconduct may have been
considered by the D.C. Parole Board because it occurred within the three
years prior to the candidate's initial hearing, that misconduct would not
necessarily have added period of incarceration to the time the candidate
had to serve to establish presumptive parole suitability.  The 2000 Guidelines,
on the other hand, automatically add aperiod of months to a parole candidate's
parole eligibility period for any but the most minor infractions.

### INDEX OF EXHIBITS TO
### PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

**EXHIBIT**          **DESCRIPTION**

Exhibit 1    Plaintiff's Judgement and Commitment order

Exhibit 2    Plaintiff's Sentence Monitoring Computation

Exhibit 3    Plaintiff's Initial Parole Hearing Summary

Exhibit 4    Plainttff's July 23, 2007 Notice of Action

Exhibit 5    Plaintiff's Initial Prehearing Assesment

Exhibit 6    Report on the the Developement of Paroling Policy Guidelines for the District of Columbia Board of Parole

Exhibit 7    28 D.C. Mun. Regs. §204.1-204.18

Exhibit 8    Memorandum from M. Stover, General Counsel, and R. Chickinell, Deputy General Counsel, U.S. Parole Commission to J.R. Clay, Jr., Acting Chairman, U.S. Parole Commission

Exhibit 9    Memorandum from Michael A. Stover, General Counsel, USPC, to Michael J. Gaines, Chairman, USPC

Exhibit 10   Excerpts from Deposition of Gladys W. Mack, Cosgrove v. Meese, No. 80-0516 (Mar. 18, 1988)

Exhibit 11   28 D.C. Mun. Regs. App. 2-1

Exhibit 12   1991 Policy Guideline

Exhibit 13   Excerpts from Deposition of Rockne Chickinell, (Sellmon v. Reilly 1:06-cv-01650 ESH)

Exhibit 14   Excerpts from Deposition of Stephen Husk, (Sellmon v. Reilly 1:06-cv-01650 ESH)

# Exhibit

# 1

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America

~~XXXXXXXXXXXXXXXX~~

OCC-# *106*

*MAXSEC*

vs.

**ERNEST D. SMITH**

Case No. **F 4505-92 CDR**

PDID No. **419072**

DCDC: 245853

## JUDGMENT AND COMMITMENT/PROBATION ORDER

The above-named defendant having entered a plea of ☒ Not Guilty ☐ Guilty to the Charge(s) of _____

**CT. C- CARRYING PISTOL WITHOUT LICENSE**-Misd( ) Felony( ✓ )   Ct. E- ____

**CT. D- POSSESION OF FIREARM DURN. CRIME OF VIOLENCE OR DANGEROUS OFFENSE**

and having been found guilty by ☒ Jury ☐ Court, it is hereby ORDERED that the defendant has been convicted of and is guilty of the offense(s) charged, and is hereby SENTENCED to *Ct C: 3-9 years, Ct D; 5-15 years, Ct E; 10-30 years*

Concurrent with: *Cts C + D w/ each other*   Consecutive to: *Cts C & D*

☒ MANDATORY MINIMUM term of *Ct D-5yrs Ct E-5 yrs.* applies to the sentence imposed.

☐ MANDATORY MINIMUM term does not apply.

☒ ORDERED that the defendant be committed to the custody of the Attorney General for imprisonment for the period imposed above.

☐ ORDERED that the defendant be committed to the custody of the Attorney General for treatment and supervision provided by the D.C. Department of Corrections pursuant to Title 24, Section 803[b] of the D.C. Code [Youth Rehabilitation Act 1985].

☐ ORDERED that the defendant be placed on probation in charge of the Director, Social Services Division, and it is further ORDERED that while on probation the defendant observe the following marked conditions of probation:

☐ Observe the general conditions of probation listed on the back of this order.

☐ Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with written notice from your Probation Officer.

☐ Treatment for ☐ alcohol problems ☐ drug dependency or abuse as follows:

_____

☐ Restitution of $_____ in monthly installments of $_____ beginning

_____ (see reverse side for payment instructions). The Court

will distribute monies to _____ .

☐ _____

Costs in the aggregate amount of $_____ (*)TO BE PAID OUT OF INSTITUTIONAL EARNINGS: YES (✓) have been assessed under the Victims of Violent Crime Compensation Act of 1981 and ☐ have ☒ have not been paid. NO( ) N/A( )

ORDERED that the Clerk deliver a true copy of this order to appropriate authorized official(s) and that the copy shall serve as the commitment order for the defendant. (*)PSI ATTACHED USMS: YES (✓) NO( ) N/A( )

**DEC 03 1993**
Date

_____
Judge

Certification by Clerk pursuant to Criminal Rule 32(d).

**DEC 03 1993**
Date

_____
Deputy Clerk

Form CD(18)-1040/Aug. 87

*Left margin:* COMMUNITY SERVICE ORDERED: YES ( ) NO ( ) HOURS (*)

## GENERAL CONDITIONS OF PROBATION

1. Obey all laws, ordinances and regulations.

2. Keep all appointments with your Probation Officer.

3. Notify your Probation Officer of any change of address within 48 hours and obtain the permission of your Probation Officer if you plan to leave the Washington Metropolitan Area for more than two weeks.

4. Abstain from the use of hallucinatory or other illegal drugs.

5. Obtain a job as soon as possible or continue your present employment.

**NOTICE TO DEFENDANT:** If you do not comply with the terms and conditions of your probation the Court may, after notice and hearing, revoke your probation , which may result in commitment to an institution.

## INSTRUCTIONS FOR PAYMENT OF RESTITUTION AND FINES

Unless specifically ordered otherwise by the Judge, monthly installments on restitution and fines are due on the first Monday of each month.

Make such payments to the Criminal Finance Office, Room 1225, Superior Court of the Distirct of Columbia, 500 Indiana Avenue, N.W., Washington, D.C.  20001.

Payments may be made by cash, or by cashier's check or money order made payable to the Superior Court of the District of Columbia.

| | |
|---|---|
| Original — Court | Pink — Mayor's Office |
| Blue — Jail | Goldenrod — U.S. Attorney/Corporation Counsel |
| Green — Defendant | Goldenrod — Defense Attorney |
| Canary — Social Services | Goldenrod — Bureau of Prisons |

# Exhibit

# 2

```
    LEWHL  540*23 *              SENTENCE MONITORING
PAGE 004 OF 004 *               COMPUTATION DATA              *       05-07-2007
                                 AS OF 05-07-2007             *       15:00:39

   REGNO..: 11565-007 NAME: SMITH, ERNEST DERRICK


   DATE COMPUTATION BEGAN..........: 10-08-1993
   AGGREGATED SENTENCE PROCEDURE...: DC GTC ACT ADULT AGGREGATE SENTENCE
   TOTAL TERM IN EFFECT............:     57 YEARS
   TOTAL TERM IN EFFECT CONVERTED..:     57 YEARS
   AGGREGATED MINIMUM TERM.........:     19 YEARS
   COMBINED MANDATORY MINIMUM......:     10 YEARS
   EARLIEST DATE OF OFFENSE........: 01-16-1990

   JAIL CREDIT.....................:     FROM DATE        THRU DATE
                                         04-26-1992       10-07-1993

   TOTAL JAIL CREDIT TIME..........: 530
   TOTAL INOPERATIVE TIME..........: 0
   STATUTORY GOOD TIME RATE........: 10
   TOTAL SGT POSSIBLE..............: 6840
   PAROLE ELIGIBILITY..............: 01-25-2008
   STATUTORY RELEASE DATE..........: 08-03-2030
   TWO THIRDS DATE.................: N/A
   180 DAY DATE....................: N/A
   EXPIRATION FULL TERM DATE.......: 04-25-2049

   NEXT PAROLE HEARING DATE........: 07-00-2007
   TYPE OF HEARING.................: INITIAL

   PROJECTED SATISFACTION DATE.....: 04-18-2030
   PROJECTED SATISFACTION METHOD...: MAND PAR




   G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

# Exhibit

# 3

# HEARING SUMMARY

**Name:** **Smith, Ernest**

**Reg No:** **11565-007**

## Hearing Parameters

Hearing Format .............................: **In Person**
Hearing Type ...............................: **Initial**
Hearing Date ................................: July 23, 2007
Examiner.....................................: Joseph M. Pacholski
Institution ...................................: Lewisburg USP

## Sentence Parameters

Sentence Type...............................: **DC Parole Eligible**
MR/Statutory Release ...................: 8/3/2030
Full Term Date .............................: 4/25/2049
Months in Custody.......................: 183 as of 7/25/2007
Fines/Restitution/Assessment ......: $120
Detainer.......................................: None

**Additional text regarding the above parameters:** None

## Prior Action & Institutional Factors

**Prior Action:** See Pre-review completed by Sandra Hylton dated 7/12/2007.

**Codefendants:** See Pre-review dated December 12, 2007 for Kenneth Sims who was paroled on 9/25/2005 after the service of 105 months.

**Representative & Representative's Statement:** Doug Contri Psychologist and Coordinator of the Challenge Program. Also representing was T. Follmer, Teacher of a Vocational Training Program.

**Prisoner's Statement:** The subject admitted to taking somebody's life however was not forthcoming at first with details regarding the offense. Even after the subject described the offense at best did not have an actual reason for killing the other individual other than the other individual was looking for him. The subject stated that the behavior was not triggered by a drug trade relationship and that it was just another individual in the neighborhood who heard a disrespectful term come from our subject in a crap game.

## Disciplinary Infractions

**No. 1 - BOP Incident Report No. 1056927**
    **Description of Behavior:** Fighting (Code 201).
    **Prisoner's Response:** Admits.

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.

**Basis:** Your admission to the examiner at the hearing and your DHO finding dated 12/31/2002.

**Rescission Guideline: 0-2 months.**

## No. 2 - BOP Incident Report No. N/A

**Description of Behavior:** Failed to Follow Posted Orders.

**Prisoner's Response:** Admits.

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.

**Basis:** Your admission to the examiner at the hearing and your finding of guilt in front of a Hearing Officer on 7/24/2002.

**Rescission Guideline: 0-2 months.**

## No. 3 - BOP Incident Report No. N/A

**Description of Behavior:** Possession of Contraband.

**Prisoner's Response:** Admits. The subject stated that when people would leave to go to the Federal Institution they would leave property behind and give it to other individuals. The subject was in possession of the fan and headphones.

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.

**Basis:** Your admission to the examiner at the hearing and DHO finding dated 6/9/2002.

**Rescission Guideline: 0-2 months.**

## No. 4 - BOP Incident Report No. N/A

**Description of Behavior:** Intentionally Destroying or Altering Damaged Property.

**Prisoner's Response:** Admits.

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.

**Basis:** Your admission to the examiner at the hearing and DHO finding dated 4/23/2002.

**Rescission Guideline: 0-2 months.**

## No. 5 - BOP Incident Report No. N/A

**Description of Behavior:** Altering or Destroying Property.

**Prisoner's Response:** Admits.

**Findings of Fact:** This examiner finds that the subject violated the rules of the institution as indicated in the above violation.

**Basis:** Your admission to the examiner at the hearing and the finding on 6/8/2002.

**Rescission Guideline: 0-2 months.**

**Program Achievement:** Since 2002 the subject has completed the CODE Program, Chess Video, Informational Employment Video, Introduction to Business Law, Real Estate, Mortgage Transactions, Understanding Fitting, Retaining Industrial Housekeeping, First Aid Adult CPR, Victim Impact, CDL, Health Fitness, African American Studies, Industrial Housecleaning, Introduction to Business and Accounting Principles, Health Awareness, Fitness Assessment, Creative Cake Decorating, Cage Your Rage, Introduction to Spanish, Total Body Fitness, Business Entrepreneurship and Mentoring, Vocational Electric and Plumbing Training and the Challenge Program.



The subject currently is still in the Vocational Training Program for Heating and Air Conditioning the subject plans to complete that in the fall of 2008.

**Release Plans:** The subject plans to release to his mother in Suitland, MD. Upon release the subject plans to work in the Heating and Air Conditioning field.

## Guideline Parameters, Evaluation & Recommendation

**Salient Factor Score:**  4
**Base Point Score:**  8

**Modifications From Prehearing:** This examiner would note that the subject was 22 years of age at the time of offense and that Item C was changed to a 2 from a 3. The subject is in the second tier category.

**Salient Factor Score Items**

1 - **Item A**
1 - **Item B**
2 - **Item C**
0 - **Item D**
0 - **Item E**
0 - **Item F**

**Total SFS: 4**

Category II (Current or Prior Violence): ...............................3 points
Category III (Death of Victim or High Level Violence):    3 points

Base Point Score Guideline Range: ................................72-96
Months to Parole Eligibility Date: ..............................189-189
Disciplinary Guideline SINCE Last Hearing: ...................0-10
Superior Program Achievement SINCE Last Hearing: ..12-12
Total Guideline Range: ...........................................249-283

**Evaluation:** This examine would note that the subject has programmed well since he has been incarcerated. The subject has completed a number of Vocational Training Programs including the Challenge Program to deal with his drug behavior. This examiner believes that a decision at the top of the guidelines for the offense is appropriate because the subject explained the offense as if was carrying a pistol to protect himself for when this individual comes after him instead of using the legal terms in order to protect himself thus, not calling the police. It is understandable that the subject did not call the police because he was acting in the drug trade in Washington, DC. This examiner would note that a 12 months Superior Program Achievement Award should be given because of the courses that the subject has completed which include the CODE and Challenge Programs, his Business and Accounting Principle Courses and his continued Education and the Vocational Training Program. This examiner would note that the subject will not complete that program until fall of 2008 however; some of his behavior should be given the Superior Program Achievement due to the fact that the subject has remained incident report free for a period of time since he's been in the Federal System. The last incident report in the Federal System is dated 12/7/2002.

**Smith, Ernest, Reg. No. 11565-007**                    **Page 3 of 4**

This examiner believes that the subject should be given a decision at the top of the guideline range at 283 months however this not comply with the US Parole Commission's guidelines of which this examiner believes the subject should be given a 60 month Reconsideration Hearing in July, 2012. The subject at that point would be at 243 months which is below the 249 below the guidelines. This examiner still believes a top of the guideline decision is appropriate in this case and a Superior Program Achievement Award may be warranted at the next hearing if the subject continues Vocational Programming and remain incident report free.

**Recommendation:**  Schedule for a Reconsideration Hearing in July of 2012.

**Conditions:**  Drug Aftercare.

**Statutory Interim Hearing:**  July, 2009.

**Guideline Use:**  A departure from the guidelines at this consideration is not warranted.

**Additional Text:**  None.

[Signature]


JMP/PAH
August 1, 2007


**Executive Reviewer's Comments:**

# Exhibit

# 4

U.S. Department of Justice
United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815-7201

**Notice of Action**

Name: SMITH, Ernest
Register Number: 11565-007
DCDC No: 245-853

Institution:   Lewisburg USP

Date:          August 10, 2007

As a result of the hearing conducted on July 23, 2007, the following action was ordered:

Deny parole. Continue to a Three-Year Reconsideration Hearing in July 2012.

**REASONS:**

Your Total Guideline Range is 249-283 month(s). See the attached sheet for the components that make up your Total Guideline Range. These components are your Salient Factor Score; Base Point Score; Base Point Score Guideline Range; Months Required to Serve to Parole Eligibility Date; Disciplinary Guidelines (if applicable); and Superior Program Achievement Award (if applicable).

You have been in confinement as a result of your current offense behavior for a total of 183 months as of July 25, 2007.

After consideration of all factors and information presented, a decision outside the Total Guideline Range at this consideration is not found warranted.

THE ABOVE DECISION IS NOT APPEALABLE.

Copies of this Notice are sent to your institution and to your supervising officer. In certain cases, copies may also be sent to the sentencing court. You are responsible for advising any others you wish to notify.

cc:    CSS Data Management Group
       D.C. Court Services & Offender Supervision Agency
       300 Indiana Avenue, N.W., Suite 2070
       Washington, D.C. 20001

# SALIENT FACTOR SCORE (SFS-98)

| Your Pts | Salient Factor Score (SFS-98) Item Explanations |
|---|---|
| 1 | **A** - Prior convictions/adjudications (adult or juvenile) None = 3; One = 2; Two or three = 1; Four or more = 0 |
| 1 | **B** - Prior commitments of more than thirty days (adult or juvenile) None = 2; One or two = 1; Three or more = 0 |
| 2 | **C** - Age at commencement of the current offense/prior commitments of more than thirty days (adult or juvenile) (see table below for an explanation) |
| 0 | **D** - Recent commitment free period (three years) No prior commitment of more than thirty days (adult or juvenile), or released to the community from last such commitment at least three years prior to the commencement of the current offense = 1; Otherwise = 0 |
| 0 | **E** - Probation/parole/confinement/escape status violator this time Neither on probation, parole, confinement, or escape status at the time of the current offense; nor committed as a probation, parole, confinement or escape status violator this time = 1; Otherwise = 0 |
| 0 | **F** - Older offenders If the offender was 41 years or more at the commencement of the current offense (and the total score from Items A-E above is 9 or less) = 1; Otherwise = 0 |
| 4 | **Salient Factor Score (SFS-98)** (sum of points for A-F above) |

# BASE POINT SCORE

| Your Pts | Base Point Score Category Explanations |
|---|---|
| 2 | **I** - Contribution from Salient Factor Score 10-8 (Very Good Risk) = +0; 7-6 (Good Risk) = +1; 5-4 (Fair Risk) = +2; 3-0 (Poor Risk) = +3 |
| 3 | **II** - Current or Prior Violence Violence in current offense and any felony violence in two or more prior offenses = +4; Violence in current offense and any felony violence in one prior offense = +3; Violence in current offense = +2; No violence in current offense and any felony violence in two or more prior offenses = +2; Possession of firearm in current offense if current offense is not scored as a crime of violence = +2; No violence in current offense and any felony violence in one prior offense = +1 |
| 3 | **III** - Death of Victim or High Level Violence (Category III points are added to points scored in Categories I and II) Current offense was high level or other violence with death of victim resulting = +3; Current offense involved attempted murder or violence in which death of a victim would have been a probable result = +2; Current offense was other high level violence = +1 |
| 8 | **Base Point Score** (sum I-III above) |

## DISCIPLINARY GUIDELINES

You have 5 non-drug related infraction(s) [0-2 months each], which requires 0-10 months to be added to your base point score guideline range.

## SUPERIOR PROGRAM ACHIEVEMENT AWARD

You have been granted a reduction of 12 month(s) from your Total Guideline Range for superior program achievement. This was granted because you have completed the CODE Program, Chess Video, Informational Employment Video, Introduction to Business Law, Real Estate, Mortgage Transactions, Understanding Fitting, Retaining Industrial Housekeeping, First Aid Adult CPR, Victim Impact, CDL, Health Fitness, African American Studies, Industrial Housecleaning, Introduction to Business and Accounting Principles, Health Awareness, Fitness Assessment, Creative Cake Decorating, Cage Your Rage, Introduction to Spanish, Total Body Fitness, Business Entrepreneurship and Mentoring, Vocational Electric and Plumbing Training and the Challenge Program.

## TOTAL GUIDELINE RANGE

| | | |
|---|---|---|
| 72—96 | Base Point Score Guideline Range | |
| 189—189 | Months Required to Serve to Parole Eligibility Date | |
| 0—10 | Disciplinary Guideline Range | |
| less 12—12 | Superior Program Achievement Award (if applicable) | |
| **249—283** | **Total Guideline Range** | |

| Base Point Score Guideline Range | | Points For SFS Item C | | | |
|---|---|---|---|---|---|
| Base Point Score | Guideline Range | Age | Prior Commitments | | |
| | | | 0-3 | 4 | 5+ |
| 3 or less | 0 months | 26 & Up | 3 | 2 | 1 |
| 4 | 12-18 months | | | | |
| 5 | 18-24 months | 22-25 | 2 | 1 | 0 |
| 6 | 36-48 months | | | | |
| 7 | 54-72 months | 20-21 | 1 | 0 | 0 |
| 8 | 72-96 months | | | | |
| 9 | 110-140 months | 0-19 | 0 | 0 | 0 |
| 10 | 136-172 months | | | | |

# Exhibit

# 5



# D.C. Initial Prehearing Assessment
### Presumptive Date Format

**Offense of Conviction :** Carrying a Pistol Without a License; Possession of a Firearm During a Crime of Violence/Dangerous Offense; Manslaughter While Armed; Carrying a Pistol without a License.

Name.............................. :  Smith Ernest
Reg. No..............................:  11565-007
DCDC Number................:  245-853
PDID Number.................:  419-072
Birthdate.........................:  04/28/1971
Examiner..........................:  Hylton Sandra G.
Institution.......................:  Lewisburg USP
Pre-Hearing Date............:  07/12/2007
Sentence Length.............:  57 years 0 months 0 days
Sentence Type................:  Adult

Parole Eligibility Date..... :  01/25/2008
Months Served at
Eligibility......................:  189
MR Date (2/3)..................:  08/03/2030
Months at MR..................:  459
Full Term Date.............. :  04/25/2049
Jail Credit......................:  530
In-Operative Time...........:  0
Fines/Restitution/.......... :  $120

**Detainer:**  None

**Additional Text:**  NA

**Current Offense and/or Previous Parole Action :**   Research did not reveal a PSI for the sentencing offense behavior:

On 10-08-93 the subject was sentenced to 12 yeas  for Attempted Distribution of Cocaine as a result of a probation violation.
On 12-03-93 he was sentenced to 45 years for Carrying a Pistol without a License, Possession of a Firearm During Crime of Violating Dangerous Offense, and Manslaughter while Armed. On 8-20-02 the subject was sentenced to 10 years for Carrying a Pistol without License. The subject's aggregate sentence  was 57 years.

**Subsequent Offense(s):**   None

**Codefendants:** Kenneth Simms- 19920-009- Sentenced to 40 months to 10 years. Paroled 9-25-05 after the service of 105 months.

## SALIENT FACTOR SCORE   (SFS-98)

| Date | Offense | Disposition of 3 most significant prior convictions: |
|---|---|---|
| 02/22/1989 | Assault With a Dangerous Weapon | 6-7-90: 1 year probation (1-0) |
| 01/16/1990 | Attempted Distribution of Cocaine | 5-23-90: 15 years (YRA 803-b).ESS to all but 120 days work release; 2 years probation (YRA 803a) (2-1) |

Smith, Ernest 11565-007

04/21/1990   Carrying a Pistol without a License          9-19-90: 120 days (3-?)

SFS Item A =  1       Subject has 3 prior convictions/adjudication.

SFS Item B =  1       Subject has  2  prior commitments of more than 30 days that were imposed prior to the
last overt act of the current offense.

SFS Item C =  2       Subject was 31  22  years old at the commencement of the current offense and had  2
prior commitments.

SFS Item D =  0       08/20/2002 - Date of Probation Violation.
Unknown, but clearly less than three years before the commission of the current
offense

SFS Item E =  0       Subject is a probation status violator.

SFS Item F =  0       Sum of Items A-E = 5  and the offender was 31 years old at the commencement of the
current offense.

**Salient Factor Score =  5 4**

---

## D.C. Code Point Assignments

Category I Points:    2       SFS is 5  4    { SFS... 10-8 = 0; 7-6 = 1; 5-4 = 2; 3-0 = 3}

Category II Points:   3       Subject committed acts of violence in the current offense and felony violence in
ONE prior offense.

Category III Points:  3       Current offense involved high level of violence or resulted in death of victim.

**Base Point Score = 8**     Sum of Categories I, II and III

Base Guidelines       72 - 96
(range in months):

**Negative Institutional Behavior:**   The subject has received the following DHO infractions: 12-31-02:  02
Fighting with another Person; 1-5-04: Possessing Unauthorized Item; 7-15-02: Failing to Follow Posses
Rules; 6-18-02: Possessing Contraband (fan and headphones); 4-9-02: Intentionally destroying, altering, or
damaging State or another person's property.  02                                02

The Hearing Examiner may access some of these charges as UDC's at the hearing.

Administrative Rescission Infractions

|    Number    |    Type    |    Guidelines (range in months):    |
|--------------|------------|-------------------------------------|

Smith, Ernest 11565-007

of Occurrences

5

Non-Drug Infractions                        0 - 10

Total Administrative GL:   0 - 10

<u>Criminal Rescission Behavior</u>

| Number of Occurrences | Severity | Location | Guidelines (months) | SFS |
|---|---|---|---|---|

Total New Criminal GL:    0 - 0

**Program Achievement:** Since 2002 the subject has completed the CODE program; Ace Chess Videos, Employment information, introduction to Marketing, Business law, Real Estate and Mortgage Transactions, Understanding Fit Assessment, Retaining, Industrial Housekeeper, Ace First Aid, Adult CPR Class, Victim Impact, Commercial Drivers License, Health Fitness, African American Studies, Industrial Housekeeping, Introduction to Business, Accounting Principles, Health Awareness , Fitness Assessment, Creative Cake Decorating, Cage Your Rage, Introduction to Spanish, Total Body Fitness, Business Entrepreneurship and Mentoring. At the time of the progress report he was taking heating, air conditioning, vocational training, electrical and ACE Finance Class.

Prisoner has demonstrated Superior Program Achievement for 58 months    *Plumbo*    *challenge Prog.*    *certi Pers train*

**Guidelines (range in months):**

Months to Serve to PE Date .........:    189  -  189
Base Guidelines.........................:    72  -  96
Negative Behavior Guidelines.......:    0  -  10
(Sum of Administrative & Criminal)    *264*    *295*
Superior Program Achievement GL.:    19  -  19
Total Guidelines.......................:    242  -  276

**Risk:** No aggravating or mitigating risk factors are noted

**Prehearing Evaluation and Summary:**
The subject has a SFS of 5, Base Point Score of 8 with total guidelines 242 - 276 which includes a recommendation for 10 months rescission guidelines ~~and 19 months for SPA~~. He has been incarcerated 189 months as of PE in 1-08. The subject's prior convictions consist of gun related offenses. There was not a PSI available for the current offenses and the Hearing Examiner will have to ascertain the details as best as possible at the hearing.

Smith, Ernest 11565-007

# Exhibit

# 6

E

# REPORT ON THE DEVELOPMENT OF PAROLING POLICY GUIDELINES

## FOR THE DISTRICT OF COLUMBIA

## BOARD OF PAROLE

F I L E D

MAY ?.? 1980

CLERK, U.S. ........ ....RT
DISTRICT OF COLUMBIA

Exhibt "A"
Civil Action No. 80-0516

STATEMENT OF POLICY AND PROCEDURES

The District of Columbia Board of Parole represents but one link, albeit a crucial one, in the overall administration of criminal justice in the District. As such, the Board of Parole, after examining a variety of approaches for structuring its decision-making process, is adopting a set of formal parole guidelines. In so doing, the Distict of Columbia Board of Parole joins paroling authorities in a number of other jurisdictions, such as the United States Parole Commission, the Pennsylvania Board of Probation and Parole, and the New Jersey Board of Parole that have sought to structure the exercise of the paroling authority's discretion.

The decision to employ formal parole guidelines has been made with the benefit of prior research in this area done by the Board of Parole as well as by parole entities in other jurisdictions. Based on the results of these studies and the experiences of other jurisdictions, the Board of Parole is confident that its guidelines are a significant step toward a more coherent parole decision-making process that will lead both to increased consistency in parole release decisions and enhanced accountability of the Board. It should be noted further that the adoption of these guidelines will enable the Board of Parole to function more productively within a sentencing guidelines structure, such as that which might be promulgated by the D.C. Superior Court's Sentencing Guidelines Study Committee.

1

The decision ● utilize parole guideli●● should not be
viewed as a decision to abandon the aim of making parole release
decisions on the merits of the individual case.   Instead, the use
of guidelines should be seen as an effort to make explicit those
factors that will be considered in each individual case.

We, however, do not consider the guidelines promulgated here
to be a finished or static product.  The model used is a dynamic
one, requiring an ongoing data collection and feedback mechanism
to provide the information necessary to modify either the content
or the structure of the guidelines if, based on experience, it
appears that the objectives of the guideline system could be
better served by such modification.  The point that these
guidelines represent only the initial effort in the process
cannot be over-emphasized.


## Major objectives

In promulgating formal parole guidelines, the District of
Columbia Board of Parole expects to achieve the following
objectives:

1.  Promoting consistent parole decision-making by the Board of
    Parole;

2.  Making more explicit the paroling policies of the Board of
    Parole;

3.  Incorporating a concern for fairness by ensuring that the
    time served by an offender is proportionate to the sentence
    imposed by the court and the risk posed by the offender.

4.  Achieving the sentencing purposes of incapacitation and
    specific deterrence, while promoting, to the fullest extent
    possible, the offender's efforts at rehabilitation;

5.  Penalizing institutional misconduct; and

6.  Developing an evolutionary model of management control,

wherein the policies, procedures, and decisions of the Board
of Parole are modified or adjusted as a result of an ongoing
data collection and feedback mechanism.

While there are clearly a range of secondary objectives that the
Board of Parole wishes to achieve, the above represent the
primary goals of the new guidelines.


## Principles behind the D.C. Board of Parole Guidelines

Sound operating policies must never be created in a vacuum.
In adopting its guidelines, the Board of Parole has been guided
by its mandates (as set out in Title 24 of the District of
Columbia Code and Title 28, section 204, of the District of
Columbia Municipal Regulations) and by a number of operating
principles. The principles all derive from the Board's goals of
achieving fairness and consistency in its decisions.

The first principle is that the touchstone of the parole
decision-making process should be based on offender
characteristics that have a statistically determined bearing on
the offender's risk of future involvement in criminal behavior.
This focus should enable the Board to most reliably meet its
statutorily imposed duty to protect the public. The structured
consideration of other offense and institutional factors within
this empirically based framework will ensure that the Board
utilizes the full range of information at its disposal to
determine that parole release in an individual case would not be
incompatible with the welfare of society.

The second principle behind the guidelines is that the court
addresses the purposes of retribution and general deterrence
through the sentence it imposes in adult cases. As a matter of

3

policy, the Board of Parole does not and will not function in a
manner that might be viewed as a usurpation of the functions of
the sentencing judge. Similarly, the Board assumes that the
sentencing goals of retribution and general deterrence do not
apply in the case of youthful offenders sentenced under the Youth
Corrections Act (18 U.S.C. § 5010). The YCA statute provides
general guidance to both the court and the paroling authority by
requiring that the focus of the sentencing and release decisions
be on whether a youth offender will derive further benefit from
treatment. Guidelines oriented to the assessment of risk and
institutional performance, therefore touching on the need for and
progress towards rehabilitation, will be consistent with the
intent of this Act.

A third principle is that in determining the factors to be
used in assessing the guidelines, consideration should be given
to their fairness as well as to their statistical reliability.
Unless predictibility would be seriously compromised, social
items, such as employment, living arrangements, and education
should be excluded from consideration. Additionally, attempts
should be made to ensure that the information used to assess the
guidelines is of a type that can be reliably collected in that it
is objective, generally available and easy to score.

In short, the overriding principle of the guidelines is that
they should enable the Board of Parole to exercise its release
discretion when, and only when, reliable information indicates
that there is a reasonable probability that an individual will
live and remain at liberty without violating the laws and in the

opinion of the Board. Such release is not compatible with the welfare of society.

## Overview of the Guidelines of the Guidelines

The D.C. Board of Parole's guidelines are comprised of four factors, two of which utilize information known at the time of incarceration, the other two based on post-incarceration factors.

### PRE-INCARCERATION FACTORS:

1. **Degree of Risk:** This is the primary factor of the guidelines, applicable in all cases, and is based on calculation of the Salient Factor Score, an actuarial risk assessment device that relies exclusively on information known at the time of incarceration. All other factors are considered within the context of this general risk classification.

2. **Type of Risk:** This is an aggravating factor applicable to those cases in which the Board has made findings that the current offense, or the offender's pattern of past offenses, involved violence, weapons, or drug trafficking.

### POST-INCARCERATION FACTORS:

3. **Institutional adjustment:** This is an aggravating factor applicable to those cases in which the Board has made findings that disciplinary infractions, adjudicated by the Department of Corrections under due process procedures, are either serious or repetitious enough to impact negatively on the parole decision.

4. **Program participation:** This is a mitigating factor applicable to those cases in which the Board has made findings that the program or work accomplishments of the prisoner during this period of incarceration are substantial enough to impact favorably on the parole decision.

The guidelines are determined by first calculating the Salient Factor Score. This score places the offender into one of four categories of risk. A baseline number of points is assigned to each risk category. For each of the other factors for which an affirmative finding is made, points to be added to or

5

subtracted .... is particular are set for within each stamp category. The resulting point total determines whether or not parole is granted, and if so, the level of supervision to be imposed. Decisions outside the guidelines may be rendered for good cause when accompanied by written reasons that include a summary of the information upon which the determination is based.

Attachments to this document provide the following specific information. Annex A presents the guidelines for initial hearings, including the Salient Factor Score, the guideline point assignment grid, and guideline worksheets that provide definitions and illustrate the guideline calculation process. Similar information for rehearings is contained in Annex B. Annex C presents a detailed background report explaining the purpose and supporting rationale of each guideline factor. Annex D contains the Board's proposed research agenda, followed by the instruction manual for calculating each item of the Salient Factor Score in Annex E.

ANNEX A

DISTRICT OF COLUMBIA PAROLE DECISION-MAKING GUIDELINES

SAMPLE 1 - FORM 22 - SALIENT FACTOR SCORE (SFS 81)

**Item A:** PRIOR CONVICTIONS/ADJUDICATIONS (ADULT OR JUVENILE) ...... ☐

    None ................ = 3
    One ................. = 2
    Two or Three ........ = 1
    Four or more ........ = 0

**Item B:** PRIOR COMMITMENT(S) OF MORE THAN THIRTY DAYS ............. ☐
    (ADULT OR JUVENILE)

    None ................ = 2
    One or two .......... = 1
    Three or more ....... = 0

**Item C:** AGE AT CURRENT OFFENSE/PRIOR COMMITMENTS .................. ☐

    Age at commencement of current offense
    26 years of age or more .......... = 2
    20-25 years of age .............. = 1
    19 years of age or less .......... = 0

    ***Exception: If five or more prior commitments of more
    than thirty days (adult or juvenile), place an "X" here_____
    and score this item ................... = 0

**Item D:** RECENT COMMITMENT FREE PERIOD (THREE YEARS), ............. ☐

    No prior commitment of more than thirty days (adult
    or juvenile) or released to the community from last
    such commitment at least three years prior to the
    commencement of the current offense .............. = 1

    Otherwise ........................................ = 0

**Item E:** PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS ................. ☐
    VIOLATOR THIS TIME

    Neither on probation, parole, confinement,/or escape
    status at the time of the current offense; nor
    commited as a probation, parole, confinement, or
    escape status violator this time ................ = 1

    Otherwise ........................................ = 0

**Item F:** HEROIN/OPIATE DEPENDENCE ................................... ☐

    No history of heroin/opiate dependence ... = 1
    Otherwise ................................ = 0

    TOTAL SCORE ...................................................... ☐

Note: For purposes of the Salient Factor Score, an instance of criminal
    behavior resulting in a judicial determination of guilt or an
    admission of guilt before a judicial body shall be treated as a
    conviction, even if a conviction is not formally entered.

10/1/83   Published by U.S. Parole Commission

(Joint Assignment Grid)

## Instructions:

1. Circle the appropriate Salient Factor Score Category.
2. Circle any aggravating and/or mitigating factors for which a finding has been made.
3. Within each applicable cell, circle the number of points to be added or subtracted from the baseline point assignment determined by the Salient Factor Score Category.

DEGREE OF RISK
Salient Factor Score Category

|  | Low | Fair | Moderate | High |
|---|---|---|---|---|
|  | +0 | +1 | +2 | +3 |
| **1. TYPE OF RISK** | | | | |
| a. Violence | +1 | +1 | +1 | +1 |
| b. Weapons | | | | |
| c. Drug Trafficking | | | | |
| **2. Negative Institutional Behavior** | +1 | +1 | +1 | +1 |
| **3. Program Achievement** | -1* | -1 | -1 | -1 |

* Applicable only where points have been added for aggravating factor.

TOTAL POINTS: _____

IF POINTS = 0:   Parole should be granted at initial hearing with low level of supervision required.

IF POINTS = 1:   Parole should be granted at initial hearing with high level of supervision required.

IF POINTS = 2:   Parole should be granted at initial hearing with with highest level of supervision required.

IF POINTS = 3 - 5:   Parole should be denied at initial hearing and rehearing scheduled.

9

JUREMPBOLZ
(Point Assignment Grid)

Instructions:

1. Circle the appropriate Salient Factor Score Category.
2. Circle any aggravating and/or mitigating factors for which a finding has been made.
3. Within each applicable cell, circle the number of points to be added or subtracted from the baseline point assignment determined by the Salient Factor Score Category.

### DEGREE OF RISK
Salient Factor Score Category

|  | Low | Fair | Moderate | High |
|---|---|---|---|---|
|  | +0 | +1 | +2 | +3 |
| 1. TYPE OF RISK | | | | |
| a. Violence | +1 | +1 | +1 | +1 |
| b. Weapons | | | | |
| c. Drug Trafficking | | | | |
| 2. Negative Institutional Behavior | +1 | +1 | +1 | +1 |

*As initial hearings for YCA offenders are held approximately 60 days after their incarceration, a reduction in points for sustained program achievement is not appropriate at the initial hearing.

### TOTAL POINTS: _____

IF POINTS = 0: Grant parole at initial hearing with conditions established to address treatment needs.

IF POINTS =1-5: Deny parole at initial hearing and schedule for a rehearing based on estimated time to achieve program objectives established by the classification team and the Board of Parole.

10

A. Salient Factor Score _____ (From SFS Worksheet)
RISK GROUP:
Low _____ (10-9)    Moderate _____ (6-4)
Fair _____ (8-6)    High _____ (3-0)

B. TYPE OF RISK ASSESSMENT:

|  | Yes | No |
|---|---|---|
| **1. Violence:** | | |
| a. Does the current offense involve a felony in which the defendant caused, attempted to cause, or threatened to cause death or serious bodily injury to another individual? | _____ | _____ |
| b. Does the offender have two or more previous convictions for such felony described in (1.a)? | _____ | _____ |
| c. Does the offender have a history of committing crimes of violence while under the influence of PCP? | _____ | _____ |
| **2. Weapons:** | | |
| a. Does the current offense involve a felony in which the defendant used a dangerous weapon? | _____ | _____ |
| b. Does the offender have two or more previous convictions for such felony described in (2.a)? | _____ | _____ |
| **3. Drug Trafficking:** | | |
| a. Does the current offense involve a felony conviction under the D.C. Uniform Controlled Substances Act for distribution, or intent to distribute, illicit substances? | _____ | _____ |
| b. Does the offender have two or more previous convictions for significantly similar offenses as those described in (3.a) (i.e., convictions under this statute or a similar one in another jurisdiction)? | _____ | _____ |

### Post-Incarceration Factors

|  | Yes | No |
|---|---|---|
| A. INSTITUTIONAL ADJUSTMENT: Has this offender committed serious or repeated disciplinary infractions (adjudicated under Department of Corrections due process procedures)? | _____ | _____ |
| B. INSTITUTIONAL PROGRAM PARTICIPATION Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignment during this period of incarceration? | _____ | _____ |

11

(3) Months in custody at Date of Hearing:_____

(4) Decision:  / / Parole          Date_____
               / / Rehearing       Date_____

(5) Decision is Within___  Below___  Above___  Guidelines

Reasons (if outside of the Guidelines):

WORSE RISK:

...Repeated Failure under parole supervision;
...Current offense involves on-going criminal behavior
...Lengthy history of criminally related alcohol abuse;
...History of repetitive sophisticated criminal behavior
...Unusually extensive and serious prior record [at least five
   felony convictions]
...Unusual cruelty to victims
Specifically:_____
_____

BETTER RISK: NOTE:  Applicable only to offenders not classified
                    as low risks by the salient factor score.

...record resulting exclusively from trivial offenses
...substantial crime-free period for which credit not already
   given on the salient factor score.
Specifically:_____
_____

OTHER PRE-INCARCERATION FACTORS:

...This YCA offender would have been exposed to a maximum
   sentence of _____ months had he been sentenced as an adult.
...Substantial cooperation to the government that has not been
   otherwise rewarded
...Substantial Period in Custody on other Sentence(s) or
   Additional Committed Sentences.(NOTE:  This circumstance can
   also be used as an "other change in circumstances" below if a
   new committed sentence is imposed after incarceration on the
   current                     offense.
...Other_____

Specifically:_____
_____

POST-INCARCERATION FACTORS:

...Change in the availability of community resources leading to
   better parole prognosis
...Poor medical prognosis
...Other Change in Circumstances _____
_____

Specifically:_____
_____

12

# ANNEX B

## REHEARING GUIDELINES

## POINT GRID FOR PAROLE REHEARINGS

POINTS

1. **Points From Previous Hearing** _____

2. **Negative Institutional Behavior Since Last Consideration**     +1

3. **Program Achievement Since Last Consideration**     −1

TOTAL POINTS: _____

IF POINTS = 0-3, Parole should be granted at this rehearing with highest level of supervision required.

IF POINTS = 4-5, Parole should be denied and a rehearing date scheduled.

**Findings**

|  | Yes | No |
|---|---|---|
| A. INSTITUTIONAL ADJUSTMENT: Has this offender committed serious or repeated disciplinary infractions (adjudicated under Department of Corrections due process procedures)? | _____ | _____ |
| B. INSTITUTIONAL PROGRAM PARTICIPATION Has this offender demonstrated sustained achievement in the area of prison programs, industries or work assignment during this period of incarceration? | _____ | _____ |

14

(1) Name of Case or CVC

(3) Months in custody at Date of Hearing: _____

(4) Decision:  / / Parole        Date _____
               / / Rehearing     Date _____

(5) Decision is Within___  Below___  Above____  Guidelines


Reasons (if outside of the Guidelines):



...Change in the availability of community resources leading to
   better parole prognosis
...Poor medical prognosis
...Other Change in Circumstances _____
_____

Specifically: _____
_____

15

# ANNEX C

## BACKGROUND REPORT

## The Experience of Other Jurisdictions

The parole decision-making guideline system for the District of Columbia has been built on ideas and tools derived in part from the United States Parole Commission and in part from those of the state of Pennsylvania. Both of these models provide a decision-making framework that is specific enough to control the exercise of the Board's discretion while still allowing the flexibility to deviate from the guidelines when the circumstances of a particular case so warrant.

The Board incorporates the risk assessment component of the federal model, the Salient Factor Score, into its guidelines, thereby benefitting from the results of extensive research carried out over the last fourteen years to construct and validate this actuarial device. The Board, however, did not wish to pattern entirely the structure of its guidelines after the federal grid which includes an offense severity scale. It therefore looked to other jurisdictions for a guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant. That of Pennsylvania, which considers more subjective parole factors within the context of an actuarial risk assessment, seemed a good model for accomplishing these objectives.

## Choice of Salient Factor Score

The District of Columbia, in 1984, engaged in a research project, funded by the Bureau of Justice Statistics, to test the applicability of the Iowa Risk Assessment Scale. This device had

17

appeal because it contains a "risk of violence" classif[...]
addition to a general risk classification scheme. Our [...]

based on followup of a retrospective sample of 581 Di[...]

Columbia parolees released during CY 1980, however,

indicate that this device would be a satisfactory one [...]

population. [1]

With the seeming inapplicability of the Iowa Risk

to D.C. parolees, we turned to the Salient Factor S[...]

risk assessment device that has been used in connect[...]

federal parole decision-making, in one form or anothe[...]

last ten years. There were a number of reasons for [...]

the federal device:

1. It was developed and validated on samples of pris[...]
that included some D.C. offenders (i.e., those incar[...]
federal facilities). This led us to believe it might [...]
D.C. population better than the Iowa scale.

2. A recent annual D.C. Board of Parole performanc[...]
showed that many of the factors that seem to predict[...]
failure of D.C. offenders under parole supervision a[...]
in the Salient Factor Score.

3. It does not contain social items such as employme[...]
arrangements, and relies on adjudicated guilt (rat[...]
arrest) for determining its prior record items. It [...]
with our principles of guideline construction.

---

[1]District of Columbia Office of Criminal Justic[...]
Analysis, D.C. Department of Corrections, "The Iowa
Tool: A Partial Replication", Report to the Bureau
Statistics, Washington, D.C., August, 1984.

[2]D.C. Department of Corrections, "Annual Parole
Monitoring Report", Washington, D.C., August, 1984.

appeal because it contains a risk of violence classification in addition to a general risk classification scheme. Our research, based on followup of a retrospective sample of 581 District of Columbia parolees released during CY 1980, however, did not indicate that this device would be a satisfactory one for our population.[1]

With the seeming inapplicability of the Iowa Risk Assessment to D.C. parolees, we turned to the Salient Factor Score, the risk assessment device that has been used in connection with federal parole decision-making, in one form or another, for the last ten years. There were a number of reasons for turning to the federal device:

1. It was developed and validated on samples of prison releasees that included some D.C. offenders (i.e., those incarcerated in federal facilities). This led us to believe it might apply to the D.C. population better than the Iowa scale.

2. A recent annual D.C. Board of Parole performance study[2] showed that many of the factors that seem to predict success or failure of D.C. offenders under parole supervision are included in the Salient Factor Score.

3. It does not contain social items such as employment or living arrangements, and relies on adjudicated guilt (rather than arrest) for determining its prior record items. It therefore fit with our principles of guideline construction.

---

[1] District of Columbia Office of Criminal Justice Plans and Analysis, D.C. Department of Corrections, "The Iowa Assessment Tool: A Partial Replication", Report to the Bureau of Justice Statistics, Washington, D.C., August, 1984.

[2] D.C. Department of Corrections, "Annual Parole Performance Monitoring Report", Washington, D.C., August, 1984.

4.   Also consistent with our principles of guideline construction, the salient factor score (s) is relatively straightforward to score, using a simple additive scale of 0's, 1's, and 2's, and (b) has been subjected to two separate reliability exercises which resulted in the refinement of its items and the instructions for scoring items to enhance its reliability (e.g., its items now focus on recent information which is more readily available and therefore more likely to be scored correctly).[3]

The Salient Factor Score has been used as the risk assessment component of the federal parole guidelines nationwide since 1974 and has a strong empirical foundation.   It was developed as part of a three-year federal guideline development project, funded by the Law Enforcement Assistance Administration, being initially constructed and validated on random samples of offenders released from federal prisons during 1970.[4]   Since that time the device has been re-validated on other samples of federal prison releasees.[5]   The device has also been modified through the years so as to eliminate reliance on social items without a loss of predictive power, and to remove items that, though predictive when coded for a retrospective sample, turn out to be less

---

[3]Hoffman, P., Fife, J., and Stone-Meierhoefer, B., "Reliability in Guideline Application:   A Preliminary Assessment", United States Parole Commission Research Report 25, May, 1980; Hoffman, P., Stone-Meierhoefer, B., and Fife, J, "Reliability in Guideline Application:   Initial Hearings 1980", United States Parole Commission Research Report 27, July, 1981.

[4]See, Hoffman, P. and Beck, J., "Parole Decision-Making:   A Salient Factor Score", Journal of Criminal Justice, V. 2, 1974, pp. 195-206.

[5]See, Hoffman, P., Stone-Meierhoefer, B. and Beck, J., "Salient Factor Score and Releasee Behavior:   Three Validation Samples", Law and Human Behavior, V. 2, No. 1, 1978, pp. 47-63.

effective in practice either because their basis is easily
manipulated or because it is difficult to score the item
reliably.

To ascertain whether this device differentiated adequately
for D.C. offenders, we calculated salient factor scores as best
we could from available data for 402 of the cases in the
retrospective sample that had been used for the research on the
Iowa device.[6]  On the whole, outcome by score distributes as
would be expected, with those scoring in the low risk range
having the lowest revocation rate and those parolees scoring in
the high risk range having the highest revocation rate.  It is
critical to note that due to serious limitations of our database,
these analyses are strictly preliminary.[7]   Therefore, the Board
will adopt the Salient Factor Score as a part of its
guidelines on an experimental basis.  This necessitates the
development of a data feedback system that will allow us to
validate more rigorously the applicability of this device to our
population.

---

[6]Supra, Note 2.

[7]First, the sample for which calculation of the Salient
Factor Score was attempted was but a subsample of the original
581 1980 releasees.  In addition, the sample included only those
who were release by parole during 1980.  Secondly, the outcome
measures refer to a parolee's behavior while under supervision.
There is, therefore, not a uniform follow-up period for all
sample members and the data are not specific enough to allow for
a survival analysis to account for sample "drop-outs".  Further,
the scoring of the salient factor score items for our sample
cases was not refined to include all of the restrictions that are
applicable in actual scoring practice.  For example, the item
that refers to prior commitments counts only commitments of more
(Footnote Continued)

Choice of Additional Pre-Incarcerative Factors to be Considered

TYPE OF RISK

The Salient Factor Score does not profess to predict the type of criminal behavior in which an offender is likely to become involved. Attempts to predict specific behavior such as dangerousness with any reasonable degree of accuracy have repeatedly failed. For example, our research in connection with the Iowa device failed to replicate its claim to predict violence for our population.

The concept of type of risk, however, is an important one in the parole release decision. It cannot be ignored that if an offender has already indicated through past behavior that he or she is capable of committing a type of crime that is considered particularly serious (e.g. use of violence or weapons), we should be willing to tolerate a lesser degree of risk.

The two systems that we have used as patterns for our guideline development both take this type of information into account. The U.S. Parole Commission lists "a history of repetitive assaultive (violent) behavior" as a risk related reason for going above the guidelines. Pennsylvania lists as reasons for parole refusal: aggressive behavior, victim injury, and weapon involved in the commission of the offense.

The D.C. Board of Parole has chosen to incorporate this consideration into our guidelines in a manner similar to that

---

(Footnote Continued)
than thirty days (see infra, The Salient Factor Scoring Manual, Annex E); our data, however, did not include information on the length of prior commitments.

used in Pennsylvania modified to reflect the District's particular crime problems. The Board has chosen three types of offense behaviors to be counted as negative parole indicants: violence (including violence involving PCP use), use of a weapon and drug trafficking. Our guidelines will consider as an adverse parole factor the situation where either the current offense, or two prior felony convictions, involve any or all of the above listed behaviors.

## PRE-INCARCERATIVE REASONS FOR GOING OUTSIDE THE GUIDELINES

The Board of Parole recognizes that, when applying guidelines to individual cases, there occasionally will be unique circumstances that are not taken into account by either the Salient Factor Score or the type of risk assessment, but that none-the-less should impact on the release decision. Following the procedures of the U.S. Parole Commission, the Board sets forth examples of circumstances that, when supported by specific documentating information, could constitute reason for going outside of the guidelines. These are listed on the Decision Worksheet for Initial Hearings (see Annex 1).


## Selection of Post-Incarcerative Factors to be Considered

### INSTITUTIONAL FACTORS:

Adjustment: The relationship between institutional adjustment and release adjustment is essentially curvilinear. A lack of disciplinary infractions may mean one of two things: one is that the offender is a generally good citizen and can be expected to continue to do well upon release; the other that the offender can function successfully only within an institutional setting.

22

serious adjustment problems during confinement may not bode well for post-release adjustment. In addition to this risk-related rationale for including institutional adjustment in our guidelines, we also believe that the Board has a role to play in imposing sanctions for misconduct to contribute to the orderly running of the facility.

For these reasons, the Board's guidelines call for imposing sanctions on offenders who have serious or repeated disciplinary infractions. To ensure the rights of the prisoner, however, the Board will consider only those infractions that form the basis of findings from a Department of Corrections due process hearing.

The inclusion of prison misconduct as a negative parole factor is consistent with the practices of both the U.S. Parole Commission (which penalizes adjudicated misconducts through its recission guidelines) and the Pennsylvania Board of Probation and Parole which lists specified serious or repetitious prison misconduct as its most heavily weighted "reason for parole refusal".

Program Participation: Though studies have been unable to establish an empirical link between participation in programs and post-release outcome, the Board still believes that some offenders will benefit from their prison experiences. Though we can not establish a priori groups of offenders for whom this will be the case, the Board will reward sustained achievement on a case-by-case basis where it seems apparent that the offender has substantially improved his or her situation regarding future criminal behavior. It is hoped that this will encourage

23

prisoners to avail themselves of the rehabilitative opportunities offered at the institution.

This factor is similarly considered in the parole release decision-making of the U.S. Parole Commission (through its schedule of reductions for superior program achievement) and of the Pennsylvania Board of Probation and Parole which lists positive response to prison programs as a factor countervailing a guideline recommendation to refuse parole.

As part of its research program, the D.C. Board of Parole plans to assess what this approach to participation in prison programming adds to our understanding of rehabilitation and its proper role in the parole process.

## POST-INCARCERATION REASONS FOR DECISIONS OUTSIDE THE GUIDELINES

The D.C. Board of Parole is aware that offenders may experience a change in circumstances other than those delineated by the specific institutional factors that form a part of our guidelines. Where these changes are significant and can be expected to relate to the criteria for parole release, decisions outside the guidelines, supported by specific written reasons, are allowed. Examples of permissible post-incarcerative reasons for going outside the guidelines are listed on the Decision Worksheets for both initial hearings (Annex A) and rehearings (Annex B).

ANNEX D

PROPOSED RESEARCH AGENDA

25

Throughout this report, mention has been made of the feedback system and research tasks that the Board will undertake in support of its guideline system. The major points of our research/data analysis program will be as follows:

(1) Monitoring guideline usage: For each case having a parole hearing, data will be kept on each guideline factor and each decision, including the reasons for departure from the guidelines where relevant. These will be analyzed on an ongoing basis to:

   a. Exercise quality control on decision-making in individual cases;

   b. Gather material for training purposes; and

   c. Assess whether decisions outside the guidelines for particular reasons or in particular types of cases are so frequent as to raise the possibility of incorporating the underlying factor for such decisions into the guideline scheme.

(2) Releasee Followup: Additional background and post-release followup data will be collected for each case in order to:

   a. Assess the validity of applying the salient factor score to the D.C. population.

   b. Assess whether a better risk prediction device can be developed for the D.C. population.

   c. Assess whether those cases in which the Board of Parole gave credit for program achievement do better than would be expected given their baseline risk categorization.

(3) Impact Analysis: By relating the specific case information to time-served data, the Board will be in a position to assess the impact of any proposed changes in the guidelines on the prison and parole population.

# ANNEX E

## SALIENT FACTOR SCORING MANUAL

# SALIENT FACTOR SCORING MANUAL[1]

The following instructions serve as a guide in computing the salient factor score. Obviously, no guide can include all possible situations – good judgement always must be used. When in doubt about a classification, follow as closely as possible the examples listed below. Remember, however, that the salient factor score is designed as an actuarial parole prognosis aid. You may override this actuarial predictive aid, where warranted, provided you adequately explain your reasons.

## Item A.  PRIOR CONVICTIONS/ADJUDICATIONS  (ADULT OR JUVENILE)

None......... = 3
One.......... = 2
Two or three.. = 1
Four or more.. = 0

## Scoring Instructions

A.1   In General.  The purpose of this item is to consider previous verified instances of criminal conduct.  Except as specifically noted, count all convictions/adjudications (adult or juvenile) for criminal offenses other than the current offense.  Count convictions for offenses committed while on bail or probation for the current offense.  Do not count the current offense behavior, or any other convictions in the District of Columbia or elsewhere resulting from the offense behavior.  These more properly relate to evaluation of current offense factors.

---

[1] Adapted from U.S. Parole Commission Procedures Manual, "Salient Factor Scoring Manual" (January 31, 1983), pp. 55-57.

1

A.2   **Minor Offenses.**   Do not count convictions for minor offenses such as disorderly conduct, vagrancy, loitering, public intoxication, hitchhiking, possession of alcohol by a minor, or minor traffic offenses.  Serious vehicular offenses (e.g., driving while intoxicated, hit and run) are to be counted.

A.3   **Juvenile Conduct.**   Count juvenile convictions/adjudications except as follows:

    (a) Do not count any status offense (e.g., runaway, truancy, habitual disobedience) unless the behavior included a criminal offense which would otherwise be counted;

    (b) Do not count any criminal offense committed at age 15 or less unless it resulted in a commitment of more than 30 days or involved an offense that would be classified as a "High" Type of Risk.

A.4   **Military Conduct:**   Count military convictions/adjudications for acts that are generally prohibited by civilian criminal law (e.g., assault, theft).  Do not count convictions for strictly military offenses.  NOTE:  This does not preclude consideration of serious or repeated military misconduct as a negative indicant of parole prognosis (i.e., a possible reason for overriding the salient factor score in relation to this item).

A.5   **Diversion.**   Conduct resulting in diversion from the judicial process without a specific finding of guilt (e.g., deferred prosecution, probation without plea) is not be be counted in scoring this item.  However, behavior resulting in a judicial determination of guilt or an admission of guilt before a judicial body shall be counted as a conviction even if no formal conviction results.

2

A.6  <u>Setting Aside of Convictions/Restoration of Civil Rights.</u>
<u>Setting aside or removal of juvenile convictions/</u>
<u>adjudications is normally for civil purposes (to remove</u>
<u>civil penalties and stigma).</u>  <u>Such convictions/adjudications</u>
<u>are to be counted for purposes of assessing parole</u>
<u>prognosis.</u>  <u>This also applies to adult convictions/</u>
<u>adjudications which may be set aside by various methods</u>
<u>(including pardon).</u>  <u>However, convictions/adjudications that</u>
<u>were set aside or pardoned on grounds of innocence are not</u>
<u>to be counted.</u>

A.7.  <u>Convictions Reversed or Vacated on Grounds of</u>
<u>Constitutional or Procedural Error:</u>  <u>Exclude any conviction</u>
<u>reversed or vacated for constitutional or procedural</u>
<u>grounds, unless the prisoner has been retried and</u>
<u>reconvicted.</u>  It will be presumed that a conviction/
adjudication is valid.  <u>If a prisoner challenges</u>
such conviction he/she should be advised to petition for a
reversal of such conviction in the court in which he/she was
originally tried, and then to provide the Board with
evidence of such reversal.  NOTE: Occasionally the file
documents facts clearly indicating that a conviction was
unconstitutional for deprivation of counsel [This occurs
only when the conviction was for a felony, or for a lesser
offense for which imprisonment was actually imposed; and the
record is clear that the defendant (1) was indigent, and (2)
was not provided with counsel and (3) did not waive
counsel].  In such case, do not count the conviction.
Similarly, if the offender has applied to have a conviction
vacated and provides evidence (e.g., a letter from the court
clerk) that the required records are unavailable, do not
count the conviction.  NOTE: If a conviction found to be
invalid is nonetheless supported by persuasive information
that the offender committed the criminal act, this may be
considered as a negative indicant of parole prognosis (i.e.,
a possible reason for overriding the salient factor score).

A.8  <u>Ancient Prior Record</u>:  Do not count convictions occurring prior to a conviction free record of ten years in the community immediately prior to the current offense behavior (including time on probation or parole).  The ten year period is counted between the date of the last countable conviction or release from the last countable commitment (whichever is last) and the date of commencement of the current offense behavior.  NOTE:  This does not preclude consideration of earlier behavior (e.g., repetition of particularly serious conduct) as a negative indicant of parole prognosis (i.e., a possible reason for overriding the salient factor score).  Similarly, a substantial crime free period in the community, not amounting to ten years, may, in light of other factors, indicate that the offender belongs in a better risk category than the salient factor score indicates.

A.9  <u>Foreign Convictions</u>:  Foreign convictions for behaviors that are criminal in the United States are counted.

A.10  <u>Forfeiture of Collateral</u>.  If the only known disposition is 'forfeiture of collateral', count as a conviction (if the offense would otherwise be counted).

<u>Item B.  PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS</u>
<u>(ADULT OR JUVENILE)</u>

None........... = 2
One or two...... = 1
Three or more... = 0

<u>Scoring Instructions</u>

B.1  <u>Count all prior commitments of more than thirty days</u> (adult or juvenile) resulting from a conviction/adjudication listed under Item A, except as noted below.  <u>Do not count any commitment of thirty (30) days or less</u>. Also <u>count commitments of more than thirty days imposed upon revocation of probation or parole where the probation or parole resulted from a conviction/adjudication counted under Item A.</u>

B.2  Count only commitments that were imposed prior to the commission of the current offense behavior.  Commitments imposed after the current offense are not counted for purposes of this item.  Concurrent or consecutive sentences (whether imposed at the same time or at different times) that result in a continuous period of confinement count as a single commitment.  However, a new court commitment of more than thirty days imposed for an escape/attempted escape or for criminal behavior committed while in confinement/escape status counts as a separate commitment.

B.3  <u>Definitions</u>

(a)  This item only includes commitments that were actually imposed.  Do not count a suspended sentence as a commitment.  Do not count confinement pending trial or sentencing or for study and observation as a commitment unless the sentence is specifically to 'time served'.  If a

5

sentence imposed is subsequently reconsidered and reduced, do not count as a commitment if it is determined that the total time served, including jail time, was 30 days or less.

(b) This item includes confinement in adult or juvenile institutions, and residential treatment centers. It also includes confinement in a community treatment center. It does not include foster home placement.

(c) If a committed sentence of more than thirty days is imposed prior to the current offense but the offender avoids or delays service of the sentence (e.g., by absconding, escaping, on bail pending appeal), count as a prior commitment.

## Item C.   AGE AT COMMENCEMENT OF THE CURRENT OFFENSE/PRIOR COMMITMENTS OF MORE THAN THIRTY DAYS (ADULT OR JUVENILE

Age at commencement of the current offense:
    26 years of age or more.................... = 2***
    20-25 years of age......................... = 1***
    19 years of age or less.................... = 0

***EXCEPTION: If five or more prior commitments of more than thirty days, (adult or juvenile), place an 'x' here _____ and score this item............................. = 0.

### Scoring Instructions

C.1   Score 2 if the subject was 26 years of age or more at the commencement of the current offense and has fewer than five prior commitments.

C.2   Score 1 if the subject was 20-25 years of age at the commencement of the current offense and has fewer than five

prior commitments.

C.3  Score 0 if the subejct was 19 years of age or less at the commencement of the current offense, or if the subject has five or more prior commitments.

C.4  Definitions

(a)  Use the age at the commencement of the subject's current offense behavior, or in the case of probation violators, the age at commencement of the behavior leading to violation.

(b)  Prior commitment is defined under Item B.

Item D.  RECENT COMMITMENT FREE PERIOD (THREE YEARS)

No prior commitment of more than thirty days (adult or juvenile), or released to the community from last such commitment at least three years prior to the commencement of the current offense...........................................= 1

Otherwise....................................................= 0

## Scoring Instructions

D.1  Score 1 if the subject has no prior commitments; or if the subject was released to the community from his/her last prior commitment at least three years prior to commencement of his/her current offense behavior.

D.2  Score 0 if the subject's last release to the community from a prior commitment occurred less than three years prior to the current offense behavior; of if the subject was in confinement/escape status at the time of the current

7

D.3  Definitions

    (a)  Prior commitment is defined under Item B.

    (b)  Confinement/escape status is defined under Item E.

    (c)  Release to the community means release from confinement status (e.g., a person paroled through a Halfway House is released to the community upon release from the Halfway House, not the institution.)

Item E.  PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS VIOLATOR THIS TIME

Neither on probation, parole, confinement, or escape status at the time of the current offense; nor committed as a probation, parole, confinement or escape status violator this time.....= 1

Otherwise..................................................= 0

### Scoring Instructions

E.1  Score 1 if the subject was not on probation or parole, nor in confinement or escape status at the time of the current offense behavior; and was not committed as a probation, parole, confinement, or escape status violator this time.

E.2  Score 0 if the subject was on probation or parole or in confinement or escape status at the time of the current offense behavior; of if the subject was committed as a probation, parole, confinement, or escape status violator this time.

8

(a)  The term probation/parole refers to a period of federal, state, or local probation or parole supervision. Occasionally, a court disposition such as 'summary probation' or 'unsupervised probation' will be encountered. If it is clear that this disposition involved no attempt at supervision, it will not be counted for purposes of this item.

(b)  The term 'parole' includes parole, mandatory parole, conditional release, or mandatory release supervision (i.e., any form of supervised release).

(c)  The term 'confinement/escape status' includes institutional custody, work or study release, pass or furlough, halfway house (community treatment center) confinement or escape from any of the above.

Item F.  HISTORY OF HEROIN/OPIATE DEPENDENCE

No history of heroin or opiate dependence....... = 1

Otherwise...................................... = 0

## Scoring Instructions

F.1  Score 1 if the subject has no history of heroin or opiate dependence.

F.2  Score 0 if the subject has any record of heroin or opiate dependence.

9

F.3  <u>Ancient Heroin/Opiate Record</u>.  If the subject has no record
     of heroin/opiate dependence for the <u>ten year period</u>
     preceeding the current offense (not counting any time spent
     in confinement), do not count a previous heroin/opiate
     record in scoring this item.

F.4  <u>Definition</u>

     Heroin/opiate dependence refers to physical or phychological
     dependence, or regular or habitual usage.  Drug abuse other
     than heroin/opiate dependence is not counted in scoring this
     item.  However, this does not preclude consideration of
     serious abuse of a drug not listed above as a negative
     indicant of parole prognosis (i.e., a possible reason for
     overriding the salient factor score in relation to this
     item).

10

# Exhibit



DISTRICT OF COLUMBIA MUNICIPAL REGULATIONS

TITLE 28

CORRECTIONS, COURTS, AND CRIMINAL JUSTICE

Certified and Published

by the

D.C. OFFICE OF DOCUMENTS

MAY 1987

Copyright © 1987

Office of Documents
Room 523 - District Bldg.
Washington, D.C. 20004

204    PROCEDURES FOR GRANTING PAROLE

204.1    As its criteria for determining whether an incarcerated
individual shall be paroled or reparoled, the Board shall use
the criteria set forth in this section and Appendices 2-1 and
2-2 to this chapter.  These criteria consist of pre and
post-incarceration factors which enable the Board to exercise
its discretion when, and only when, release is not incompatible
with the safety of the community.  Any parole release decision
falling outside the numerically determined guideline shall be
explained by reference to the specific aggravating or mitigating
factors as stated in Appendices 2-1 and 2-2.

204.2    The Board shall assign each candidate for parole a salient
factor score (SFS) which shall be one of the factors used in
calculating parole eligibility pursuant to the provisions of
this section.

204.3    The Board shall utilize the SFS as an actuarial parole prognosis
aid to assess the degree of risk posed by a parolee.

204.4    For the purposes of calculating the SFS, the Board shall assign
a numerical value to each of the following categories:

(a)    Prior convictions and adjudications;

(b)    Prior commitments of more than thirty (30) days;

(c)    Age at commission of current offense;

(d)    Recent commitment-free period;

(e)    Status of prisoner at time current offense; and

(f)    History of heroin or opiate dependence.

204.5    In assigning a SFS numerical value for the factor of prior
convictions and adjudications pursuant to §204.4(a), the Board
shall count the following:

(a)    All convictions and adjudications for criminal offenses
(except as excluded by §204.6), other than the current
offense;

(b)    Convictions for offenses committed while on bail or
probation for the current offense;

(c)    Juvenile delinquency adjudications except the following:

(1)    Status offenses (e.g., runaway, truancy, habitual
disobedience); and

2-3

**204**      PROCEDURES FOR GRANTING PAROLE     (Continued)

204.5      (Continued)

> (2)  Criminal offenses committed at age fifteen (15)
> or younger unless it resulted in a commitment of
> more than thirty (30) days or involved violence
> (as defined in §23-1331(a), D.C. Code (1981
> ed.)), use of weapons (as defined by §22-3202(a),
> D.C. Code (1981 ed.)), or drug trafficking.

(d)  Military convictions for acts that are generally
prohibited by civilian criminal law;

(e)  Criminal conduct resulting in a judicial determination
of guilt or an admission of guilt before a judicial
body, even if no formal conviction results;

(f)  Convictions and adjudications even though later set
aside for civil purposes;

(g)  Foreign convictions and adjudications for conduct that
is criminal in the United States; and

(h)  Forfeitures of collateral if the offense would
otherwise be counted.

204.6      In assigning a SFS numerical value for the factor of prior
convictions and adjudications, the Board shall not count the
following:

(a)  Convictions and adjudications for misdemeanors for which
the maximum punishment is not more than ninety (90) days in
prison;

(b)  Convictions and adjudications reversed or vacated unless
the prisoner has been retried and reconvicted; and

(c)  Convictions and adjudications occurring prior to a
conviction and adjudication-free period of ten (10) years
in the community immediately prior to the commission of the
current offense.

204.7      In assigning a SFS numerical value for the factor of prior
commitments of more than thirty (30) days pursuant to §204.4(b),
the Board shall count the following:

(a)  All prior commitments actually imposed of more than thirty
(30) days resulting from convictions and adjudications
counted pursuant to §204.5; and

**204**    PROCEDURES FOR GRANTING PAROLE    (Continued)

204.7    (Continued)

        (b)    Prior commitments of more than thirty (30) days imposed upon revocation of probation or parole where the probation or parole resulted from a conviction or adjudication counted pursuant to §204.5.

204.8    Concurrent or consecutive sentences, whether imposed at the same time or at different times, that result in a continuous period of confinement shall be counted as a single commitment.

204.9    Commitments of more than thirty (30) days imposed for an escape, an attempted escape, or for criminal conduct committed while in confinement or escape status shall be counted as a separate commitment.

204.10    A commitment under §204.4(b) means confinement in a jail, prison, juvenile institution, or residential or community treatment center.

204.11    A prior commitment for more than thirty (30) days shall be counted under §204.7(a) despite avoidance of actual confinement through escape or bail pending appeal.

204.12    In assigning a SFS numerical value for the factor of age at commission of the current offense pursuant to §204.4(c), the Board shall, in the case of a parole or probation violator, use the age at the commencement of the conduct constituting the parole or probation violation.

204.13    In assigning a SFS numerical value for the factor of recent commitment-free period pursuant to §204.4(d), the Board shall regard a prisoner's commitment as terminated when he or she is released from confinement status regardless of where confinement occurs.

204.14    In assigning a SFS numerical value for the factor of status of the prisoner at the time of commission of the current offense pursuant to §204.4(e), the Board shall not consider a prisoner to have been on parole or probation if at the time of the commission of the current offense that parole or probation was unsupervised.

204.15    In assigning a SFS numerical value to the factor of history of heroin or opiate dependence under §204.4(f), the Board shall not consider the prisoner to have had a history of dependence if the prisoner had no dependence for the ten (10) year period preceding the commission of the current offense, not counting any time spent in confinement.

204     PROCEDURES FOR GRANTING PAROLE    (Continued)

204.16    For the purposes of this chapter, heroin or opiate dependence
          refers to physical or psychological dependence, or regular or
          habitual usage.

204.17    The Board shall use the parole candidate's SFS to determine
          which risk category applies to the candidate, as follows:

          (a)  10-9 = low risk

          (b)  8-6 = fair risk

          (c)  5-4 = moderate risk

          (d)  3-0 = high risk

204.18    After determining which risk category applies to a parole
          candidate, the Board shall consider the following pre and post
          incarceration factors to determine whether a candidate should be
          granted parole:

          (a)  Whether the current offense involved a felony in which the
               parole candidate caused, attempted to cause, or threatened
               to cause death or serious bodily injury to another
               individual;

          (b)  Whether the parole candidate has two (2) or more previous
               convictions for a felony of the nature described in
               §204.18(a);

          (c)  Whether the parole candidate has ever been convicted of a
               crime of violence (as defined in §23-1331(4), D.C. Code
               (1981 ed.)) while under the influence of PCP (other than
               current offense);

          (d)  Whether the current offense involved a felony in which the
               parole candidate used a dangerous weapon (as defined by
               §22-3202(a), D.C. Code (1981 ed.));

          (e)  Whether the parole candidate has two (2) or more previous
               convictions for a felony of the nature described in
               §204.18(d);

          (f)  Whether the current offense involved a felony conviction
               under the D.C. Uniform Controlled Substances Act for
               distribution or intent to distribute illicit substances;

          (g)  Whether the parole candidate has two (2) or more previous
               convictions under the D.C. Uniform Controlled Substances
               Act;

204    PROCEDURES FOR GRANTING PAROLE    (Continued)

204.18    (Continued)

> (h)    Whether the parole candidate has committed serious
>         disciplinary infractions (adjudicated under the Department
>         of Corrections' due process procedures) while under
>         confinement for the current offense; and
>
> (i)    Whether the parole candidate has demonstrated sustained
>         achievement in the area of prison programs, industries, or
>         work assignments while under confinement for the current
>         offense.

204.19    After determining an adult parole candidate's SFS score and
          after applying the pre and post incarceration factors to arrive
          at a total point score pursuant to §204 and Appendix 2-1, the
          Board shall take one (1) of the following actions:

> (a)    IF POINTS = 0:    Parole shall be granted at initial
>                          hearing with low level of
>                          supervision required;
>
> (b)    IF POINTS = 1:    Parole shall be granted at initial
>                          hearing with high level of
>                          supervision required;
>
> (c)    IF POINTS = 2:    Parole shall be granted at initial
>                          hearing with highest level of
>                          supervision required; or
>
> (d)    IF POINTS = 3-5   Parole shall be denied at initial
>                          hearing and rehearing scheduled.

204.20    After determining a youth offender parole candidate's SFS score
          and after applying the pre and post incarceration factors to
          arrive at a total point score pursuant to §204 and Appendix 2-1,
          the Board shall take one (1) of the following actions:

> (a)    IF POINTS = 0:    Parole shall be granted at initial
>                          hearing with conditions established to
>                          address treatment needs; or
>
> (b)    IF POINTS = 1-5:  Parole shall be denied at initial
>                          hearing and a rehearing scheduled based
>                          on estimated time to achieve program
>                          objectives established by the
>                          classification team and the Board of
>                          Parole.

**204**    PROCEDURES FOR GRANTING PAROLE    (Continued)

204.21    In determining whether to release on parole an adult or a youth offender appearing before the Board at a parole rehearing, the Board shall take the total point score from the initial hearing and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2. The Board shall then take one of the following actions:

   (a)  IF POINTS = 0-3:        Parole shall be granted at this rehearing with highest level or supervision required; or

   (b)  IF POINTS - 4-5:        Parole shall be denied and a rehearing date scheduled.

204.22    The Board may, in unusual circumstances, waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

# Exhibit

# 8

# Memorandum

*0-2 at initials*
*0-3 at rehearings*

*point subtracted for sustained achievement*
*good conduct*



| | |
|---|---|
| **Subject** | **Date** |
| Special Procedures for District of Columbia Code Offenders | August 21, 1992 |

| **To** | **From** |
|---|---|
| Jasper R. Clay. Jr.<br>Acting Chairman<br>U.S. Parole Commission | Michael A. Stover *Michael Stover by RC*<br>General Counsel<br>and *Rockne Chickinell*<br>Rockne Chickinell<br>Deputy General Counsel<br>U.S. Parole Commission |

## I. INTRODUCTION

The U.S. Parole Commission is now required to apply District of Columbia parole laws and guidelines to all D.C. Code offenders in federal prisons, both male and female inmates. The following memorandum explains the D.C. guidelines and other relevant regulations and policies of the D.C. Board of Parole. It provides our legal advice for compliance with the court order in Cosgrove v. Thornburgh, Civ. No. 80-0516 (D.D.C. 1989)(which applies to federally-housed male D.C. Code inmates). Female D.C. Code inmates can continue to apply for a transfer and a hearing before the D.C. Board, but if they elect to appear before the Commission, a hearing must be held under D.C. procedures.

This memorandum also contains our policy for mixed sentence (U.S. and D.C.) cases, which is published at 28 C.F.R. §2.68. Due to the decision in Thomas v. Brennan, 961 F.2d 612 (7th Cir. 1992), which was recently adopted by the district court in the Cosgrove class action case, the Commission has passed an amendment to this regulation which requires the advancement of any D.C. guideline hearing that was scheduled for a date after the expiration of a mixed sentence prisoner's "federal time". This amended version of the mixed sentence policy should be implemented immediately; as the Commission determined at its July, 1992 business meeting, and it should be applied retroactively as previously decided cases come before Commissioners and staff for a review or hearing.

Note: For purposes of applying D.C. parole laws and guidelines, a prisoner sentenced in a U.S. District Court for a D.C. Code offense is a "D.C. Code offender" and must be heard under the D.C. guidelines, not the guidelines of the Parole Commission.

We have attached to this memorandum two Policy Guidelines from the D.C. Board of Parole which explain the use of various terms used by the Board in applying its guidelines. The first Policy Guideline covers decisions to override the guidelines (i.e., to grant or deny parole despite the point score). The second Policy Guideline covers rehearing dates that depart from the schedule for ordinary cases. The Policy Guidelines are more particularly described in the later sections of this memorandum.

The Policy Guidelines are not intended to cover every situation which may come before the Board. Therefore, the Board may employ, in an unusual case, a reason for overriding a favorable point score, or for setting a longer-than-ordinary rehearing date, which is not listed as one of the "countervailing factors" generally used for this purpose. The Commission has the discretion to follow the same practice.

But where the Policy Guideline does address a situation that is present in a particular case (e.g., when to add a point to the total score for "negative institutional behavior," or when to override the point score for "unusually extensive or serious prior criminal record"), we recommend that the Commission use the same criteria and terminology in its own decisionmaking.

## ELIGIBILITY, INITIAL HEARING, AND SETTING A PAROLE DATE.

Under the D.C. Good Time Credits Act of 1986 (as amended in 1991), all D.C. prisoners (wherever confined) have good time deducted from their eligibility dates at the same rate applicable to the maximum term. They are eligible on the date calculated by the Bureau of Prisons.

All D.C. Code offenders must receive an initial hearing four months in advance of their eligibility dates. After the initial hearing is held, parole may be granted up to six months after the eligibility date (or up to six months after the date of a rehearing) if pre-release CCC placement (work release) is found appropriate. Otherwise, parole must be granted for the earliest date that the release plan can be reviewed and approved by the U.S. Probation Office (but not before the eligibility date).

## GUIDELINE APPLICATION IN GENERAL

The D.C. parole guidelines (copy attached) are straightforwardly written and relatively simple to apply with the aid of the D.C. Board's worksheets. The guidelines need not be restated in full in this memorandum. However, a few words of introduction are in order.

The D.C. parole guidelines employ a salient factor score virtually identical to that contained in the federal guidelines; therefore, the federal salient factor score instructions should be used. However, the D.C. guidelines do not contain an offense severity dimension, nor do they prescribe ranges of months to be served. Rather, the D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of accountability for

2

the offense, and apply a point score system (much included other factor and other readily ascertainable items) to determine whether or not the prisoner is suitable for parole upon the completion of the minimum term. Hence, a D.C. Code prisoner has satisfied offense accountability at eligibility, unless unusual offense factors are present (discussed below). His point score will then determine his presumptive suitability for release.

A point score of 0 to 2 points indicates that parole should ordinarily be granted at the initial hearing, and a point score of 3 to 5 points indicates that parole should ordinarily be denied at the initial hearing and a rehearing scheduled. A "rehearing" is a full reconsideration hearing, unlike a federal "statutory interim hearing," and the point score may well change at that point. At a rehearing, a point may be subtracted for "sustained program achievement" or added for institutional misconduct based on the prisoner's conduct and achievements since the last consideration.

One of the "point score" factors is negative institutional behavior and refers to infractions adjudicated under due process procedures. This means a DHO type of hearing. "Negative institutional behavior" is defined in the attached Policy Guideline on "Definitions of Terms Used in Parole Guidelines." Negative institutional behavior will, of course, raise the point score at a rehearing. In the Policy Guideline the D.C. Board identifies with some specificity the type of violations that ordinarily result in a finding of negative institutional behavior. Furthermore, this Policy Guideline also states that violations committed only within a certain time period before the hearing are normally considered in adding a point for negative behavior.

At a rehearing, a point score of 0 to 3 points indicates that parole should be granted at the rehearing, and a point score of 4 to 5 points indicates that parole should continue to be denied and another rehearing scheduled. The guidelines appear to favor granting parole for many cases at the initial hearing or the first rehearing. However, departures from the guidelines are permitted based upon individual factors, including risk of recidivism, lack of programming,[1] and unusual seriousness of the offense (i.e., factors making the offense a significantly more aggravated version of its type). Examples of reasons for departures are provided in the Policy Guideline on "Definitions of Terms Used in Parole Guidelines." The reasons for deviating from a decision indicated by the total point score should be stated on the notice of action.

Since the D.C. guidelines are written in terms of a simple decision to grant or deny parole, two critical operational differences from the federal guidelines become apparent. First, presumptive parole dates are not set. No parole date can be set more than six months in the future. Second, if parole is denied at a given hearing, the timing of the next rehearing becomes critical because the inmate's total point score may be improved, and

---

[1] In accordance with Congressional intent, the Commission has, in federal cases, avoided using parole denials to coerce participation in institutional programs. However, the D.C. Parole Board's regulations and practices permit--but do not require-- parole denials for this reason.

may call for parole to be granted at the next hearing.     *REHEARING – TIMING*

The D.C. regulations set out the following general policy on the ordinary timing of rehearings: six months in the case of a maximum sentence less than five years and one year in the case of a longer maximum sentence. However, longer (or shorter) continuances are scheduled, for the same types of reasons set forth in the Policy Guideline on factors countervailing a recommendation to grant or deny parole. See 28 DCMR § 104.11 (". . . the Board may order a parole reconsideration date it determines to be appropriate."). The Board has published a separate Policy Guideline entitled "Reconsideration Hearings -- Establishing Dates". (See attached.)

The D.C. Board does not observe any limit to the length of time an inmate may be continued for a rehearing, and continuances have been ordered for rehearing dates up to nine years in the future. Use individualized discretion in determining the actual rehearing date (e.g., a hearing after 18, 24, or 36 months may be the most appropriate disposition depending on the nature of the case). Although the D.C. Board has not adopted any limit to the permissible length of a set-off, the Commission's approved practice will be not to exceed five years except for the most serious and dangerous offenders in the prison system (e.g., aggravated first-degree murderers and offenders of like seriousness). However, no presumption in favor of parole is implied in the setting of any rehearing date. For those prisoners who are found to have unusual factors warranting a rehearing beyond the "ordinary" schedule by five years or less, the rehearing date should reflect a decision that all aggravating factors identified in the decision will have been fully accounted for at that time. The reasons for deviating from the ordinary rehearing schedule should be stated on the notice of action.

For example, a longer continuance than indicated by the D.C. regulations would be appropriate for any case involving a lengthy or serious criminal history, a case with exceptional seriousness of the instant offense, cases of particularly serious or frequent institutional misconduct, and cases of substantial drug or alcohol problems. It must be emphasized that "seriousness of the offense," under the D.C. regulations, typically concerns "unusual cruelty to the victim," a case of "vulnerable victims," or a "leadership role in an organized criminal venture." (See the Policy Guidelines.) The D.C. Board does not focus upon considerations of quantity (e.g., the amount of drugs or money involved in the crime or the number of multiple separate offenses) as the U.S. Parole Commission does. The D.C. Board appears to consider such factors as already accounted for by the minimum term or terms. "Seriousness of the offense" is a concept which, for the D.C. Board, is closely related to "seriousness of risk," and should be applied by the Commission with that limitation in mind. When considering reasons for a departure from the point score or rehearing guidelines, always consult the Policy Guidelines.

Therefore, a decision "outside the guidelines" could consist of a decision to override a point score that indicates parole at the initial or rehearing stage, or to override the normal six-month or one-year rehearing schedule, or both. It could also consist of a decision to grant parole where the point score indicates no parole at an initial hearing or rehearing. A good example of an actual case decision involving aggravating factors may be found in the attached court decision in Rookard v. District of Columbia Board of Parole,

4

C.A. No. 86-3238 (January 21, 1988). The case involves a decision above the guidelines based on "unusual cruelty to the victim."

## TRANSFER TO DISTRICT OF COLUMBIA

If a D.C. Code offender who has already received a decision from the U.S. Parole Commission is transferred to a District facility, the Commission's file is to be promptly transferred to the D.C. Board of Parole, which thereafter assumes jurisdiction and treats all USPC decisions as decisions of the D.C. Board. (A complete record must be kept of this transfer so the file can be located if needed.)

## RESCISSION HEARINGS

Once a parole date is granted on a D.C.Code sentence, the date may be rescinded for a disciplinary rule violation or new criminal conduct. A rescission hearing should be scheduled to consider the new information and determine whether a point should be added to the prisoner's previous point score for "negative institutional behavior". This point should not be added at the rescission hearing if a point for negative behavior was added at the prisoner's last parole consideration (the consideration which led to the setting of the parole date). A decision notwithstanding the point score resulting from the rescission hearing may be made for countervailing factors, as discussed in the Policy Guidelines. A short retardation of the parole date may be made for a rule violation, without a rescission hearing. Such retardation of the date on the record should not exceed sixty days.

## REVOCATION CASES

Revocation hearings are the same as under the federal system except (1) street time forfeiture is automatic under D.C. Code §24-206(a) and (2) there are no reparole guidelines, only a rehearing schedule to which the same policies described above apply. See 28 DCMR §104.4 to §104.10 and Policy Guideline on "Reconsideration Hearings." This rehearing schedule must be followed unless aggravating or mitigating factors are found to warrant otherwise. The case of the repeat parole violator is perhaps the most frequent example of a decision to override the rehearing schedule and establish a longer set-off.

Sections 104.4 to 104.10 of the D.C. Board's regulations set the following general policy for the scheduling of rehearings after the revocation decision:

| Most Serious Violation | Time Remaining on Sentence | |
|---|---|---|
| | Less than 5 years | 5 years or more |
| Technical | 0-6 months | 6 to 9 months |
| Misdemeanor | 6 to 9 months | 9 to 15 months |
| Felony | 9 to 15 months | 15 to 24 months |

Note: These categories apply whether or not the offender was convicted of the

5

misdemeanor or felony in question. The rehearing date is set from the date the violator warrant is executed, not the date of the revocation hearing.

Although it has been the practice of the D.C. Board to grant reparole at the rehearing if the violator has a good institutional record, and has participated in institutional programs, that practice creates no rights or obligations and does not set a rule or policy. There are no guidelines to structure the reparole decision itself. Therefore, the Commission's discretion on whether to grant reparole is unstructured. (This does not mean the Commission may refer to federal guidelines.) Reparole may be denied at the rehearing for any permissible reason (see the Policy Guidelines) and another rehearing is then scheduled.

## HEARING PROCEDURES IN GENERAL

Although the District of Columbia Parole Board's regulations provide for somewhat different hearing procedures from those used by the Commission, the Commission should, for the sake of simplicity, continue to apply its own hearing procedures, including representation, disclosure, etc. As far as we are able to determine, this will not prejudice the prisoner's opportunities for a fair parole consideration. Therefore, in any situation not covered by these special procedures, the regular federal procedures will be applicable. Revocation hearings are, of course, governed by the same due process rules.

## VOTING QUORUM AND APPEAL

### Prisoners Serving D.C. Code Offenses Only:

In order to match the D.C. Parole Board's three-member concurrence requirement, the Regional Commissioner should refer these cases to the National Commissioners under the procedure of 28 C.F.R. §2.24(a). The release determinations are not appealable, since the D.C. Parole Board does not provide an appeal procedure.

### For mixed U.S. and D.C. Code sentences:

The consideration of the federal sentence block and the setting of the D.C. initial hearing date should be handled under the Commission's normal regulations on voting quorums. The prisoner may appeal both the federal time imposed, and the Commission's determination as to the date the D.C. initial hearing should be held. But the consideration under the D.C. guidelines at the D.C. initial hearing and subsequent hearings is handled by the procedure discussed above, i.e., referral to the National Commissioners.)

## DETAINERS

If a D.C. Code parole violator is sentenced for a new crime, and incarcerated in a facility not operated by the District of Columbia, the Commission may place a detainer, which must be reviewed every six months until the warrant is executed. **Dispositional**

6

revocation hearings are not held.  NOTE:  If the offender is designated for a D.C. facility, the case is immediately transferred to the D.C. Board, using the standard transfer letter.

## II.  STEP-BY-STEP PROCEDURES -- D.C. CODE SENTENCES ONLY

For purposes of applying the D.C. guidelines to offenders currently incarcerated in federal institutions, we suggest that they be divided into three groups:  prisoners serving exclusively D.C. Code sentences who are just approaching eligibility for parole, prisoners serving exclusively D.C. Code sentences who are already beyond the eligibility date, and prisoners serving mixed D.C. Code and U.S. Code sentences.  We recommend that the Commission proceed as outlined below.

## ONLY D.C. CODE SENTENCES--NOT YET ELIGIBLE

1.  Conduct the hearing at the scheduled time (four months before the eligibility date) and consider the case using the D.C. Parole Board's guidelines.

2.  If a parole date is found to be warranted on the basis of that consideration, grant that parole date, with or without CCC placement.  Otherwise, issue a decision denying parole, schedule a rehearing according to the rehearing policy described above, and give reasons for the decision on the Notice of Action.[2]  This includes the reason for a departure from the point score, and/or the reason for a longer continuance.

## ONLY D.C. CODE SENTENCES--ALREADY ELIGIBLE

Some prisoners (including female D.C. Code offenders) may have received decisions under the federal parole guidelines and have not yet been reheard.  Such prisoners may have already passed not only their parole eligibility dates but also the dates when they would have received rehearings, by the time they appear for a hearing under the D.C. guidelines.  Thus, to give them the benefit of the D.C. guidelines at this time, it may be necessary to conduct a hearing which applies the guidelines for both initial and review considerations.

1.  Vacate all actions already taken and schedule the case for a D.C. initial hearing as soon as possible.  [D.C. regulations do not permit parole on the record.  Therefore in-person hearings are required in all cases.]

2.  Conduct the hearing applying the D.C. initial guidelines.

3.  If a parole effective date is warranted on the basis of that consideration, grant it.

_____

[2]  The D.C. Board does not supply reasons for parole denials, except when the Board is departing from the guidelines.  28 DCMR 204.22.  However, the reasons for all its decisions are carefully recorded in the file.

7

Otherwise, determine how long a set-off is warranted.

**If that set-off time has not passed,** issue a decision denying parole, scheduling a rehearing at the appropriate time, giving reasons for the decision.

**If the set-off time has already passed,** consider the case with the D.C. Parole Board's rehearing guidelines at the present consideration *i.e.,* with the point score recalculated for the rehearing. If a parole grant is warranted on the basis of that consideration, grant it. If a parole grant is not warranted, issue a decision denying parole, and schedule a rehearing at the appropriate time, giving reasons for the decision.

## ONLY D.C. CODE SENTENCES -- ELIGIBILITY DATE ADVANCED BY GOOD TIME

Due to the Good Time Credits Act of 1991, which authorizes the reduction of the minimum term by good time, some prisoners who have yet to be heard under the D.C. guidelines may have already passed the point when they are eligible for an initial consideration. In such cases, schedule the prisoner for an initial hearing as soon as feasible and apply steps 2 and 3 outlined in the previous section for "Exclusively D.C. Code Sentences -- Already Eligible."

If the prisoner has already been given an initial hearing under the D.C. guidelines, the case should be re-evaluated at the regularly scheduled rehearing date. At the rehearing the case should be evaluated under the initial and rehearing guidelines as if the initial hearing had been held four months prior to the parole eligibility date advanced by good time deductions.

## REVOCATION CASES ALREADY HEARD UNDER USPC GUIDELINES

1. Vacate previous reparole date (not the revocation decision).

2. Schedule for a new hearing to determine reparole, or a new combined initial/reparole hearing if the parole violation term is combined with a new sentence (D.C. or Federal).

## III. STEP-BY-STEP PROCEDURES FOR MIXED U.S. CODE AND D.C. CODE SENTENCES -- 28 C.F.R. §2.66(c)-(f).

### INITIAL CONSIDERATIONS

This is the most complex group of all because it calls for the application of two different sets of guidelines in relation to different components of the overall sentence. The Bureau of Prisons will continue to aggregate the sentences for purposes of establishing a single parole eligibility date and a single mandatory release date, and the Commission will continue to treat the sentences as fully aggregated. However, **for its internal decision-making analysis only,** the Commission should hypothetically de-aggregate the sentence and arrange them into two separate blocks of sentences--federal and D.C.--with the federal

block of sentences being the first in order. (The actual order of imposition is irrelevant.) Then proceed as follows:

## STEP 1 -- Setting the Federal Date

The federal sentence block will be considered first regardless of the actual chronology of sentence imposition. Apply the federal parole guidelines to the U.S. Code offense behavior. **The offense severity rating may not include the District of Columbia conviction.** At this stage, if the D.C. <u>conviction</u> (as opposed to the D.C. offense) was sustained before the U.S. Code crime was committed, the D.C. conviction should be counted in Item A of the salient factor score. Furthermore, if the D.C. prison sentence began before the federal crime was committed, count this period of confinement in Item B. This consideration should result in the setting of the "federal date". **(Note: This is not an actual parole date.)** *Change this and be particular on whether resc gls or reg gls (ys) are used when prison misconduct leads to new US Code conviction.*

Rescission behavior should be considered under the rescission guidelines (28 C.F.R. §2.36) in setting the "federal date" unless such behavior results in a new D.C. Code conviction. (If rescission behavior is used to set the "federal date", this does not preclude use of the same behavior to later add a point for the post-incarceration risk factor of "negative institutional behavior" when the D.C. guidelines are subsequently applied.)

The "federal date" may exceed the guideline range, but it may be no later than the hypothetical statutory release date of the federal sentence block if it is less than five years, or the hypothetical two-thirds date if the federal sentence block is five years or more. These limits cannot be exceeded even if the inmate has forfeited good time, or would not qualify for mandatory parole by reason of his prison misconduct or the seriousness of the risk. However, any factor (except accountability for the D.C. crimes) can be considered in exceeding the federal guideline range up to the limits described above. (Risk factors not adequately accounted for in the federal decision can be used to override the D.C. guidelines.)

## STEP 2 -- Setting the D.C. Hearing Date

If the "federal date" exceeds the parole eligibility date on the aggregate term, the date of the D.C. guideline hearing should be set four months prior to the "federal date". If the "federal date" is the same or less than the parole eligibility date, the date of the D.C. guideline hearing should be set four months prior to the parole eligibility date on the aggregate sentence.

## STEP 3 -- Applying the D.C. Guidelines at the D.C. Hearing

At the D.C. guideline hearing, the examiners should consider the prisoner for parole with regard to his D.C. Code offense and apply the D.C. guidelines. For salient factor scoring purposes, the D.C. Code offense should be considered as the "current offense". The U.S. Code conviction should be counted as a prior conviction if the U.S. Code <u>conviction</u> (as opposed to the federal offense) occurred prior to the commission of the D.C. Code offense.

9

If the U.S. Code prison sentence began before the D.C. crime was committed, this period of confinement should be counted as a prior commitment.

**Note:** The prisoner's overall offense behavior (including U.S. and D.C. Code offenses) <u>may</u> be considered for the purpose of determining whether the prisoner poses an unusual risk to the public welfare. For example, the overall offense behavior may reveal a pattern of sustained, or repeatedly violent, criminality that warrants a finding of "unusually serious risk" and a decision to override a favorable D.C. point score.

## RETROACTIVE APPLICATION OF REVISED MIXED SENTENCE POLICY

If the prisoner has already had a hearing at which the former mixed sentence policy at 28 C.F.R. §2.66 was applied, the case should be re-evaluated at the next hearing or record review under the revised mixed sentence policy. If application of the new policy indicates that the D.C. guideline hearing should have already been conducted by the date of the present consideration (and such hearing has not been held), the prisoner should be promptly given a D.C. guideline hearing. **This hearing should be conducted as if it were being held on the date indicated by the new policy.** If it appears that a rehearing (or rehearings) should have also been held once the new policy is applied, the case should also be evaluated under the D.C. rehearing guidelines. If parole is denied, the timing of the rehearing should be set according to the date the initial (and subsequent hearing(s)) should have been held.

If the prisoner has already been given a D.C. guideline hearing, the case should be evaluated under the new policy to determine whether this hearing should have been held earlier. If so, the D.C. rehearing schedule and guidelines should be applied as if the D.C. guideline hearing had been held on the date indicated by the new policy.

## THE D.C. GUIDELINE HEARING AND GRANTING PAROLE

The D.C. guideline hearing on a "mixed sentence" is always scheduled four months prior to the date on which the Commission commences the application of the D.C. guidelines. Parole will not, however, be granted for a date earlier than the commencement date except that if there is superior program achievement, parole could be set for a date during the four months preceding the federal date. A D.C. guideline hearing is otherwise to be treated as a D.C. initial parole hearing, except that any grant of parole is from the aggregate sentence.

## MANDATORY PAROLE IN MIXED SENTENCE CASES

In a case where the federal sentence block is five years or more, do <u>not</u> grant a separate mandatory parole date on the federal sentence(s). The mandatory parole law will be satisfied by observing the procedure described above for setting the federal date.

## MIXED SENTENCE REPAROLE POLICY -- 28 C.F.R. §2.66(h)

**Note: See next section for advice on specific situations when the parolee**

10

A violation of the conditions of parole on a mixed sentence is deemed to be a simultaneous federal and D.C. parole violation. Therefore, the warrant is always issued on the aggregate sentence, regardless of when the component terms were imposed.

With respect to reparole decisions in these mixed federal and D.C. cases, federal reparole guidelines should be applied, but the D.C. rehearing schedule should be followed.

With respect to street time forfeiture, forfeit all street time if forfeiture is required by 28 C.F.R. §2.52(c) for a new conviction. If not, then divide the street time according to the proportional relationship of the D.C. sentence block to the federal sentence block, and forfeit only the D.C. portion of that time. (By our interpretation, D.C. law continues to require forfeiture in all revocations.) For example, if the parolee is serving a 10-year D.C. sentence and a 5-year federal sentence (total aggregate term of 15 years), the D.C. sentence block is two-thirds of the aggregate term, and only two-thirds of the total street time is forfeited. (In the case of an absconder, the Commission would also forfeit the total time in absconder status from the federal portion of the parolee's street time.) Measure "street time" from date of release on parole to warrant execution, or confinement on other charges.

## IV. DETAINERS AND REPAROLE DECISIONS FOR PAROLEES WITH NEW CONVICTIONS -- STEP-BY-STEP PROCEDURES

These instructions are based on the premise that the prisoner is eligible for parole on any new U.S. Code sentence imposed by the court.

## D.C. CODE SENTENCE PAROLE VIOLATORS

### Parole Violator on a D.C. Code Sentence Serving a New D.C. Code Sentence and Returned to a D.C. Facility.

Transfer the case to the D.C. Board of Parole, which acquires jurisdiction as soon as the prisoner is designated for service of his new D.C. Code sentence in a D.C. facility. There is a standard-form transfer letter.

### Parole Violator on a D.C. Code Sentence Serving a New D.C. Code Sentence in a BOP Facility.

If the warrant has not yet been executed, the Commission should conduct a dispositional review on the record within six months of notice that the warrant has been lodged as a detainer. The Commission should decide whether (a) to let the detainer stand, (b) to execute the warrant and schedule a revocation hearing, or (c) to withdraw the warrant and close the case. If the decision is to let the detainer stand, conduct a record review every six months, and consider the prisoner for parole on the new D.C. sentence

11

guidelines. The warrant should be executed when the prisoner is paroled or mandatorily released to the violator term on his original D.C. sentence.

Once the warrant is executed, conduct a revocation hearing, but continue to apply the D.C. initial parole guidelines and the rehearing schedule included therein (not the D.C/ reparole rehearing schedule). If there are parole violations in addition to the crime for which the new D.C. sentence was imposed, those violations may warrant a denial of parole on the aggregate sentence, notwithstanding a point score indicating that parole is appropriate.

If the warrant has already been executed before the prisoner is received in a federal facility, but the prisoner has yet to reach his eligibility date on the new D.C. sentence, conduct a revocation hearing to enter a revocation and street time forfeiture order, but continue the prisoner for an initial hearing four months prior to completion of the minimum term. If he is already at that point, conduct a combined initial/revocation hearing, and employ the D.C. initial guidelines as described above.

**Parole Violator on a D.C. Code Sentence Serving a New U.S. Code Sentence in a BOP Facility.**

If the warrant has not been executed, consider the prisoner for parole only on the new U.S. Code sentence pursuant to the federal guidelines. Conduct a dispositional record review within six months of notice of the detainer to determine whether (a) to let the detainer stand, (b) to execute the warrant and schedule a revocation hearing, or (c) to withdraw the warrant and close the case.

When the warrant is executed upon parole or mandatory release from the federal sentence, conduct a revocation hearing and apply the D.C. rehearing schedule for reparole cases.

If the warrant has been executed before release from the U.S. Code sentence, conduct a combined initial/revocation hearing and apply the federal reparole guidelines and the D.C. rehearing schedule for parole violators, taking into consideration time already served on the new U.S. Code sentence that relates to the parole violation charges.

**Parole Violator on a D.C. Sentence Serving a New Mixed U.S./D.C. Code Sentence.**

If the warrant has not been executed, the prisoner should be considered for parole on the new mixed sentence under the policy at 28 C.F.R. §2.66 (c)-(f). Within six months of notice of the detainer, conduct a dispositional record review to determine whether (a) to let the detainer stand, (b) to execute the warrant and schedule a revocation hearing, or (c) to withdraw the warrant and close the case.

When the warrant is executed upon parole or mandatory release from the (new) mixed sentence, conduct a revocation hearing on the D.C. violator term using the D.C. rehearing schedule in reparole cases. Take into consideration time already served on the

If the warrant is executed before consideration on the mixed sentence, the D.C. parole violator term is aggregated with the mixed sentence. Conduct a combined initial/revocation hearing, applying the policy at §2.66(c)-(f) for mixed sentence initial parole determinations. Parole violations not already accounted for in the new mixed sentence may be considered as a possible reason for denying parole notwithstanding a D.C. point score that indicates parole should be granted.

## MIXED SENTENCE PAROLE VIOLATORS

### Parole Violator on a Mixed Sentence Serving a New D.C. Sentence in a BOP Facility.

If the warrant has not been executed, the prisoner should be considered for parole on the new D.C. sentence pursuant to D.C. initial parole guidelines. The outstanding detainer from the mixed sentence is to be reviewed pursuant to 28 C.F.R. §2.47. When the warrant is executed after parole or mandatory release from the new D.C. sentence, conduct a revocation hearing and make the reparole decision in accordance with the mixed sentence reparole policy (28 C.F.R. §2.66(h), with credit toward the federal reparole guidelines being given for the time served on the new D.C. sentence. If a rehearing is ordered under the D.C. rehearing schedule for reparole cases, the date the rehearing is calculated from the date the warrant was executed.

If the warrant has already been executed, conduct a combined initial/revocation hearing, and consider the prisoner for parole on the aggregate sentence according to the standard D.C. initial guidelines. However, this hearing will be delayed until completion of the minimum term of the new D.C. Code sentence. The Commission may take into consideration the fact that the prisoner is a parole violator in deciding whether or not to exceed the D.C. point score.

### Parole Violator on a Mixed Sentence Serving a New U.S. Code Sentence.

If the warrant has not been executed, conduct an initial parole hearing on the new U.S. Code sentence and apply 28 C.F.R. §2.47 to the detainer. When the warrant is executed upon release from the U.S. Code sentence, apply the mixed sentence reparole policy (§2.66(h)), with guideline credit for time served on the new U.S. Code sentence.

If the warrant has been executed, conduct a combined initial/revocation hearing, and apply the mixed sentence reparole policy.

### Parole Violator on a Mixed Sentence Serving a New Mixed Sentence.

If the warrant has not been executed, conduct an initial hearing on the new mixed sentence using the mixed sentence initial parole policy (§2.66(c)-(f)). Review the detainer pursuant to 28 C.F.R. §2.47. When the warrant is executed upon release from the new mixed sentence, conduct a revocation hearing applying the mixed sentence reparole policy

13

If the warrant has already been executed, conduct an initial/revocation hearing, using the mixed sentence reparole policy.

## U.S. CODE SENTENCE PAROLE VIOLATORS

**Parole Violator on a U.S. Code Sentence Serving a New D.C. Sentence in a D.C. Prison.**

Transfer this case to the jurisdiction of the D.C. Board of Parole.

**Parole Violator on a U.S. Code Sentence Serving a New D.C. Sentence in a BOP Facility.**

If the warrant has not been executed, apply D.C. initial release guidelines to the new D.C. sentence and use §2.47 to determine when to execute the federal warrant. When the federal warrant is executed upon parole or mandatory release from the D.C. sentence, apply federal reparole guidelines with credit for time served on the D.C. sentence.

If the violator warrant has been executed, the prisoner is serving a mixed sentence. Conduct a combined initial/revocation hearing, and apply the mixed sentence initial parole policy (§2.66(c)-(f)), with the federal violator term acting as "the federal sentence block".

**Parole Violator on a U.S. Code Sentence Serving a New Mixed Sentence.**

If the warrant has not been executed, apply the initial release mixed sentence parole policy (28 C.F.R. §2.66 (c)-(f)) to the new mixed sentence. Review the warrant pursuant to 28 C.F.R. §2.47. When the warrant is executed upon release from the new mixed sentence, conduct a revocation hearing and apply the federal reparole guidelines, with credit for time served on the new mixed sentence.

If the warrant has already been executed, the prisoner is now serving an aggregate mixed sentence, based on the combination of the new mixed sentence and the violator term. Conduct an initial/revocation hearing and apply the mixed sentence initial parole policy (§2.66(c)-(f)), with the federal violator term aggregated with the new U.S. Code sentence to form the "federal sentence block".

## V. SAMPLE WORDING FOR ORDERS AND NOTICES OF ACTION

1.    Cancellation of prior actions [one vote]:

ORDER:    Reopen and vacate previous decision(s) of the U.S. Parole Commission on the establishment of the parole release date. [Schedule new initial hearing for _____.]

NOTICE OF ACTION: Reopen and vacate previous decision(s) of the U.S. Parole

14

Commission on the establishment of the parole release date. [Schedule new initial hearing for _____.]

2.   Exclusively D.C. Code Sentence [three concurring votes]:

a. Denial of parole:

ORDER: Continue for a review hearing in _____.

NOTICE OF ACTION: Continue for a review hearing in _____.

> REASONS: You have a score of _____ points under the District of Columbia parole guidelines. See attached point assignment grid. Those guidelines indicate that parole should be denied at this time. After consideration of all factors and information presented, a departure from the guidelines is not found to be warranted.
>
> [**Above D.C. guidelines**]: You have a score of _____ points under the Those guidelines indicate that parole should be granted at this time. However, a decision notwithstanding the favorable point score is warranted because: [give conclusion and facts in support]. [Add, if applicable]: Your case warrants a longer rehearing date than the ordianry case for the same unusual factors noted for the decision to deny parole nothwithstanding your favorable point score.
>
> [The statement of reasons for a D.C. parole denial should be accompanied by a completed point assignment grid for initial hearing (PB 48) or review hearings (PB51), as appropriate.]

b. Grant of parole [three concurring votes]:

> ORDER   AND   NOTICE   OF   ACTION:   Parole   effective _____19_____.
>
> [Reasons need not be given for parole grants.]

3.   Mixed U.S. and D.C. sentences. [One vote for setting the federal date and date for commencing D.C. guidelines; three votes to grant or deny parole under the D.C. guidelines]:

a. Parole on both.

ORDER: Commence application of the District of Columbia parole guidelines on _____ after service of ___ months for your federal offense(s) and an additional _____ months for your D.C. Code offenses. Parole effective

15

NOTICE OF ACTION: Commence application of the District of Columbia parole guidelines on _____ 19_____, after service of ___ months for your federal offense(s) and an additional ____ months for your D.C. Code offenses.  Parole effective _____19___.  [Give the customary guideline reasons to explain the federal guideline date.  Reasons for the District of Columbia guideline calculation and decision are not required when parole is granted.]

b.  Parole denied -- D.C. guidelines commenced after "federal date" or parole eligibility date, whichever comes later.

ORDER:  Commence application of the District of Columbia parole guidelines on _____ 19__, [insert either: "after service of _____ months for your federal offense(s)" or "upon your eligibility for parole".]  Your D.C. guideline hearing will be held in _____, 19__ [four months prior to the federal date, or parole eligibility date, whichever comes later].

NOTICE OF ACTION:  Commence application of the District of Columbia parole guidelines on _____ 19___, [insert either: "after service of ___ months for your federal offense(s)" or "upon your eligibility for parole".]  Your D.C. guideline hearing will be held in _____ , 19__.  [Give the customary federal guideline reasons, then add the following:]

The above federal guideline decision was made strictly on the basis of your federal crimes and sentences.  A D.C. guideline hearing will be conducted for you four months before the date determined appropriate to satisfy your U.S. Code offenses, or upon your parole eligibility, whichever is later.  At that time, the U.S. Parole Commission will determine, pursuant to District of Columbia parole guidelines, whether you should be released to the community.

## VI.  MAKING RECOMMENDATIONS TO SENTENCING COURT FOR REDUCTION IN MINIMUM TERMS.

The Parole Commission also has the responsibility to consider the requests of D.C. offenders in BOP prisons for recommendations to the D.C. Superior Court regarding the reduction of minimum terms.  We have included as an appendix a memorandum from Mr. Chickinell to Commissioner Lopez dated October 6, 1988 which outlines the proposed procedures for making such recommendations.

Compliance with the court decisions will doubtless present more problems that we have covered here.  As questions arise please call the Legal Office for further assistance, where Mr. Chickinell (301-492-5959) will take the lead in providing advice on these matters.  Recommendations to improve these procedures are invited from Commissioners and staff.

17

WORKSHEET FOR DETERMINING WHEN TO COMENCE APPLICATION OF D.C.
GUIDELINES ON A MIXED U.S./D.C. CODE SENTENCE

Inmate's Name: _____    Date: _____

Reg. No.: _____    Institution: _____

Note:  Use this worksheet after the federal date has been
established in accordance with Commission procedures.

[Federal Sentence Block]

1.    Your federal sentence block is _____ months.  The
hypothetical statutory release/two-thirds date is after _____
months.

2.    Your basic federal guideline range has been established
at _____ to _____ months.

3.    Your federal time has been set at _____ months.  This
time will be satisfied on _____, 19___ (your
federal date).*

[D.C. Sentence Block]

4.    Your D.C. sentence block is _____ to _____ months.

5.    Your D.C. minimum time is therefore _____ months.  The
highest guideline range for a prisoner (with your salient factor
score) that would be satisfied by service of your D.C. minimum
time is _____ to _____ months.

[Decision on Commencement of D.C. Time and When D.C. Guidelines
Should be Used.]

6.    Accordingly, your D.C. equivalent offense severity
rating is Category _____.  Applying the Multiple Separate

_____

* This decision will have been made by reference to the
aggregate, not the basic, federal guideline range if there are
escapes, rescission behavior, etc., that resulted in additional
guideline ranges added to the basic federal guideline range.
These additional behaviors are accounted for in setting the
federal date; they are not considered in this determination.

31.

Offenses Table to your basic federal offense (or to each of your basic federal offenses if there were multiple separate federal offenses), combined with your D.C. equivalent offense severity rating, the resulting guideline range is _____ to _____ months.

7. The difference between the minimum of the above guideline range and the minimum of your basic federal guideline range is _____ months. [Enter zero if, under the Multiple Separate Offenses Table, the basic federal guideline range would not be increased by the addition of the D.C. equivalent offense severity rating.]

8. Adding this difference to your federal time requires you to serve a total of _____ months before application of the D.C. guidelines. [Add the result in no. 7 to no. 3.] This period of time will be satisfied on _____, 19____.

9. Schedule a D.C. guideline hearing for _____, 19____. The instructions for setting this hearing date are as follows:

A. Set a hearing date four months in advance of the federal date in no. 3 if there is no increase in the guideline ranges and the prisoner is eligible for parole on the aggregate sentence. [Parole will not be granted for a date prior to the federal date, unless the Superior Program Achievement criteria at 28 C.F.R. § 2.60 are satisfied.]

B. Set a hearing date four months before the date entered in no. 8, if that date is beyond the federal date and the prisoner is eligible for parole on the aggregate sentence. [Parole will not be granted for a date prior to the date entered in no. 8, because of minimum accountability for the D.C. offense(s).]

C. Set a hearing date four months before eligibility on the aggregate sentence if the prisoner is not eligible for parole until after the federal time and any additional time for the D.C. offense(s) has expired. [Parole will not be granted for a date before eligibility.]

ATTACH THIS WORKSHEET TO THE NOTICE OF ACTION, AFTER MAKING ANY CORRECTIONS FOUND NECESSARY AFTER COMPLETION OF THE INITIAL PAROLE HEARING.

32.



GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF PAROLE
717-14TH STREET, N.W., SUITE 300
WASHINGTON, D.C. 20005

May 7, 1992

Carol Pavileck Getty, Chair
U.S. Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20815

Dear Mrs. Getty:

Enclosed is an amended Policy Guideline on establishing dates for reconsideration hearings that was adopted by the Board at its monthly public meeting on April 27, 1992. This Guideline replaces the policy on the same subject that was adopted by the Board last December.

The Guideline was amended to eliminate any interpretation that the Board is restricted to using the specific aggravating and mitigating factors listed in the document. Specifically, the amendments stipulate that the "factors considered by the Board include but are not limited to..." those listed in the Guideline. The amended language is found in section VI, paragraphs A-2 and A-3, and paragraphs B-2 and B-3.

Please contact me, if you have any questions or need additional information. Thank you for your continuing cooperation and support.

Sincerely,

Erias A. Hyman
Chairman

Enclosure

JR/jr



GOVERNMENT OF THE DISTRICT OF COLUMBIA
## BOARD OF PAROLE
717-14TH STREET. N.W.. SUITE 300
WASHINGTON. D.C. 20005

---

### POLICY GUIDELINE

**SUBJECT:** Reconsideration Hearings --- Establishing Dates
AS AMENDED BY THE BOARD ON APRIL 27, 1992

I.  **AUTHORITY:** D.C. Code Section 24-201.2 and 28 DCMR Section 104, May 1987.

II. **PURPOSE:** To ensure consistency and equity in the establishment of parole reconsideration dates.

III. **APPLICABILITY:** An offender who has been denied parole or an offender whose parole has been revoked.

IV. **REFERENCES:** Board of Parole Policy Guideline, adopted on December 16, 1991, regarding definitions of terms used in Parole Guidelines

V.  **DEFINITIONS:**

A.  RECONSIDERATION HEARING: a hearing conducted by the Board to consider whether an offender should be released on parole after the offender was denied parole, or after the offender was reincarcerated when parole was revoked.

B.  SET-OFF: a period of time ordered by the Board that an offender must remain incarcerated before being reconsidered for parole by the Board.

C.  PRESCRIBED SET-OFFS: a period of time specified in the rules that an offender may remain incarcerated before being considered for parole.

D.  AGGRAVATING FACTOR: factor(s) considered by the Board for guidance in determining whether to establish a reconsideration hearing date later than the prescribed set-off.

E.  MITIGATING FACTOR: factor(s) considered by the Board for guidance in determining whether to establish a reconsideration hearing date earlier than the prescribed set-off.

2

F.    TECHNICAL VIOLATION:  a violation of parole that is noncriminal in nature, i.e., that does not consist of new criminal activity or involvement.

V.    RATIONALE:

The rules provide prescribed set-offs for the purpose of establishing reconsideration hearing dates when parole is denied or revoked.  The Board, in its discretion, may establish a reconsideration date outside of the prescribed set-offs where certain factors exist.

VI.   POLICY:

A.    Set-offs When Parole is Denied:

1.   When the Board denies parole for any offender, it shall ordinarily schedule a reconsideration date within the prescribed set-offs unless certain factors support imposition of an alternative set-off.  The length of a set-off is based on the term of the sentence imposed by the courts, and may not exceed the date on which release from incarceration becomes mandatory.

2.   The Board, in its discretion, may schedule a reconsideration date later than the prescribed set-off if one or more aggravating factors are present.  The aggravating factors considered by the Board include but are not limited to the following:

a. There has been repeated failure under any form of community supervision (probation, parole, bail, diversion programs).

b. The instant offense involved ongoing criminal behavior or leadership role in an organized, criminal venture (e.g., an organized drug distribution operation).

c. There is a lengthy history of criminally-related alcohol and/or substance abuse.

d. There is a history of repetitive sophisticated, assaultive, or fraudulent criminal behavior (including the current offense).

e. There is an unusually extensive or serious prior record (at least five felony convictions).

3

f. The instant offense involved unusual cruelty to victim(s) or involved especially vulnerable victims (e.g., children or elderly victims of assaultive or fraudulent behavior).

g. There has been repeated or extremely serious negative institutional behavior.

h. There has been opportunity but little/no effort made toward rehabilitation/preparation for remaining crime-free if returned to the community.

i. The offender poses a serious threat to self or others and adequate resources are not available in the community.

3.    The Board, in its discretion, may schedule a reconsideration hearing date prior to the prescribed set-off if one or more mitigating factors are present.  The mitigating factors considered by the Board include but are not limited to the following:

a. There has been exceptional program achievement.

b. There is a record of exclusively trivial offenses.

c. There has been a substantial crime-free period since the last offense.

d. There has been a substantial previous period in custody on other sentence(s) or the prisoner faces a substantial period of time on additional committed sentences.

e. There has been substantial cooperation with the Government that has not been otherwise rewarded.

f. There has been a change in the availability of community resources leading to better parole prognosis or the prisoner has exceptional community resources available.

g. There is a poor medical prognosis.

h. There have been other changes in circumstances.

i. The offender has put forth maximum effort to participate in assigned programs, but opportunities for programming were not available.

4

**B.    Set-offs When Parole is Revoked**

1. When the Board revokes parole for any offender due to a noncriminal parole violation, or a new misdemeanor charge or conviction, or a new felony charge or conviction, a reconsideration hearing date shall ordinarily be set within the prescribed set-offs unless certain factors support imposition of an alternative set-off. The set-off is based on the nature of the violation(s) (noncriminal parole violation, new misdemeanor charge or conviction, or new felony charge or conviction), and the number of years remaining on the maximum sentence for the offense(s) on which parole was granted, provided the set-off does not exceed the date on which release from incarceration becomes mandatory.

2. The Board, in its discretion, may schedule a reconsideration date later than the prescribed set-off for a violation of parole if one or more aggravating factors are present. The aggravating factors considered by the Board include but are not limited to the following:

   a. There has been repeated failure under parole supervision on this sentence, or a past history of failure under community supervision (probation, parole, bond, diversion programs).

   b. The violation involved ongoing criminal behavior while on parole supervision.

   c. The violation involved unusual cruelty to the victim(s) or involved especially vulnerable victims (e.g., children or elderly victims of assaultive or fraudulent behavior)

   d. The violation involves a history of repetitive sophisticated criminal behavior.

   e. There is an unusually extensive or serious prior record (at least five felony convictions).

   f. The offender poses a serious threat to self or others and adequate resources are not available in the community.

   g. The violation involved serious new felony behavior committed soon after release.

   h. The parolee absconded from supervision for an extended period of time or otherwise frustrated all attempts at meaningful parole supervision.

5

**3.** The Board, in its discretion, may schedule a reconsideration date prior to the prescribed set-off for violation of parole if one or more mitigating factors are present. The mitigating factors considered by the Board include but are not limited to the following:

    **a.** There is ongoing and exceptional program participation and/or achievement in the community.

    **b.** There has been a substantial violation-free period on parole.

    **c.** Community resources leading to a better prognosis are or will be available prior to the end of the prescribed set-off.

    **d.** There is a poor medical prognosis.

    **e.** The prescribed set-off for noncriminal violation, or a new misdemeanor charge or conviction would terminate otherwise consistently stable community adjustment.

## VII. PROCEDURES

### A. Establishing Reconsideration Dates

**1.** Where the Board denies parole and establishes a date for reconsideration that is outside of the prescribed set-offs, each aggravating or mitigating factor applicable to the decision shall be specified in writing.

**2.** Where the Board revokes parole and establishes a date for reconsideration that is outside of the prescribed set-offs, each aggravating or mitigating factor applicable to the decision shall be specified in writing.

Adopted by the D.C. Board of Parole on April 27, 1992.

_____
Erias A. Hyman
Chairman

# Exhibit

# 9

# Memorandum

| Subject | Date |
|---|---|
| Proposed interim rules for D.C. prisoners | June 26, 1998 |

| To | From |
|---|---|
| Michael J. Gaines<br>Chairman<br>U.S. Parole Commission | Michael A. Stover<br>General Counsel<br>U.S. Parole Commission |

Enclosed are (1) the proposed rules for D.C. prisoners published in the Federal Register on April 10, 1998; (2) the public comment in response to the Federal Register publication; and (3) the draft revision of the proposed rules that is presented to the Commission for adoption (as interim rules) effective August 5, 1998. The revised rules cover both issues of procedure and paroling policy guidelines for D.C. prisoners, and feature an improved "Point Assignment Table." A revision to the Salient Factor Score at 28 C.F.R. § 2.20 is also necessary for the SFS to retain its predictive validity for the D.C. offender population. The continuance ranges for rehearings are intended to avoid increasing the total prison time served by D.C. offenders, but the Commission should continue to study (and improve) the data so that a reasonably good prediction can be made. (It may be necessary to publish revisions prior to August 5, 1998, to achieve this purpose.)

## The Public Comment

The public comment can be summarized as follows.

The D.C. Public Defender's Service and the D.C. Prisoners' Legal Services Project argue that the proposed regulations will "increase the measure of punishment" for D.C. offenders, and will therefore violate the ex post facto clause. However, it was also acknowledged that the D.C. Board of Parole does not always follow its own rules. This is the point that defeats the ex post facto argument. Parole guideline changes, especially those that incorporate factors that are used to exceed the guidelines on a discretionary basis, do not offend the ex post facto clause. See, e.g., Warren v. U.S. Parole Commission, 659 F.2d 183 (D.C. Cir. 1981), Inglese v. U.S. Parole Commission, 768 F.2d 932 (7th Cir. 1985), and Yamamoto v. U.S. Parole Commission, 794 F.2d 1294 (8th Cir. 1986).

Other contentions are that the Commission has no authority to administer the Youth Rehabilitation Act (based on the dubious proposition that YRA prisoners are not "imprisoned felons"), that the salient factor score has no demonstrated validity as a predictor of recidivism for D.C. offenders (although the revised version we propose actually predicts quite well for D.C. offenders), that the United States Attorney should not be permitted to object when the Commission proposes to petition the sentencing court for reduction of a D.C. prisoner's minimum sentence, that prisoners should not be required to undergo the "needless formality" of a parole application, and that there should be representatives at parole hearings in D.C. facilities. The comment about representatives is understandable, but it appears that the D.C. Department of Corrections would be hard-pressed to handle the security problems posed by an influx of outside representatives (most of whom would not be licensed attorneys).

Much of the other comment was devoted to pointing out discrepancies between the proposed rules at §§ 2.77 and 2.78, and the Medical and Geriatric Parole statute. (These comments were very helpful, and I have made revisions accordingly.) There was at least some praise for the Commission's proposal to conduct initial parole hearings within 180 days of eligibility. The most surprising comment came from the General Counsel of the Public Defender Service, who objected to the possibility that a crime victim might be allowed to testify at a parole hearing. That victims would be prohibited from testifying seems to me the unacceptable proposition.

There were a few comments from individual prisoners, whose concerns chiefly appear to be to receive the same opportunities as federal prisoners, and not to be subjected to anything required by the Revitalization Act that would make them serve more time in prison. This is a serious point, and we will continue to study the recommended continuance guidelines in § 2.80 in order to ensure that application of the revised D.C. guidelines by the Parole Commission will not produce unanticipated prison overcrowding.

### The Draft Revised Rules

The following revisions are recommended for adoption by the Commission at this meeting. It is also recommended that the Commission put these rules into effect on August 5, 1998, as a set of interim regulations with request for further public comment. The public comment period should extend at least to December 31, 1998, so that the interim rules can be reconsidered next year in the light of the Commission's experience and further public comment.

1.   **Proposed Procedural Revisions**

Section 2.70 **(Authority and functions)** omits the Commission's authority to submit Youth Rehabilitation Act studies to the Superior Court. It appears that this is no longer a statutory requirement, and there is no reason why the Commission should review correctional staff reports on committed youth offenders. (I am grateful to the Offender Supervision Agency's General Counsel for pointing this out.)

2

Section 2.72 **(Hearing procedure)** has a new provision allowing hearing examiners to order the postponement of a parole hearing if the Commission needs to obtain more information. It also specifies that prehearing disclosure will be available only for inmates in BOP institutions. (It cannot be expected that D.C.D.C. staff could be trained to perform this disclosure function.) In addition, the right of a victim to present not only a written statement, but to testify at a hearing (which the D.C. Board of Parole prohibits), is clarified. I have added, however, the 30-day requirement for victims who wish to appear for an office visit, because the Public Defender Service is correct that the same considerations apply to both victims and supporters (i.e., the need to make a proper record in advance of the parole hearing itself.)

Finally, I have added the provision from § 2.13 requiring examiners to provide the inmate with a recommendation at the conclusion of each hearing, except in complex cases. (It appears that security will be adequate for examiners to conform to standard federal practice in this regard.)

Section 2.73 **(Parole criteria)** has been revised to state that, in unusual cases, parole may be denied based upon the seriousness of the offense. Although the case law is sparse on this subject, and the guidelines of the D.C. Board of Parole clearly focus exclusively on the issue of risk, I am convinced that the D.C. Board of Parole occasionally exercises discretion to deny parole based upon an extremely serious offense. There is no question that this is consistent with D.C. Code § 24-204. Adding express authority to consider the seriousness of the offense in extraordinary cases will not change the basic emphasis of the D.C. parole function on determining the degree and type of risk, i.e., whether the prisoner would be "a responsible citizen if he is returned to the community" and whether "release on parole is consistent with the public safety." White v Hyman, 647 A.2d 1175 (D.C. App. 1994).

Section 2.74 **(Decision of the Commission)** has no change.

Section 2.75 **(Reconsideration hearings)** is changed so as to set a prisoner's first continuance from the eligibility date rather than the date of the initial hearing. Although this is a change from the current practice of the D.C. Board of Parole, it would avoid disparity in actual prison time caused solely by delays in conducting the initial hearing. The only drawback is that, in the case of a significantly delayed initial hearing, the time to the first rehearing will be correspondingly shortened. (However, total hearings conducted for each prisoner will not be increased.) A further change to Section 2.75 recognizes the authority of the D.C. Board of Parole to revoke and grant an immediate reparole, so that the U.S. Parole Commission's authority begins only when revocation results in the violator becoming an "imprisoned felon" under the Revitalization Act. The General Counsel for the Offender Supervision Agency agrees with this proposed division of authority.

Section 2.76 **(Reduction in minimum sentence)** has no change. It is important to give the U.S. Attorney's Office the opportunity to object to a petition before it is filed, in order to make sure that no significant new information comes to light after the petition

3

has already been filed with the court. The Commission may, in any event, file the petition notwithstanding an objection from the U.S. Attorney.

Section 2.77 and Section 2.78 **(Medical and geriatric parole)** reflect the public comment concerning the Medical and Geriatric Parole Act. The changes permit prisoners to apply for both types of parole, incorporate the 15-day deadlines for medical parole consideration that are imposed by statute, and repeat the statutory language with regard to cases of terminal illness. Although I think that the statutory requirement for "a reasonable medical judgment that the prisoner is within six months of death" is a very difficult standard to apply, any attempt to explain how this standard should be interpreted merely increases the controversy. The legislative history suggests that the City Council simply intended to establish a very restrictive standard, so the Commission might as well repeat the statutory language in the rule. In regard to comment opposing the strict standard established for cases of "permanently incapacitated" prisoners, I think that a strict standard was intended by the City Council. The law does not explain exactly what a prisoner is supposed to be incapacitated from doing, but the logical assumption is that his physical condition should be severe enough to make him incapable of continuing his criminal career.

Section 2.79 **(Good time forfeiture)** has no change.

Section 2.81 **(Effective date of parole)** has no change.

Section 2.82 **(Release planning)** is changed to refer to the CSOSA "supervision staff," and sets a 30-day deadline for submission of release plan reports for approval by the Commission. The rule gives the CSOSA staff the opportunity to report that release planning efforts were unsatisfactory, or that CSOSA lacks the resources to provide effective supervision to a particular individual. It also is changed to reflect USPC practice with regard to employment plans. (Actual employment is not required but there must be a realistic plan to pursue employment.) The Offender Supervision Agency has agreed to the 30-day deadline and will investigate the plans of both parolees and mandatory releasees.

Section 2.83 **(Release to other jurisdictions)** has been pared down to side step the issue of the Commission's authority to parole federally-housed D.C. Code prisoners to supervision outside the District of Columbia by U.S. Probation Officers. That issue should be resolved in another context.

Section 2.84 **(Conditions of release)** qualifies the prohibition on parolees serving as informants by recognizing that this can be done with the Commission's approval, (i.e., if the law enforcement agency makes the proposal). (The Department of Justice (OPD) took severe exception to the appearance of an outright ban on informant agreements.)

Section 2.85 **(Release on parole)** includes a provision authorizing the Commission to retard a parole effective date by 120 days so as to permit the use of graduated sanctions for behavior that is not serious enough to warrant a parole rescission hearing. "Drug treatment program infractions" is changed to "substance abuse treatment program infractions."

Section 2.86 (**Mandatory release**) is revised to eliminate the 180-day reduction for mandatory release supervision in the case of offenses committed after the passage of the D.C. Good Time Credits Act of 1986. This Act appears to have removed the 180-day provision of 18 U.S.C. § 4164, that formerly applied to D.C. mandatory releasees. (The Offender Supervision Agency's General Counsel pointed this out.)

Section 2.87 (**Reparole**) is a new provision that would place reparole decisions under the federal reparole guidelines at § 2.21, unless the parole violation term is aggregated with a new D.C. Code sentence to which the D.C. parole guidelines at § 2.80 would have to be applied. The result would be that for parole violations that do not result in a new D.C. Code sentence of imprisonment (especially administration violations), the reparole guidelines at § 2.21 would provide the decisionmaking policy that the rules of the D.C. Board of Parole fail to supply. (The D.C. Board's rules specify a schedule for rehearing dates, but do not specify when reparole should be granted.) However, if the parole violation is a serious new crime that has resulted in a new D.C. Code sentence, the guidelines at § 2.80 will have to apply to the single aggregate term that the parole violator will be serving. The two guideline systems cannot be harmonized, and the Revitalization Act requires that the D.C. parole rules be applied to the new sentence in any event.

Section 2.88 (**Confidentiality of records**) has no change.

Section 2.89 (**Miscellaneous provisions**), which incorporates by reference various existing procedural rules of the Commission, adds the rescission procedures at § 2.34 and the FOIA procedures at § 2.56. The rescission guidelines at § 2.36 would not apply. At a rescission hearing, the inmate would have the appropriate number of points added to his Total Point Score under § 2.80, just as if the misconduct had occurred prior to any other hearing. However, because this would yield higher guidelines than § 2.36 requires for less serious infractions, I propose that examiners be given discretion to refer to § 2.36 if the applicable range calls for less prison time. Such a change is included under the continuance ranges in § 2.80.

Section 2.90 (**Prior orders of the D.C. Board of Parole**) is unchanged.

## 2.    The Guidelines at § 2.80

The guidelines at § 2.80 have been revised to meet three goals.

First, the revised Point Assignment Table predicts violent recidivism more accurately than the current D.C. point score or the Federal Register version. However, this requires a revision of the Salient Factor Score at § 2.20 for the guidelines to predict accurately for an important offender group: prisoners who were age 19 or less at the time of the current offense.

Second, the revised Point Assignment Table incorporates most of the factors that the Commission (and the D.C. Board of Parole) have historically relied upon to go outside the guidelines based on "seriousness of the risk." We left out, however, factors that would degrade the predictive power of the score if they were included. (The revised score retains

5

the basic presumption that the more violent the current offense, and the more prior violent offenses there are on the prisoner's criminal record, the more serious the risk. This basic approach was validated by the research results.)

Third, the rehearing continuance ranges at § 2.80(j) have been revised to avoid increasing or decreasing total prison time served by this offender population.

The following discussion summarizes the proposed changes to (A) the Point Assignment Table, (B) the Salient Factor Score, and (C) the rehearing time ranges.

## A.    The Point Assignment Table

The revised point score excludes several traditional "outside the guidelines" factors that turned out not to be predictive. One of these factors was the assumption that "multiple current violent offenses" make the prisoner a more serious risk than if he committed only a single crime of violence. Drug trafficking without a firearm should also be dropped as adding nothing to the prediction already made by the prisoner's Salient Factor Score, but firearm possession by itself should be given an additional point (as compared with the Federal Register version), because it has more predictive power for future violence than was foreseen. Having one or more prior convictions for crimes of violence, even with no violence in the current offense, also turns out to be more predictive than we thought, and this factor is included in the revised score.

The distinction between "high level" and "other violence" in the current offense is retained primarily because it incorporates a traditional reason for departing from the guidelines (frequently used by the D.C. Board of Parole under the heading of "unusual cruelty to victims"), and it is the factor that best assures the public that parole decisions are addressing the true seriousness of each prisoner's individual criminal potential. But retaining this distinction does not make the revised point score appreciably less valid than other possible versions, in terms of predictive power for violent recidivism. (The research confirmed that it is violence in the current offense that is the best predictor of future violence.) The primary effect will be to prevent the Commission from making decisions outside the guidelines based on aggravating current offense factors, when the factor relied upon does <u>not</u> make the prisoner a more serious risk than the guidelines indicate. The valid factors are already included.[1]

However, we could not continue to make a distinction between "high level" and "ordinary violence" in a prisoner's prior record (as the Federal Register version did), and still produce a point score that predicts as well as the best versions we studied. Hence, we have abandoned the attempt to measure "seriousness of the risk" according to the type of violence on a prisoner's prior record. (It is violence of any sort that predicts future violence.) A decision outside the guidelines based on the prior record including one or more

---

[1]We could have proposed a valid score that was based on "any violence," but examiners would be hard-pressed not to recommend departures whenever they saw especially serious crimes.

6

episodes of a high level of violence would occur once more, unless they were really
extreme (e.g., repeated armed rapes and evidence of severe mental illness).

Finally, a two point enhancement for death resulting from a crime of "high level violence" was retained from the Federal Register version, even though the research results did not justify the conclusion that current homicides statistically predict for future homicides[2]. Nonetheless, incorporation of this factor will structure discretion that would otherwise be used in decisions outside the guidelines based on the fact that a victim was done to death. So these offenders will at least get consistent treatment. Adding this enhancement did not undermine the predictive validity of the score.

The result is a ten-point score that is still fairly similar to the eleven point score published in the Federal Register.

## B.    The Salient Factor Score

The research also indicated that the Salient Factor Score needs to be adjusted to reflect the high degree of risk associated with offenders who were 19 years of age or less when they committed the "current offense". Failing to account for this important group of offenders in the basic SFS parole prognosis category would significantly detract from the predictive validity of the Point Assignment Table (which relies upon the Salient Factor Score). It is proposed that Item C be adjusted to become a three-point, instead of a two-point item, so that age nineteen or less "at commencement of current offense" loses three points. To accomplish this, Item F (Heroin/Opiate Dependence) would have to be dropped, because it is the existing predictive item with the least predictive power (and the most difficult to get adequate information to score). The SFS would continue to be a ten-point score and it would give better overall predictive performance.

Another benefit would be that offenders with four prior commitments would be required to forfeit a point, an adjustment that would appropriately penalize repeat parole violators, who presently come in for a deduction of two points only after accumulating five prior commitments. (Each successive revocation of parole is counted as a new conviction under Item A and a new commitment under Item B.) This would counterbalance the SFS improvement that some older prisoners would gain through elimination of Item F. The Commission should not underestimate the difficulty of securing adequate information to score the heroin/opiate item in D.C. cases, and should welcome the opportunity to avoid the apparent disparity between heroin and cocaine/crack cocaine users.[3]

---

[2] In the 1992 sample studied, there were relatively few homicide cases to begin with.

[3] The research has shown that cocaine use does not have the predictive power that heroin/opiate use does, which has been a source of repeated frustration for parole decisionmakers.

**C. The "Time to Rehearing" guideline ranges**

   The guidelines published in the Federal Register also included time ranges, keyed to the prisoner's Base Point Score, to guide discretion in establishing the length of each continuance. Based on these ranges, it can be estimated how long D.C. prisoners, categorized by Base Point Score, will serve in prison before their Total Point Score calls for a grant of parole. (We assume that the average prisoner who is denied parole will earn a one-point deduction at each subsequent rehearing until his Total Point Score is brought down to a 3, indicating that parole should be granted.) As noted above, these time ranges may need further revision to ensure that total prison time for D.C. offenders is not increased. The principal effect should be that violent offenders who are not indicated for parole at eligibility (some 27% of all parole candidates) serve somewhat longer than they now do, whereas offenders who are indicated for parole at eligibility serve somewhat less time, assuming that the Commission will succeed in eliminating unnecessary delays in initial parole hearings). Due to the shortness of time available to our research staff, and difficulties with the coded data that still need to be corrected, it will probably be necessary for the Commission to publish a last-minute revision to the continuance ranges prior to August 5, 1998.

MAS/ame
Enclosures

# Exhibit

# 10

# TRANSCRIPT
# OF PROCEEDINGS

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - - -x
                                    :
MICHAEL COSGROVE, et al.,           :
                                    :
               Plaintiffs,          :
                                    :        Civil Action Number
          v.                        :
                                    :        80-0516 (NHJ)
EDWIN MEESE, et al.,                :
                                    :
               Defendants.          :
- - - - - - - - - - - - - - - - - -x
```

F I L E D

APR 8  1988

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

### DEPOSITION OF GLADYS W. MACK

Washington, D. C.

Friday, March 18, 1988

ACE-FEDERAL REPORTERS, INC.
*Stenotype Reporters*
444 North Capitol Street
Washington, D.C. 20001
(202) 347-3700
**Nationwide Coverage**
**800-336-6646**

34124.0
ree

11

1    A    Yes.

2    Q    Section 204 -- appendices 2-1 and 2-2, does it

3    not?

4    A    That is correct.

5    Q    And if you will check, 2-1 is what you and I just

6    described as identical, or apparently the same document as

7    this appendix A that you are referring to, now Exhibit C for

8    this deposition, isn't it?

9    A    Correct.

10    Q    So that appendix 2-1 and appendix 2-2 are the

11    appendices that you had reference to in your declaration as

12    providing the source of specific aggravating and mitigating

13    circumstances or, excuse me, specific aggravating and

14    mitigating factors that could allow the Board to go outside

15    the guidelines?

16    A    Well, let me examine 2-2 for a moment.

17         Would you ask your question again?

18         MR. POTTENGER:  Why don't you read it back,

19    please.

20         (The reporter read the record as requested.)

21         THE WITNESS:  Yes.

22

34124.0
ree

12

1          BY MR. POTTENGER:

2     Q     Okay.  Thank you.

3          Turning then to Exhibit C, which you have got,

4     where in Exhibit C do you find the specific aggravating and

5     mitigating factors which can be a reason for the D.C. Board

6     of Parole going outside the guidelines?

7     A     The aggravating factors are shown under worse risk

8     and they are set forth there.

9          The mitigating ones are shown under better risk as

10    set forth.

11    Q     Thank you.  And these are worse risk and better

12    risk in this decision worksheet, initial hearings; is that

13    right?

14    A     That is correct.

15    Q     How many factors are there listed under worse

16    risk?

17    A     Six.

18    Q     No more, just six?

19    A     That is how many there are listed on this

20    exhibit.

21    Q     Are there any not listed there that the Board may

22    use to go outside the guidelines?

34124.0
ree

13

1       A    Well, the rule sets forth what the Board may use.

2    So these are the six factors that it may use.

3       Q    Thank you.

4            Would you read those six into the record, please?

5       A    Repeated failure under parole supervision is

6    number 1.

7            "Number 2, current offense involves ongoing

8    criminal behavior.

9            "Number 3, lengthy history of criminally-related

10   alcohol abuse.

11           "Number 4, history of repetitive sophisticated

12   criminal behavior.

13           "Number" 5, unusually extensive or serious prior

14   record (at least five felony convictions)."

15           Number six is unusual cruelty to victims.

16      Q    Okay, now and then there is a place where the

17   person preparing this worksheet is supposed to be specific

18   about which of those and how that relates to the case under

19   review.

20      A    That is right.

21      Q    Of those six factors, isn't it true that the first

22   does not have to do with the seriousness of the current

# Exhibit

# 11

## APPENDIX 2-1

### SALIENT FACTOR SCORE

(Used to determine numerical values for parole eligibility criteria pursuant to §204).

Item A:   PRIOR CONVICTIONS/ADJUDICATIONS (ADULT OR JUVENILE)........☐

      None ................. = 3
      One ................. = 2
      Two or Three ........ = 1
      Four or more ........ = 0

Item B:   PRIOR COMMITMENT(S) OR MORE THAN THIRTY DAYS...............☐
      (ADULT OR JUVENILE)

      None ................. = 2
      One or Two .......... = 1
      Three or more ....... = 0

Item C:   AGE AT CURRENT OFFENSE/PRIOR COMMITMENTS...................☐

  Age at commencement of current offense
      26 years of age or more ............. = 2
      20-25 years of age .................. = 1
      19 years of age or less ............. = 0

  ***Exception:  If five or more prior commitments of more than
    thirty days (adult or juvenile), place an "X" here _____
    and score this item ................... = 0

Item D:   RECENT COMMITMENT-FREE PERIOD (THREE YEARS), ..............☐

    No prior commitment of more than thirty days (adult or
    juvenile) or released to the community from last such
    commitment at least three years prior to the commencement
    of the current offense .............. = 1

    Otherwise .......................... = 0

Item E:   PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS ................☐
    VIOLATOR THIS TIME

    Neither on probation, confinement, or escape status at
    the time of the current offense; nor committed as a
    probation, parole confinement, or escape status violator
    this time .......................... = 1

    Otherwise .......................... = 0

APPENDIX 2-1   (Continued)


Item F:   HEROIN/OPIATE DEPENDENCE ................................. ☐

          No history of heroin/opiate dependence ....... = 1

          Otherwise .................................. = 0


TOTAL SCORE .................................................... ☐


<u>Pre-Incarceration Factors</u>


A.   Salient Factor Score _____ (From SFS Worksheet)
     Risk Group:

     Low        _____ (10-9)      Moderate    _____ (5-4)
     Fair       _____ (8-6)       High        _____ (3-0)


B.   TYPE OF RISK ASSESSMENT:

     1.   <u>Violence:</u>

                                                              Yes      No
          a.   Does the current offense involve a felony in   ___      ___
               which the defendant caused, attempted to cause
               or threatened to cause death or serious bodily
               injury to another individual?

          b.   Does the offender have two or more previous
               convictions for a felony described in (1.a)?   ___      ___

     2.   <u>Weapons:</u>

          a.   Does the current offense involve a felony in
               which the defendant used a dangerous weapon?   ___      ___

          b.   Does the offender have two or more previous
               convictions for a felony described in (2.a)?   ___      ___

     3.   <u>Drug Trafficking:</u>

          a.   Does the current offense involve a felony
               conviction under the D.C. Uniform Controlled
               Substances Act for distribution, or intent to
               distribute, illicit substances?               ___      ___


2-32

APPENDIX 2-1    (Continued)

Drug Trafficking:  (Continued)

> b.  Does the offender have two or more previous
> convictions for significantly similar offenses
> as those described in (3.a) (i.e., convictions
> under this statute or a similar one in another
> jurisdiction)?                                    ___  ___

## Post-Incarceration Factors

A.  INSTITUTIONAL ADJUSTMENT:

Has this offender committed serious disciplinary
infractions (adjudicated under Department of Corrections
due process procedures)?                              ___  ___

B.  INSTITUTIONAL PROGRAM PARTICIPATION:

Has this offender demonstrated sustained achievement in
the area of prison programs, industries, or work
assignments during this period of incarceration?     ___  ___

### POINT ASSIGNMENT GRID
### ADULT OFFENDERS

Instructions:

1.  Circle the appropriate Salient Factor Score category.

2.  Circle any aggravating or mitigating factors for which a finding has
    been made.

3.  Within each applicable cell, circle the number of points to be added
    or subtracted from the baseline point assignment determined by the
    Salient Factor Score Category.

POINT ASSIGNMENT GRID ADULT OFFENDERS (Continued_

|  | DEGREE OF RISK | | | |
|---|---|---|---|---|
|  | Salient Factor Score Category | | | |
|  | Low | Fair | Moderate | High |
|  | +0 | +1 | +2 | +3 |
| TYPE OF RISK | | | | |
| a. Violence | +1 | +1 | +1 | +1 |
| b. Weapons | | | | |
| c. Drug Trafficking | | | | |
| 2. Negative Institutional Behavior | +1 | +1 | +1 | +1 |
| 3. Program Achievement | -1* | -1 | -1 | -1 |

* Applicable only where points have been added for aggravating factor.

TOTAL POINTS: _____

IF POINTS = 0:     Parole shall be granted at initial hearing with low
                   level of supervision required.

IF POINTS = 1:     Parole shall be granted at initial hearing with high
                   level of supervision required.

IF POINTS = 2:     Parole shall be granted at initial hearing with
                   highest level of supervision required.

IF POINTS = 3-5:   Parole shall be denied at initial hearing and
                   rehearing scheduled.

DECISION WORKSHEET:  INITIAL HEARINGS

(1) Minimum Term: _____   (2) Maximum Term: _____
(3) Months in custody at Date of Hearing: _____
(4) Decision:  / /  Parole              Date _____
               / /  Rehearing           Date _____
(5) Decision is Within _____ Below _____ Above _____ Guidelines

Reasons (if outside of the Guidelines):

WORSE RISK:

...Repeated failure under parole supervision;
...Current offense involves on-going criminal behavior;
...Lengthy history of criminally related alcohol abuse;

2-34

# Exhibit

# 12

GOVERNMENT OF THE DISTRICT OF COLUMBIA

B O A R D   O F   P A R O L E

717·14TH STREET N.W. SUITE 300
WASHINGTON D.C. 20005

---

## POLICY GUIDELINE

**SUBJECT:** Definitions of Terms Used in Parole Guidelines

**I.   AUTHORITY:** DCMR Title 28, Section 204 and Appendices 2-1 and 2-2, May 1987

**II.  PURPOSE:** To define criteria and parameters for determining the applicability of descriptive terminology used in the Parole Guidelines for release decisionmaking, and to facilitate consistency in Guideline application.

**III. APPLICABILITY:** All cases requiring Board action in which the Parole Guidelines are applied.

**IV.  REFERENCES:** D.C. Department of Corrections Rules published at 28 DCMR Sections 502 and 503, May 1987 (copy attached); Board of Parole Policy Guideline regarding the establishment of dates for parole reconsideration, adopted on December 16, 1991.

**V.   RATIONALE:**

Many of the descriptive terms used in the Parole Guidelines criteria are judgmental and subjective. As such, they lend themselves to disparate interpretations and applications by Guideline users. To ensure equitable treatment of similarly-situated offenders, these terms require definitions that facilitate equitable application across affected cases, while preserving sufficient discretion to accommodate individual circumstances.

**VI.  POLICY:**

The following definitions shall apply to Parole Guidelines terminology in the release decisionmaking process; however, the weight accorded to any applicable countervailing factor shall be at the discretion of the Board.

A.   POST-INCARCERATION FACTORS:

1.   **Negative Institutional Behavior** consists of repeated major disciplinary infractions as desc that are sanctioned under Department of Corr process procedures.

  a.  In INITIAL PAROLE CONSIDERATION cases, t disciplinary infractions shall ordinarily t as negative institutional behavior:

   (1)  One Class I Offense for murder, m kidnapping, armed robbery or first deg at any time during the minimum senten 28-502.3, May 1987); OR

   (2)  One Class I Offense as defined 502.4 through 502.17 (May 1987) du months preceding the hearing OR dur half of the minimum sentence up to three years, whichever is longer; OR

   (3)  Two Class II Offenses as defined 503.2 through 503.12 (May 1987) du months preceding the hearing OR dur half of the minimum sentence up to three years, whichever is longer.

  b.   In PAROLE RECONSIDERATION cases, t disciplinary infractions occurring <u>since</u> <u>release consideration on the sentence</u> shall considered as negative institutional beha

   (1)  One Class I Offense (see DCMR 28-502.17, May 1987); OR

   (2)   Two Class II Offenses (see through 503.12, May 1987).

  c.   In RESCISSION CONSIDERATION cases, disciplinary infraction shall ordinarily negative institutional behavior:

   (1)  Removal from Work Release for or violations without subsequent reinsta WHERE REMOVAL WAS AT THE EXPRESS F OFFENDER; AND

   (2)  No point for negative institut was assessed in the most recent Pa computation.

2.    **Sustained Program or Work Assignment Achievement** consists of completion of a program or work assignment as described below that shall ordinarily be documented by a certificate, a diploma, a report from an institutional teacher, counselor or work supervisor, OR other documentary evidence.

    **a.**  In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:

        **(1)**     Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area; <u>OR</u>

        **(2)**  Award of a GED where the offender possessed the prerequisite skills for participation in the GED program at the time of incarceration on the sentence; <u>OR</u>

        **(3)**  Successful completion of the requirements and award of an Associate's or Bachelor's degree; <u>OR</u>

        **(4)**  Successful completion of one or more short-term special needs programs, such as drug treatment or psychological counseling, to address the offender's identified problems;

            NOTE:  Completion of the 2-day DAAP program alone does NOT qualify as sustained program achievement.

        <u>OR</u>

        **(5)**  Satisfactory participation in one or more work details for at least one-third of the period of incarceration.

    **b.**  In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence.

B.   **FACTORS COUNTERVAILING A RECOMMENDATION TO DENY PAROLE:**

1.   **Exceptional Program or Work Assignment Achievement** consists of completion of a program or work assignment as described below that shall ordinarily be documented by a certificate, a diploma, a report from an institutional teacher, counselor or work supervisor, OR other documentary evidence.

a.   In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as exceptional program or work assignment achievement during the period of incarceration on the sentence:

(1)   Successful completion of three or more educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area; OR

(2)   Award of a GED where more than six (6) months of study were necessary to meet the requirements, i.e., the offender began academic courses of study without the prerequisite skills for participation in the GED program and successfully completed the coursework necessary to earn a GED while incarcerated; OR

(3)   Award of an Associate's or Bachelor's degree where the offender needed 18 or more credits to fulfill the requirements for the degree; OR

(4)   Participation at a better than satisfactory level in one or more work details as evidenced by three or more promotions or formal increases in levels of responsibility.

b.   In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-B-1(a) of this policy shall ordinarily be considered as exceptional program or work assignment achievement where completion occurred since the preceding consideration for release on the sentence.

2.   **Record of Exclusively Trivial Offenses** consists of misdemeanor offenses, ordinarily excluding offenses involving:

a.   Possession, use, sale, attempted sale, distribution or attempted distribution of narcotics, controlled dangerous substances, or related paraphernalia;

**b.** Possession, use, sale or control of dangerous or deadly weapons;

**c.** Infliction or attempted infliction of bodily injury or harm; or

**d.** Destruction of public or private property.

**3. Substantial Crime-Free Period** is a period of at least five (5) years prior to commission of the instant offense(s) during which the offender was in the community, was not on escape, active parole or probation, and was not committed for more than thirty (30) days on any offense.

**4. Substantial Previous Period in Custody on Other Sentence(s) or Additional Committed Sentences** consists of:

**a.** A continuous period of at least five (5) years in custody on other sentence(s) immediately preceding the date the sentence for the instant offense(s) began; OR

**b.** A continuous period of at least five (5) years to be served on one or more additional sentences to incarceration which are consecutive to the instant sentence.

**5. Substantial Cooperation with the Government that Has Not Been Otherwise Rewarded** consists of documented special or unusual assistance to the Department of Corrections or another governmental agency during the period of incarceration which made an exceptional contribution to the health, welfare or safety of persons or property.

**6. Change in Availability of Community Resources Leading to Better Parole Prognosis** may apply when there is an opening or opportunity for an offender to participate in a program, service or other accommodation in the community that will meet the offender's identified need(s) and lead to reduced risk to the community and/or any other person.  For example, a drug-dependent offender is accepted into an in-patient, residential or other highly structured program of drug treatment or rehabilitation.

**7. Poor Medical Prognosis** may occur when an offender has been diagnosed as terminally ill and/or is sufficiently debilitated that the likelihood of repeated criminal involvement, or risk to the community and/or any other person is minimal.

**8. Other Change in Circumstances** may occur when the capabilities or characteristics of an offender are altered or modified in ways that minimize the likelihood of repeated

criminal involvement, or risk to the community and/or any other person.

C.   **FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE:**

1. **Repeated Failure Under Parole Supervision** consists of two (2) or more revocations of parole on the current sentence, OR three (3) or more revocations of parole on any sentence within the preceding five years.  The term "parole supervision" as used in the Parole Guidelines is inclusive of other forms of conditional release including probation, bail, diversion programs or other community supervision.

2. **Ongoing Criminal Behavior** consists of:

   a.   Poor community adjustment as evidenced by failure to remain free of criminal activity over sustained periods of time; <u>or</u>

   b.   Acting in a leadership role in an organized, criminal venture, such as an organized drug distribution operation; <u>or</u>

   c.   A criminal record where the current conviction is at least the third (3rd) conviction for substantially similar offenses, OR at least the fourth (4th) conviction for dissimilar offenses.

3. **Lengthy History of Criminally-Related Alcohol Abuse** consists of at least five (5) convictions, including the current conviction, for criminal activity committed while under the influence of alcohol.

4. **History of Repetitive Sophisticated Criminal Behavior** consists of three (3) or more convictions, including the current conviction, for:

   a.   Serious crimes involving premeditation or methodical planning; or

   b.   Assaultive or fraudulent criminal behavior.

5. **Unusually Extensive or Serious Prior Record** consists of at least five (5) felony convictions for commission, or attempted commission, of any one or any combination of the following "crimes of violence ... notwithstanding that the offender lacked the capacity to commit the crime by reason of infancy, insanity, intoxication, or otherwise" (D.C. Code 3-401(3)):

   a.   Arson;

**b.** Assault, OR maliciously disfiguring another person, OR mayhem, OR manslaughter, OR murder;

**c.** Forcible sodomy, OR sodomy of a child less than 16 years of age, OR rape;

**d.** Kidnapping;

**e.** Riot;

**f.** Robbery;

**g.** Unlawful use of explosives.

**6. Instant Offense Involved Unusual Cruelty to Victims** may apply where the offense involved:

**a.** Physical, mental or emotional abuse beyond the degree needed to sustain a conviction on the instant offense; OR

**b.** Especially vulnerable victims, e.g., children or elderly persons were the victims of assaultive or fraudulent behavior.

**7. Repeated or Extremely Serious Negative Institutional Behavior** consists of one or more extremely serious disciplinary infractions, or multiple disciplinary infractions as described below that are sanctioned under Department of Corrections due process procedures.

**a.** In INITIAL PAROLE CONSIDERATION CASES, the following offenses shall ordinarily be considered as repeated or extremely serious negative institutional behavior:

**(1)** One or more Class I Offenses for murder, manslaughter, kidnapping, armed robbery, or first degree burglary at any time during the minimum sentence (see DCMR 28-502.3, May 1987); OR

**(2)** Two or more Class I Offenses as defined at DCMR 28-502.4 through 502.17 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; OR

**(3)** One Class I Offense plus two Class II Offenses as defined respectively at DCMR 28-502.4 through 502.17, and 503.2 through 503.12 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; OR

(4) Three or more Class II Offenses as defined at DCMR 28-503.2 through 503.12 (May 1987) during the 12 months preceding the hearing OR during the last half of the minimum sentence up to a period of three years, whichever is longer; OR

(5) Open charge(s) for new crime(s) committed during this sentence; OR

(6) New conviction(s) for crime(s) committed during this sentence.

b.    In PAROLE RECONSIDERATION cases, the following offenses occurring since the preceding release consideration on the sentence shall ordinarily be considered as repeated or extremely serious negative institutional behavior:

(1) One Class I Offense for murder, manslaughter, kidnapping, armed robbery, or first degree burglary (see DCMR 28-502.3, May 1987); OR

(2) Two or more Class I Offenses as defined at DCMR 28-502.4 through 502.17 (May 1987); OR

(3) One Class I Offense plus two Class II Offenses as defined respectively at DCMR 28-502.4 through 502.17, and 503.2 through 503.12 (May 1987); OR

(4) Three or more Class II Offenses as defined at DCMR 28-503.2 through 503.12 (May 1987); OR

(5) Open charge(s) for new crime(s) committed during this sentence; OR

(6) New conviction(s) for crime(s) committed during this sentence.

c.    In RESCISSION CONSIDERATION cases, a recommendation to grant parole may be countervailed for repeated or extremely serious negative institutional behavior where a point for negative institutional behavior was assessed in the most recent Parole Guideline computation.

8.    Lengthy History of Criminally-Related Substance Abuse consists of at least five (5) convictions, including the current conviction, for criminal activity committed:

a.    While under the influence of illegal substances, or illegal use of controlled substances; OR

9

b.  Involving the illegal sale, distribution, purchase or possession of any narcotic drug, controlled dangerous substance or related paraphernalia.

9.  **Absence of Community Resources Which Ensure Safety of the Community** consists of the unavailability of services necessary to support an offender's personal or community adjustment, and to minimize the risk to the community, any other person or the offender, _e.g._, the opportunity is not currently available to participate in an appropriate program to treat the offender's diagnosed emotional, mental or physiological disability or dependency.

Adopted by the Board of Parole on December 16, 1991.

_____
Erias A. Hyman
Chairman

# Exhibit

/3

Page 5

1                    C O N T E N T S

2   EXAMINATION OF ROCKNE CHICKINELL                PAGE

3       By Mr. Mizrahi       7; 55; 103; 107; 163; 208

4       By Mr. Wallach                    141; 223

5

6

7

8

9

10           I N D E X   O F   E X H I B I T S

11   CHICKINELL DEPOSITION EXHIBIT              PAGE

12   No. 1    Westlaw 28 C.F.R. Section 2.73.      23

13   No. 2    Westlaw 28 C.F.R. Section 2.36.      31

14   No. 3    Preliminary Results from 100-Case    63

15           Sample, March 27, 1998.

16   No. 4    Memorandum from Michael A. Stover    78

17           To Jasper R. Clay, Jr.  Subject:

18           Special Procedures for

19           District of Columbia Code

20           Offenders.

21   No. 5    2.80 Guideline Worksheet, Salient   114

22           Factor Score (SFS-98).

Page 6

| 1  | No. 6  | Board of Parole, Chapter 1.        | 119 |
| 2  | No. 7  | Westlaw 28 C.F.R. Section 2.80.    | 156 |
| 3  | No. 8  | Federal Register, Volume 65,       | 174 |
| 4  |        | No. 288, Monday, November 27,      |     |
| 5  |        | 2000, Rules and Regulations.       |     |
| 6  | No. 9  | Rules and Regulations, DOJ,        | 190 |
| 7  |        | Parole Commission, 28 C.F.R. Part  |     |
| 8  |        | 2, Tuesday, July 21, 1998.         |     |
| 9  | No. 10 | Notice of Action, Benson West,     | 220 |
| 10 |        | April 12, 2006.                    |     |

11

12

13

14

15

16

17

18

19

20

21

22

Page 38

1        Q.   And did the statute give the U.S. Parole

2   Commission authority to amend and supplement to,

3   use your words, the D.C. Board of Parole guidelines

4   and regulations perspectively or both perspectively

5   and retroactively?

6             And do you know what I mean by those two

7   terms?

8        A.   I know what you mean by those two term

9   terms.

10       Q.   All right.

11       A.   But those weren't my words, by the way.

12   That's right in the statute.  And there was no

13   indication in the statute.

14            If you look at the explicit terms,

15   there's nothing said about perspective or

16   retrospective application.

17       Q.   And did the U.S. Parole Commission pass

18   regulations that would apply only prospectively?

19       A.   Yes, some did apply prospectively and in

20   the sense that, I think, the dividing line that the

21   Commission selected was the date of the initial

22   hearing that had been given or it was to be given

1    the D.C. offender.

2                For example, the 2.80 guidelines, if a

3    prisoner had already had his initial hearing under

4    a former -- in the former guidelines of the D.C.

5    Board of Parole, the Commission stated in its

6    Federal Register publication that the D.C. Board's

7    guidelines would continue to be applied by the

8    Commission to those offenders.

9                If the initial hearing had yet to have

10   been -- yet to be held, then the guidelines that

11   were promulgated at 2.80 would then apply.

12        Q.    And when you say "initial hearing," you

13   mean an initial hearing by the D.C. Board of

14   Parole.  Right?

15        A.    Well, not necessarily.  Before the

16   Revitalization Act, the Parole Commission also had

17   responsibility over D.C. Code offenders that there

18   were incarcerated by the Federal Bureau of Prisons.

19   And in 1996, assuming we conducted a hearing in

20   1996 or 1997, we would have applied the guidelines

21   of the D.C. Board of Parole at an initial hearing

22   for that offender.

Page 78

1          Q.    Okay.  So you referenced this memorandum

2    that you wrote with Mr. Stover.

3                Why don't me look at that.

4                MR. WALLACH:  Do you need a break soon?

5                THE WITNESS:  Let's just keep going.

6                MR. WALLACH:  Okay.

7                MR. MIZRAHI:  Let's mark this as

8    Exhibit 4.

9                (Chickinell Deposition Exhibit No.  4

10                was marked for Identification.)

11   BY MR. MIZRAHI:

12         Q.    Do you know what this document is?

13         A.    Yes.

14         Q.    What is it?

15         A.    The title is Special Procedures for

16   District of Columbia Code Offenders, and its

17   purpose was to give legal advice to the

18   Commissioners and Staff on implementing Cosgrove.

19         Q.    And you wrote this?

20         A.    I wrote part of it.

21         Q.    Do you know which parts you wrote?

22                Do you remember?

Page 105

1    prepare that part of the memo.

2    BY MR. MIZRAHI:

3         Q.   Well, his name -- is your name not on

4    this entire memo?

5         A.   Yes, it is.

6         Q.   I assume you're familiar with the

7    context -- the contents of the entire memorandum?

8              Can you answer my question?

9              MR. ADEBONOJO:  Nevertheless, that

10   statement, because of the witness' earlier

11   testimony, that statement cannot be attributed to

12   this witness because he said he didn't prepare it,

13   regardless of whether he signed it or not.

14   BY MR. MIZRAHI:

15        Q.   What do you understand what I just read

16   to mean?

17        A.   Well, I understand the third paragraph

18   to instruct Commission staff that they should

19   consult and use the instructions and the policy

20   guidelines when the policy guideline addressed a

21   particular situation counsel.

22             MR. MIZRAHI:  Why don't we take the

Page 117

 1                THE WITNESS:  Page 5 is another

 2     guideline worksheet which assist in the tabulation

 3     of the Base Point Score, which is one of the

 4     components of the D.C. guidelines.

 5                Page 6 is another score sheet regarding

 6     the scoring of Category 2 of the D.C. guidelines.

 7     .          Page seven --

 8     BY MR. MIZRAHI:

 9          Q.    Is it also -- sorry, let's take a step

10     back.

11          A.    Page 7 is --

12                MR. ADEBONOJO:  Let him finish.

13                MR. MIZRAHI:  Oh, sorry.

14     BY MR. MIZRAHI:

15          Q.    Go ahead.

16          A.    Page 7 is another worksheet regarding

17     the scoring, the total at scoring of each category.

18                Page 8 includes the chart for

19     determining the outcome, whether parole should be

20     granted or denied, based on a particular total

21     point score.

22                So this is a worksheet that dealt with

 1    the offender, his period of parole and eligibility.

 2              And then you would add to that any

 3    guidelines determined under the recision guidelines

 4    for disciplinary infractions.  That would be added

 5    to the aggregate.  And then there would be -- if

 6    superior program achievement were found, then there

 7    would be a subtraction of that award from the

 8    aggregate guideline range.  And what you would end

 9    up with would be a total guideline range specifying

10    a number of months to be served before release.

11         Q.   How are those months calculated, those

12    month ranges, let's say in the Base Point Score

13    guideline range.

14         A.   They're calculated according to the Base

15    Point Score.  I'm sorry, I don't understand --

16         Q.   Let me --

17         A.   -- your question.

18         Q.   -- let me rephrase that question.

19              How did the U.S. Parole Commission

20    determine that for a Base Point Score of four, for

21    example, the Base Point Score guideline range will

22    be 12 to 18 months, or how did it determine that

1  enough for him to be able to give you a meaningful

2  answer.

3           THE WITNESS:  Well, like I said before,

4  in the first place, I don't think that I would see

5  a case where parole had been granted to a murderer

6  because he wouldn't be complaining about the

7  decision.  I can only foresee that occurring in a

8  case where he had been granted parole by us and

9  then came back as a parole violator.  I simply

10 don't remember.

11 BY MR. MIZRAHI:

12      Q.  When the Commission made the changes in

13 '98 from the D.C. Board of Parole guidelines and

14 passed 2.80, or drafted 2.80, did it analyze

15 whether the changes made to the D.C. Board of

16 Parole guidelines would increase the risk that D.C.

17 inmates would serve longer, the D.C. Code offenders

18 would serve longer than under the D.C. guidelines?

19           MR. ADEBONOJO:  Objection.

20           THE WITNESS:  You're talking about the

21 rule change made in 1998?

22 BY MR. MIZRAHI:

Page 185

 1          Q.    Yeah.   Let's start there.

 2          A.    Yeah.   I think there was an intent of

 3    the Commission to try to ensure that prison time

 4    wasn't substantially increased for D.C. Code

 5    offenders.  And I think that intent is expressed in

 6    the Federal Register publication itself.

 7          Q.    What do you mean by "substantially

 8    increased"?

 9          A.    I don't know.  I'd fix a number to it.

10          Q.    But, I mean, do you think they were

11    not -- that the U.S. Parole Commission in

12    promulgating 2.80 in '98 was not worried about

13    increasing D.C. Board of Parole -- D.C. Code

14    offenders' sentences, only?

15          A.    No.  I think that --

16          MR. ADEBONOJO:  Objection to the form of

17    the question.

18    BY MR. MIZRAHI:

19          Q.    You can answer.

20          A.    I think there was a concern on the part

21    of the Commission, and I don't know whether the

22    word is unreasonably or is -- I think there was a

Page 186

```
 1    concern by the Commission not to increase prison

 2    time for D.C. Code offenders.

 3            Now I don't know if it's possible to

 4    ensure an exact equivalency between time served

 5    under the 2.80 guidelines and time served under the

 6    Board's guidelines.  I don't know that it's

 7    possible to accomplish that.

 8            All I'm saying is that I think the

 9    Commission was concerned about that and set the

10    rehearing ranges with that concern in mind.

11        Q.    Under the D.C. Board of Parole

12    guidelines, if a D.C. Code offender was setoff for

13    a specific period of time, is there a presumption

14    at his rehearing assuming he had no disciplinary

15    infractions and good programming, that he would be

16    paroled at that rehearing?

17            MR. ADEBONOJO:  Objection.

18            THE WITNESS:  For just parole release

19    decisions?

20    BY MR. MIZRAHI:

21        Q.    What do you mean parole --

22        A.    Before they were revoked or they came up
```

Page 187

1    for revocation.  I mean, just that they're

2    sentenced to a prison term and they served that

3    term of incarceration, and they're being considered

4    for parole the first time.

5         Q.   And they are given a setoff because,

6    let's say, under the grid score they have a three

7    to five.  So the Appendix 2.1, the D.C. Guidelines

8    say that parole should be denied at the initial

9    hearing.

10        A.   I don't -- I don't know the answer to

11   that.

12        Q.   Under the Commission guidelines, when

13   they're up -- when D.C. Code -- under 2.80, the

14   Commission guidelines, 2.80, when an inmate -- when

15   a D.C. Code offender is denied parole at a hearing

16   and granted a rehearing, is it presumed that after

17   the rehearing range, at the rehearing, that the

18   D.C. Code offender would be granted parole?

19        A.   At the three-year reconsideration

20   hearing?

21        Q.   Or is it always a three-year

22   reconsideration?

1              It's not necessarily --

2              MR. ADEBONOJO:  Objection.

3              Which question are you --

4              MR. MIZRAHI:  Sorry.

5              MR. ADEBONOJO:  -- asking?

6              MR. MIZRAHI:  Let's take a step back.

7   BY MR. MIZRAHI:

8        Q.   It's not always a three-year

9   reconsideration range, is it?

10       A.   No.  The choice between setting a

11  presumptive parole date within three years or

12  setting the person off for a three-year

13  reconsideration hearing.  It's unlimited

14  circumstances and it's -- I can't give you the

15  criteria off the top of my head.

16            For certain murder cases, a continuance

17  to a hearing in five years is permitted, and that

18  exception is specified right in the regulation, but

19  those are the three options that are available to

20  the decision-maker.

21       Q.   Well, let's go back to this.

22            You were saying that when the U.S.

```
 1    Parole Commission was promulgating the 2.80

 2    guidelines in 1998, that they did have a concern,

 3    that the U.S. Parole Commission did have a

 4    concern -- was concerned about potentially

 5    lengthening D.C. Code offenders' sentences.  They

 6    would be longer under the 2.80 guidelines as

 7    opposed to under the D.C. guidelines.

 8              What's your basis for that knowledge?

 9              How do you know they had -- that the

10    U.S. Parole Commission had --

11         A.   I read it in the Federal Register.

12         Q.   Which Federal Register?

13         A.   The July 1998 Federal Register.

14              Do you have a copy of that here?

15         Q.   I do have a copy of it.

16              Did you discuss that with anybody before

17    we get to that?

18         A.   No.

19         Q.   So it's only from what you read?

20         A.   Yes.

21         Q.   Why don't we look at that.

22              MR. MIZRAHI:  Number 9?
```

14

# Exhibit

14

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x

TONY R. SELLMON, ET AL.,          :

       Plaintiffs,          : Docket No.

    Vs.          : Civil Action No.

EDWARD F. REILLY, JR. ET AL., :

       Defendants.          :

- - - - - - - - - - - - - - - x



Deposition of STEPHEN HUSK

Washington, D.C.

November 20, 2007

1:15 p.m.

Page 2

1              Deposition of STEPHEN HUSK, held at the

2    offices of:

3

4              Dickstein Shapiro LLP

5              1825 Eye Street, N.W.

6              Washington, D.C. 20006

7              (202)420-2668

8              (202)420-2201

9              wallachj@dicksteinshapiro.com

10

11

12

13              Pursuant to agreement, before

14    Tristan-Joseph, Registered Professional Reporter and

15    Notary Public of the District of Columbia.

16

17

18

19

20

21

22

                                                     Page 3
 1                    A P P E A R A N C E S

 2

 3        ON BEHALF OF THE PLAINTIFFS TONY R. SELLMON,

 4        Et al.:

 5              JASON D. WALLACH, ESQ.

 6              Dickstein Shapiro LLP

 7              1825 Eye Street, N.W.

 8              Washington, D.C. 20006

 9              (202)420-2668

10              (202)420-2201

11              wallachj@dicksteinshapiro.com

12

13

14        ON BEHALF OF THE DEFENDANTS EDWARD F.

15        REILLY, JR., et al.

16              KENNETH ADEBONOJO, ESQ.

17              Assistant United States Attorney

18              555 Fourth Street, N.W.

19              Washington, D.C. 20530

20              (202)514-7157

21              Kenneth.Adebonojo@usdoj.gov

22

Page 5

1                        C O N T E N T S

2        EXAMINATION OF STEPHEN HUSK                    PAGE

3              By Mr. Wallach                  8; 86; 175; 215

4              By Mr. Adebonojo                        - -

5

6                I N D E X    O F    E X H I B I T S

7        HUSK DEPOSITION EXHIBIT                        PAGE

8        No. 1        Notice of Deposition of the United      22

9                     States Parole Commission.

10       No. 2        Defendant's Answer to Plaintiffs'        86

11                    First Set Of Interrogatories.

12       No. 3        Notice of Action for Carlton Martin    104

13                    Register No. 11400-007, DCDEC No:

14                    248-984, Lee County USP,

15                    February 13, 2003.

16       No. 4        Westlaw 28 C.F.R. § 2.73:  Parole       120

17                    Suitability Criteria.

18       No. 5        Westlaw 28 C.F.R. § 2.80:               120

19                    Guidelines For D.C. Code Offenders.

20

21

22

Husk, Stephen - Vol. I                                    November 20, 2007
                        Washington, DC

                                                              Page 6

1    I N D E X   O F   E X H I B I T S

2    HUSK DEPOSITION EXHIBIT                              PAGE

3    No. 6      Appendix 2-1, Salient Factor Score.    146

4    No. 7      D.C. Initial Prehearing Assessment     147

5               Presumptive Date Format, Carlton

6               Martin, Jr. 11400-007.

7    No. 8      Memorandum dated February 4, 2003,     175

8               From Shelley L. Witenstein to All

9               Commissioners U.S. Parole

10              Commission.  Subject:  Carlton

11              Martin, Jr. 11400-007.

12   No. 9      Memorandum dated August 21, 1992,      177

13              From Michael A. Stover and Rockne

14              Chickinell to Jasper R. Clay, Jr.

15              Action Chairman, U.S. Parole

16              Commission.  Subject:  Special

17              Procedures for District of Columbia

18              Code Offenders.

19

20

21

22

```
 1              I N D E X   O F   E X H I B I T S

 2      HUSK DEPOSITION EXHIBIT                      PAGE

 3      No. 10     Westlaw 63 FR 39172-01,            192

 4                 1998 WL 403222.  Rules and

 5                 Regulations Department of Justice

 6                 Parole Commission 28 C.F.R. Part 2,

 7                 Paroling, Recommitting

 8                 Tuesday July 21, 1998.

 9      No. 11     Notice of Action of Carlton Martin, 199

10                 Register No. 11400-007, DCDC No.

11                 248-984, Lee County USP, April 12,

12                 2006.

13      No. 12     Hearing Summary of Carlton Martin,  215

14                 Reg No:  11400-007.

15      No. 13     Notice of Action of Tony Sellmon,   223

16                 Register No. 11630-007,

17                 DCDC No. 250-180, Lee County USP,

18                 April 11, 2005.

19      No. 14     Hearing Summary of Tony Sellmon,    229

20                 6/22/04.

21

22
```

Page 47

1    that was less than what the Parole Commission was

2    applying.  For instance, 1 in 200-level incident,

3    whereas the Parole Commission was using two

4    200-level incidents to require the point.

5         Q.   Does the Parole Commission apply --

6              MR. ADEBONOJO:  Sorry, just one minute.

7              (Whereupon, Mr. Adebonojo briefly

8    confers with Mr. Thiessen.)

9    BY MR. WALLACH:

10        Q.   Does the Commission apply any time

11   cut-off for disciplinary infractions, meaning

12   disciplinary infractions over than three years

13   we're not going to look at?

14        A.   In terms of applying its guideline

15   currently, no.  There's no -- there's no time

16   cut-off in terms of the actual guideline.  It

17   doesn't necessarily mean that the decision may

18   not -- may be impacted by, you know, the age of the

19   incident reports, but the actual guidelines, none.

20        Q.   And when the Parole Commission applies

21   the D.C. Board of Parole guidelines, does it apply

22   any time cut-off when determining whether negative

```
 1    wide range of types of cases and that the training

 2    be given sort of on a one-on-one basis.

 3         Q.   Let's switch topics now.

 4         A.   Okay.

 5         Q.   Of what significance to the Parole

 6    Commission is that an inmate is a D.C. Offender?

 7              MR. ADEBONOJO:  Objection.

 8              If you understand the question.

 9              THE WITNESS:  Yeah, I know what -- could

10    you explain what "significance" of being.

11    BY MR. WALLACH:

12         Q.   Does the Commission apply different

13    guidelines to D.C. Code Offenders than it does to

14    Federal U.S. Code Offenders?

15         A.   Yes, it does.

16         Q.   Okay.  And what guidelines did the U.S.

17    Parole Commission apply to D.C. Code Offenders?

18         A.   It applies the Parole Commission's

19    guidelines that we referenced before at

20    28 C.F.R. 2.80.

21         Q.   Okay.  And if a D.C. Code Offender had

22    an initial hearing before August 5, 1998, it
```

Husk, Stephen - Vol. I                                    November 20, 2007
                        Washington, DC

Page 61

1    applies to the D.C. Board of Parole guidelines; is

2    that correct?

3          A.    That is correct.

4          Q.    Is a copy of the D.C. Board of Parole

5    guidelines contained in the Policy and Procedures

6    Manual?

7          A.    No, no, it's not.

8          Q.    Is a copy in the Federal Regulations?

9          A.    Not that I'm aware of.

10         Q.    Is a copy of the D.C. Board of Parole

11   Guidelines in any publication of the U.S. Parole

12   Commission?

13         A.    Not something that the Parole Commission

14   published.  We have them available at the

15   Commission office but it's not in anything that the

16   Parole Commission actually published, no.

17         Q.    Why did the Parole Commission decide to

18   adopt different guidelines for D.C. Code Offenders

19   who had an initial hearing after August 5, 1998,

20   than the ones they applied to the D.C. Code

21   Offenders who had an initial hearing before

22   August 5, 1998?

Page 91

1    degree needed to sustain a conviction" apparently

2    are defined in D.C. parole statute, but the other

3    terms listed in interrogatory, The Commission has

4    no criteria, specific criteria that it applies to

5    determine whether or not those phrases apply; is

6    that correct?

7         MR. ADEBONOJO:  Objection to the form of

8    the question.

9    BY MR. WALLACH:

10        Q.   Well, for example, Interrogatory No. 6,

11   the first term is "unusual circumstances."

12        Do you know of any criteria that the

13   Parole Commission has that explains what -- how to

14   determine whether the circumstances are unusual?

15        A.   The Commission, in my experience, use

16   each case individually.  So there's no -- if you're

17   asking is there a definition for "unusual," I don't

18   know that the Commission uses anything to guide

19   that but --

20        Q.   So are you saying every case is unusual

21   because none of them are unusual?

22        A.   No.  But in terms of defining whether

Husk, Stephen - Vol. I                          November 20, 2007
                        Washington, DC

                                                      Page 92

1    something is unusual is made on a case-specific

2    matter.  It's not made -- it's not -- there's no

3    definition for what is unusual.

4         Q.   Okay.  What about "offense

5    accountability"?

6         A.   Uh . . .

7         Q.   What do you understand "offense

8    accountability" to mean?

9         A.   Whether the person is being held

10   accountability for the severity of their crime.

11        Q.   Okay.  And so if an inmate has served

12   sufficient time for offense accountability you

13   understand that to mean that he has served

14   sufficient time to be held accountable for the

15   crime?

16        A.   That would be -- that would be one thing

17   that was looked at, I mean.

18        Q.   Okay.  Yeah, we spoke about unusual

19   cruelty to victims.

20        A.   Mm-hmm.

21        Q.   And I believe -- a Parole Commission

22   doesn't have specific criteria that explains what

Page 132

1   temper or this is something that actually did a lot

2   of thought, did a lot of planning, was an ongoing

3   type criminal activity, and that would warrant the

4   departure that you're more serious because the

5   violent or other types of crimes were sophisticated

6   and ongoing.

7        Q.   Right.  Is it fair to say that absent

8   unusual circumstances you're presumed suitable for

9   parole once you've served the minimum of the total

10  guideline range?

11            MR. ADEBONOJO:  Objection.

12            Where?  Under what?  280?

13  BY MR. WALLACH:

14       Q.   There's no guideline range under

15  anything else except 220.

16            And I assume you're not applying 220 to

17  D.C. Code Offenders.

18       A.   If we're defining unusual circumstances

19  as case-specific factors that are not fully taken

20  into account by the guidelines, the answer to that

21  question is yes.

22

1          Q.    And only an unusual circumstances would

2     a D.C. Code Offender serve more than the minimum of

3     the total guideline range; is that correct?

4                Defining unusual circumstances as it is

5     defined in Section n of 2.80.

6          A.    As defined in Section n (1) of 2.80,

7     yes.

8          Q.    And can we agree that, absent unusual

9     circumstances, as that term is defined in Section N

10    of Section 2.80 of C.F.R., the USPC lacks

11    discretion to deny parole if an offender has served

12    the minimum of the total guideline range?

13         A.    Lacks discretion to denial parole?

14         Q.    Correct.

15         A.    Well, excuse me.  Can you state that

16    question, again, so I can --

17                MR. ADEBONOJO:  Or we'll have it read

18    back.

19                MR. THIESSEN:  I'm not sure the witness

20    is clear.

21                Your question was more than the minimum,

22    not the total guideline range?

Page 141

 1          MR. ADEBONOJO:  Objection.

 2          That was not his testimony.

 3          MR. WALLACH:  I didn't say it was.  I'm

 4   asking, Is that correct?

 5          MR. ADEBONOJO:  He already answered that

 6   question, and that's not how he answered it.

 7          MR. WALLACH:  No, he didn't.

 8   BY MR. WALLACH:

 9      Q.   Go ahead and answer it.

10      A.   If the Commissioners believe that

11   there's case-specific factors, again, that

12   distinguish a case, then that's their decision to

13   find that it's an exceptional case.

14      Q.   All right.  Let's go back to Husk

15   Exhibit No. 3.

16      A.   Is that the order?

17          MR. ADEBONOJO:  The Notice of Action?

18          MR. WALLACH:  Yeah.

19          MR. ADEBONOJO:  Yeah.

20   BY MR. WALLACH:

21      Q.   Husk Exhibit 3.

22          All right.  What action did the U.S.

Page 187

1    minimum of the total guideline range.  Right?

2         A.   Right, he -- the guideline would

3    indicate he served beyond eligibility.

4         Q.   Okay.

5              (Discussion held off the record.)

6    BY MR. WALLACH:

7         Q.   Can we agree that under the Board of

8    Parole Guidelines, the Board of Parole expressly

9    took into account the likelihood of recidivism and

10   the likelihood that the recidivism will include a

11   violent offense?

12        A.   I know that's hard for me to agree.  I

13   mean, I -- we -- I know the factors that they

14   applied for it, but I can't necessarily say that

15   they've taken into consideration that the

16   likelihood that the recidivism will include a

17   violent offense.  I don't really get that.

18        Q.   Does the U.S. Parole Commission contend

19   that that 28 C.F.R. Section 2.80 expressly takes

20   into account the likelihood of recidivism and the

21   likelihood hat the recidivism will include a

22   violence offense?

Page 213

1    indication of what it does in another case --

2              MR. ADEBONOJO:  Objection.

3    BY MR. WALLACH:

4         Q.    -- because it always has discretion?

5         A.    Well, the Commission has discretion.  It

6    should treat generally similarly-situated offenders

7    the same except that, you know, it's really hard

8    to -- each parole application is judged individual

9    and it's really hard to make generalizations about

10   what its policy, based upon a type of offense, a

11   background.  As I said, each application is judged

12   individually.

13        Q.    So can you -- can we agree that it's not

14   unusual for someone convicted of murder to have a

15   prior weapons charge?

16             MR. ADEBONOJO:  Objection.

17   BY MR. WALLACH:

18        Q.    Is that -- can we agree on that?

19        A.    I don't --

20        Q.    Not whether it qualifies as an unusual

21   circumstance as defined as a case-specific factor

22   that is not factored in the guidelines.

Page 214

1              Just meaning, in your -- in your

2    experience, do people convicted of murder sometimes

3    have prior weapons offenses?

4         A.   Yes.

5         Q.   Do they often have prior weapons

6    offenses?

7              MR. ADEBONOJO:  Objection.

8              THE WITNESS:  It's hard for me to

9    qualify often.  I mean --

10   BY MR. WALLACH:

11        Q.   Fifty percent of the time at least?

12        A.   Let me just say it wouldn't be unusual.

13   It wouldn't be necessarily out of the ordinary.

14        Q.   Okay.  You were involved in this parole

15   decision, weren't you?

16        A.   It appears from, yeah, the signature,

17   yeah.

18        Q.   Okay.  And in this parole on Exhibit

19   Husk 11, the hearing examiner actually recommended

20   parole; did he -- did he not?

21        A.   Yes.

22        Q.   Okay.  Did you talk to Mr. Haworth, who

Page 228

1    guideline range is warranted because you brutally

2    beat the female victim with a gun causing massive

3    head trauma.  The victim died as a result of the

4    injury he inflicted.  While you have programmed

5    well, you continue to claim that you were the

6    victim of a robbery or an attempted robbery is not

7    supported by the evidence.

8          Q.    Were those -- strike that.

9                Is it unusual for there to be a massive

10   head trauma in -- strike that.

11               Isn't there a massive head trauma when

12   someone shoots someone in the head?

13               MR. ADEBONOJO:  Objection.

14               THE WITNESS:  I'm not a medical expert,

15   but I would guess yes.

16   BY MR. WALLACH:

17         Q.    Okay.  So is that an unusual

18   circumstance?

19         A.    It -- well, for someone that dies of a

20   head injury, no.

21         Q.    Okay.  And then it says, While you have

22   programmed well, you continue to claim that you